IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| STEVEN BRICE WIBRACHT | § | CASE NO. 17-52300-RBK |
| AND ERIN MICHELLE WIBRACHT, | § | CHAPTER 7 |
| | § | |
| DEBTORS. | § | |
| | § | |
| | § | |
| TRAVELERS CASUALTY AND SURETY | § | |
| COMPANY OF AMERICA, PLAINTIFF | § | |
| | § | |
| v. | § | ADVERSARY PROCEEDING |
| | § | NO. _____ |
| STEVEN BRICE WIBRACHT | § | |
| AND ERIN MICHELLE WIBRACHT, | § | |
| DEFENDANTS. | § | |

COMPLAINT OBJECTING TO DISCHARGE
OF STEVEN BRICE WIBRACHT AND ERIN MICHELLE WIBRACHT

**TO THE HONORABLE RONALD B. KING**

**CHIEF UNITED STATES BANKRUPTCY JUDGE:**

Creditor Travelers Casualty and Surety Company of America ("Travelers" or "Plaintiff") files this adversary proceeding against Debtors Steven Brice Wibracht and Erin Michelle Wibracht (the "Debtors" or "Defendants"), and represents and alleges as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157, and 11 U.S.C. § 727.

2. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

3. Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a).

4. The deadline for filing a complaint objecting to the Debtors' discharge is

{00343658}

April 4, 2018.  This Complaint is timely.

## PARTIES

5.      Plaintiff, Travelers, is a secured creditor of the Debtors' estate (*see* POC 18), who brings this action pursuant to 11 U.S.C. § 727(c)(1).

6.      Defendants, Steven Brice Wibracht and Erin Michelle Wibracht, are individuals who jointly filed a voluntary petition on September 30, 2017, commencing a case under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas (the "Court"), initiating Case No. 17-52300-RBK (the "Bankruptcy Case").  Service of process may be made by first class U.S. mail, postage prepaid, pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7004(b), on the Defendants at their home address, 536 E. Borgfeld Drive, San Antonio, Texas 78260.

## BACKGROUND FACTS

### A.      The Defendants' Petition, Schedules, and SOFA

7.      On September 30, 2017 (the "Petition Date"), the Defendants filed a Voluntary Petition (the "Petition") for relief under Chapter 7 of the Bankruptcy Code initiating the Bankruptcy Case.  (*See* DE 1.)

8.      The Defendants signed the Petition declaring under penalty of perjury that the information provided in the Petition was true and correct.  (*See id.*)

9.      In addition to the Petition, on the Petition Date, the Defendants filed their Schedules and Statement of Financial Affairs ("SOFA") in the Bankruptcy Case.  (*See id.*)

10.      The Defendants signed the SOFA affirming that they "have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that answers are true and correct."  (*See id.*)

11.     In conjunction with their Schedules, the Defendants signed the Declaration About an Individual Debtor's Schedules affirming that "[u]nder penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct." (*See id.*)

12.     The Defendants testified under oath at a meeting of creditors on November 2, 2017 (the "First Meeting of Creditors").  Defendants testified at the First Meeting of Creditors that they had signed the Petition, Schedules, and SOFA, and that they had read all the information in those documents before they signed them.   (First Meeting of Creditors Transcript 4:16-5:8.)   A true and correct copy of the relevant portions of the First Meeting of Creditors Transcript is attached hereto and incorporated herein as <u>Exhibit "1"</u>.

13.     The Defendants further testified that all the information in the Petition, Schedules, and SOFA was true and correct to the best of their knowledge and belief as of the Petition Date. (*See id.* at 5:9-13.)   The Defendants also testified that since the Petition Date they had not thought of any changes that needed to be made to the Schedules or the SOFA, that the Schedules list all of the Defendants' assets and creditors.  (*See id.* at 5:14-6:2.)

14.     On November 10, 2017, after the First Meeting of Creditors, the Defendants filed amended Schedules amending Schedules A/B, C, and D (the "First Amended Schedule"), and SOFA (the "First Amended SOFA").  (*See* DE 16.)

15.     In conjunction with their First Amended Schedules, the Defendants signed the Declaration About an Individual Debtor's Schedules affirming that "[u]nder penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct."  (*See id.*)  The Defendants also signed the First Amended SOFA affirming that they "have read the answers on this *Statement of Financial Affairs* and any attachments, and I

declare under penalty of perjury that answers are true and correct." (*See id.*)

16.    Steven Wibracht testified under oath at a continued meeting of creditors on December 11, 2017 (the "Second Meeting of Creditors"). (*See* Second Meeting of Creditors Transcript 5:13-6:9.) A true and correct copy of the relevant portions of the Exh 2, is attached hereto and incorporated herein as Exhibit "2".

17.    On March 14, 2018, the Defendants filed their Amended Schedules A/B and C (the "Second Amended Schedules"). (*See* DE 84.)

18.    In conjunction with their Second Amended Schedules, the Defendants signed the Declaration About an Individual Debtor's Schedules affirming that "[u]nder penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct." (*See id.*)

19.    On February 22, 2018, Steven Wibracht testified under oath at an examination under Federal Rule of Bankruptcy Procedure 2004 noticed by the United States Trustee.

**I.    THE WIBRACHTS' RELATIONSHIP WITH CORE LOGISTICS**

20.    Prior to and during the year before the Petition Date, Steven was a 50% owner of Core Logistics Services, LLC d/b/a Core Constructors ("Core Logistics") which is a company that performs excavation and site work on construction projects. (*See* February 22, 2018, Rule 2004 Examination Transcript, 13:12-21.) A true and correct copy of the relevant portions of the 2004 Examination Transcript is attached hereto and incorporated herein as Exhibit "3". Steven has produced scant information about Core Logistics. He testified at his First Meeting of Creditors that he did not know Core Logistics' gross income for 2015, 2016, or during the period of his ownership in 2017. (*See* Exh 1 18:11-19:25.) Despite his lack of knowledge about basic information regarding Core, Steven testified that "I was Core. I was the majority owner of Core. … Core was my life. Core is – me and Core were no different." (*See* Exh 2, 76:13-19.)

21.     On April 1, 2016, Steven listed his 50% ownership value in Core to be worth $350,000 on a personal financial statement provided to Compass Bank.  (*See* 1st Tr. 36:11-37:4.) Later, in October 2016, Steven listed his 50% ownership in Core to be worth $1,000,000 on a personal financial statement signed under penalty of perjury to the U.S. Small Business Association (the "SBA").  (*See* Exh 3, 40:15-41:1.)

22.     Steven testified that he received "nothing" in exchange for relinquishing his ownership interest in Core Logistics to Glen Boltinghouse in March 2017.  (*See* Exh 1 17:19-23.) Later he testified that he received $20.  (*See* Exh 2, 8:15-19.)  At another time, Steven testified that Mr. Boltinghouse agreed to "indemnify" Steven for debts of Core that Steven was obligated to pay.  (*See* Exh 2, 58:20-24.)  However, Steven testified that he made no investigation or inquiry as to Mr. Boltinghouse's wherewithal to indemnify Steven.  (*See* Exh 2, 60:7-12.)

23.     As such, Steven has removed, destroyed and mutilated his ownership interest in Core Logistics within the year prior the Petition Date; failed to produce or preserve documents from which the financial condition and business transactions of Core might be ascertained without justification; knowingly or fraudulently made false oaths regarding Core Logistics; and failed to satisfactorily explain the loss of the value of his interest in Core Logistics or deficiency of assets to meet liabilities. More specifically, Travelers avers as follows:

A.     **The Ownership Structure of Core Logistics**

24.     In 2013, Steven Wibracht acquired an ownership interest in Core Logistics in 2013 as part of buy-out package from his prior employment with Federal Management Solutions. (*See* Exh 3, 11:22-12:20.)

25.     Steven along with three other people, his brother, Michael Wibracht, Glen Boltinghouse, and Raymond Jenkins, each acquired a twenty-five percent (25%) interest in Core Logistics.  (*See* Exh 3, 12:19-20, 15:15-17.)

26.     Shortly thereafter, Steven purchased Raymond Jenkins's twenty-five (25%) ownership interest for $15,000 or $20,000.  (*See* Exh 3, 12:21-13:11.)

27.     As a result, Steven held a fifty percent (50%) ownership interest in Core Logistics and Michael Wibracht and Glen Boltinghouse each only had a twenty-five percent (25%) interest.  (*See* Exh 3, 13:2-5.)

**B.     Core Logistics' Operations and Interest in Wishing Star Ranch, LLC**

28.     Core Logistics performed site work on construction projects as a subcontractor to various general contractors.  (*See* Exh 3, 13:12-21.)

29.     As part of its operations, Core Logistics owned significant amounts of equipment. Steven testified under oath that in March 2017, Core Logistics owned equipment with approximately $750,000 in equity.  (*See* Exh 1 63:13-25.)

30.     However, upon information and belief, some of the equipment owned by Core Logistics may have been titled in Steven Wibracht's name.

31.     During Steven's time as an owner of Core Logistics, Steven "managed the finances, managed the operations and try to – you know, business development."  (*See* Exh 3, 15:10-15.)

32.     In addition to performing site work, Steven testified that Core Logistics was also a fifty-percent owner of Wishing Star Ranch, LLC.  (*See* Exh 1 30:7-12.)

33.     Steven further testified that Wishing Star Ranch, LLC owned approximately 107 acres in real property.  (*See* Exh 1 31:205.)

**C.     The Sale of Steven's Ownership Interest in Core Logistics**

34.     In March 2017, Steven sold his fifty percent (50%) ownership interest to Glen Boltinghouse for $20.  (*See* Exh 3, 42:16.)

35.     Less than a year prior to selling his ownership interest to Glen Boltinghouse, Steven Wibracht prepared a financial statement in April 2016 for Compass Bank.  (*See* Exh 1 6:11-16.)

36.     Steven signed the financial statement under penalty of perjury and valued his fifty percent (50%) ownership interest in Core Logistics at $350,000.  (*See* Exh 1 37:2-4.)

37.     Six months later, and just five months before he sold his ownership interest to Glen Boltinghouse, Steven prepared a personal financial statement to submit to the SBA.  (*See* Exh 3, 40:15-41:1.)  Steven signed the personal financial statement under the penalty of perjury.

38.     In the personal financial statement, Steven valued his fifty-percent (50%) ownership interest at $1,000,000.  (*See id.*)

39.     When asked to elaborate on how he reached the $1,000,000, Steven testified that it was nothing "scientific", but was based on a "cash flow statement" that he either refuses to produce or does not have.  (*See* Exh 3, 41:1-7; 42:23-43:3.)

40.     However, on or about March 16, 2017, Steven Wibracht sold his 50% interest in Core Logistics to Glen Boltinghouse for $20.00.

41.     When asked to elaborate about the sale of his membership interest to Boltinghouse, Steven testified several times under oath that he received "nothing" and that he "didn't get anything in return" for the transfer.  (*See* Exh 1 17:19-22; Exh 2, 7:18-8:19.)

42.     Steven later testified that Mr. Boltinghouse agreed to "indemnify" Steven for debts of Core that Steven was obligated to pay.  (*See* Exh 2, 58:20-24.)  However, Steven testified that he made no investigation or inquiry as to Mr. Boltinghouse's wherewithal to indemnify Steven.  (*See* Exh 2, 60:7-12.)

43.     Steven once again contradicts himself and testified that "Mr. Boltinghouse doesn't personally owe me anything."  (*See* Exh 2, 61:13-16.)

**D.      Failure to Preserve the Assets of Core Logistics and Thereby the Value of Wibracht's Ownership Interest Therein**

44.     In addition to selling his membership interest to Botlinghouse for "nothing" just six months before he filed his Bankruptcy Case, Steven failed to preserve the assets of – and thus the value of his membership interest in – Core Logistics.

45.     In April or May of 2017, Wishing Star Ranch, LLC sold the 107 acres.   (*See* Exh 1 31:1-5.)

46.     Upon information and belief, the sale proceeds, after paying the mortgage on the 107 acres, was approximately $93,659.18.

47.     Steven testified that Core Logistics' portion of the sale proceeds was to go to pay down a $35,000 line of credit with Texas Capital Bank, which was guaranteed by Steven, Mr. Boltinghouse, and Steven's brother Michael Wibracht.  (*See* Exh 2, 89:1-90:25.)

48.     Upon information and belief, however, the sale proceeds were not paid to Texas Capital Bank, but were deposited into the bank accounts of 210 Development Group, LLC ("210 DG").

49.     210 DG is a development company owned, in part, by Steven's brother, Michael Wibracht.

50.     Despite stating under oath several times that he has no ownership interest in 210 DG, Steven, nonetheless, has full access and control over 210 DG's bank accounts, including the bank account where the sale proceeds from Wishing Star Ranch real property sale were deposited.

## II.  THE WIBRACHTS' FAILURE TO BE FORTHRIGHT AND REFRAIN FROM MAKING FALSE OATHS.

51.    As more fully set forth below, the Wibrachts have failed to accurately disclose their assets and the disposition of such assets, including without limitation, failure to disclose income, an ownership interest in at least one limited liability company, ownership and disposition of a certificate of deposit and treasury bonds, jewelry, guns and weaponry, clothing, a life insurance policy, and equipment. The Wibrachts have made these false statements knowingly and fraudulently with intent to deceive creditors or reckless disregard for the truth.

52.    On a few occasions, the Wibrachts have amended their disclosures to the Court, but only after being caught by Travelers or the U.S. Trustee in a prior false oath.  Because the Wibrachts amended their schedules only after their falsity was revealed, these actions also show that the Wibrachts possessed the requisite intent to support the denial of discharge.

### A.    The Wibrachts' Failure to Accurately Report and Disclose Income

53.    In response to Question No. 4 on the Defendants' SOFA, First Amended SOFA, and Second Amended SOFA, the Defendants list their combined income as follows:

|  | Debtor 1 (Steven Wibracht) | Debtor 2 (Erin Wibracht) |
|---|---|---|
| January 1 of the current year until the date you filed for bankruptcy: | $65,742.42 | $9,414.40 |
| For the last calendar year: (January 1 to December 31, 2016) | $200,000.00 | $20,000.00 |
| For the calendar year before that: (January 1 to December 31, 2015) | $143,400.00 | $45,911.00 |

(*See* DE 1, 16, 84.)

#### (i)    *Statements Under Oath About the Source and Amount of the Wibrachts' Income*

54.    Erin Wibracht testified that her only source of income prior to filing the Petition was from her work as a teacher, or from insurance for having a baby.  (*See* Exh 1 51:4-11, 52:16-24.)

55.     Steven Wibracht testified under oath that during 2015 his only source of income was from Core Logistics.  (*See* Exh 1 53:1-6.)

56.     Steven Wibracht also testified that his income from Core Logistics in 2015 was $100,000.  (*See* Exh 1 23:14-18.)

57.     Steven further testified that his only source of income derived from employment or from the operation a business in 2016, and the beginning of 2017 was Core Logistics, and that his sole source of income thereafter from employment or from the operation of a business in 2017 was from Brown Excavation and Utilities ("Brown Excavation").  (*See* Exh 1 50:11-25, 53:7-15.)

58.     Steven Wibracht also testified that his income from Core Logistics in 2016 was $150,000.  (*See* Exh 1 23:6-13.)

59.     Steven Wibracht further testified that his income from Core Logistics in 2017 before he left Core Logistics, was $10,000 to $15,000.  (*See* Exh 1 23:23-24:2.)

60.     Steven was specifically asked whether "there [are] any other sources of income derived from your employment or from operating a business for … this period" to which he responded "No." (*See* Exh 1 53:7-15.)

61.     Steven further testified that his current salary with Brown Excavation that commenced when he left Core Logistics is $100,000 a year, paid weekly, with no insurance, pension or bonuses.  (*See* Exh 1 61:4-16.)

62.     Thereafter, Steven testified that the only additional sources of income pre-petition were from:

      (a)    the sale of his 2006 Ferrari F430 in April or May of 2017 for $80,000, for which he did not have appraised or otherwise valued before selling (*see* Exh 1 54:1-21);

(b)     the trade-in of a 2015 Chevy 2500 and a 2013 Ford F-350 for a single Ford F-250 (*see* Exh 1 55:4-13);

(c)     the sale of three Rolex watches for $17,000 to Diamond & Jewelry Exchange in the summer of 2017, for which he did not have appraised (*see* Exh 1 57:4-25); and

(d)     guns sold from February 2017 to summer to 2017 for $23,386.02, which were not appraised prior to their sale (*see* Exh 1 58:23-60:2.)

### *(ii)     Undisclosed Payments from Brown Excavation*

63.     On February 22, 2016, Steven received a check from Brown Excavation for $45,000.  (*See* Exh 2, 21:12-17.)  The income was not reported on any of the SOFAs filed by the Defendants.  It also contradicts Steven's prior sworn testimony that he only received income from operating Core Logistics in 2016.

64.     Steven testified that he received the $45,000 check from Brown Excavation as a "commission" for selling a utility job to Brown Excavation.  (*See* Exh 2, 21:8-22:3.)  Steven later testified the job included site and utilities work for the project.  (*See* Exh 3, 29:15-16.)

65.     Steven testified that at the time he "sold" Brown Excavation the job and received the $45,000 commission check he was working for Core.  (*See* Exh 2, 22:4-5.)

66.     Steven further testified that the utility job was for subcontract work on a condo projected being developed by 210 DG, Steven's brother's, Michael's, entity.  (*See* Exh 2, 30:17-31:4.)

67.     Steven further testified that Brown Excavation never paid him any other commissions.  (*See* Exh 2, 22:6-8.)

68.     In June 2016, Brown Excavation wrote a check for $37,000 to Steven Wibracht, which was deposited into his Bank of America account.  (*See* Exh 3, 48:11-18.)  The income was not reported on any of the SOFAs filed by the Defendants.  It also contradicts Steven's prior sworn testimony that he only received income from operating Core Logistics in 2016.

69. Steven could not remember why Brown Excavation paid him $37,000. (*See id.*)

70. Upon information and belief, Brown Excavation also wrote a check to Steven Wibracht dated May 12, 2016, for $3,500. The income was not reported on any of the SOFAs filed by the Defendants. It also contradicts Steven's prior sworn testimony that he only received income from operations of a business from Core Logistics in 2016.

71. Steven received the $45,000 check, the $37,000 check, and the $3,500 check from Brown Excavation in 2016, but Steven testified under oath that his only source of income in 2016 was from Core Logistics. (*See* Exh 1 50:11-25.)

72. Steven received two additional checks from Brown Excavation in 2017. The first check was dated June 12, 2017, for $8,000, and the second check was dated August 25, 2017, for $10,000. The income was not reported on any of the SOFAs filed by the Defendants.

73. Steven testified that these funds were loans for the Defendants to pay their bankruptcy counsel. (*See id.* at 50:22-51:19.)

74. Steven then admitted that the $18,000 "loaned" from Brown Excavation was not specifically listed on his Schedule F. (*See id.* at 55:10-12.)

75. The Defendants did not disclose any of these additional payments from Brown Excavation in their Schedules, First Amended Schedules, their Second Amended Schedules, their SOFA, their First Amended SOFA, or the Second Amended SOFA as income.

### *(iii)* *Payments from 210 DG*

76. During the First Meeting of Creditors, Steven was asked if he ever received any money or payments from 210 Developers, to which he responded "No." (*See* 1st 341 Tr. 46:2-4.)

77. Upon information and belief, from January 1, 2015 to the Petition Date, Steven received at least $1,300 from 210 DG, including but not limited to the following amounts:

| 1/30/2015 | $150.00 |
|-----------|---------|
| 3/30/2015 | $150.00 |
| 5/6/2015 | $150.00 |
| 8/14/2015 | $300.00 |
| 6/30/2016 | $300.00 |
| 9/9/2016 | $250.00 |

78.     Steven, however, testified that in 2015 and 2016, he only received income from Core Logistics.  (*See* Exh 1 50:11-25, 53:1-6.)

79.     The Defendants also did not disclose this additional income on their Schedules, First Amended Schedules, Second Amended Schedules, SOFA, First Amended SOFA, or Second Amended SOFA.

*(iv)     Undisclosed Non-Payroll Payments from Core Logistics*

80.     In addition to his payroll payments from Core Logistics, Steven received at least $540,000 from Core Logistics from January 1, 2015 through March 2017, which he failed to disclose.

81.     The additional payments from Core Logistics were paid by check made out to Steven, or to "Cash", which Steven would then sign.

82.     When asked about the additional payments from Core Logistics, Steven testified under oath that the payments were to repay loans he made to Core Logistics, or to reimburse him for charges made on his personal American Express account -41004 for the benefit of Core Logistics.   (*See* Exh 1 23:6-24:1, 50:20-23, 53:15, 58:18-21, 92:5-13, 94:1-10; Exh 2, 9:5-10:1, 11:4, 14:1, 64:8-68:5, 99:25-100:11.)

83.     More specifically, Steven was asked about a check written by Core Logistics to Steven Wibracht in March 2016 for $42,000. (*See* Exh 2, 9:5-10:1.)

84.     Steven testified that the purpose of the check was "[t]o pay an American Express bill." (*See id.*)

85.     However, when pressed, Steven Wibracht changed his testimony and stated that the check was to repay a loan. (*See id.* at 9:17-21, 11:20-24.)

86.     Steven further testified under oath that he would use his personal American Express account -41004 because Core Logistics' American Express account -11005 had an $80,000 credit limit. (*See* Exh 2, 99:25-100:11.)

87.     From September 2015 through March 2017, Steven Wibracht paid at least $423,898.76 to his personal American Express account -41004, of which at least $250,000 was for personal expenses.

88.     From September 2015 through March 2017, Steven also used his Core Logistics American Express account -11005, of which at least $91,000 was for personal expenses.

89.     The Defendants did not disclose this additional income on their Schedules, First Amended Schedules, Second Amended Schedules, SOFA, First Amended SOFA, or Second Amended SOFA.

*(v)     Tax Refunds*

90.     Upon information and belief, the Defendants received at least $47,081.11 in federal tax refunds from January 1, 2015 to the Petition Date, including but not limited to the following refunds:

| 2/23/2015 | Federal Tax Refund | $3.11 |
| 11/6/2015 | Federal Tax Refund | $ 13,554.00 |
| 2/11/2016 | Federal Tax Refund | $ 5,708.00 |
| 2/11/2016 | Federal Tax Refund | $ 27,816.00 |

91.    During this time, the Defendants testified that their only source of income was from Core Logistics and Erin Wibracht's employment as a teacher.  (*See* Exh 1 50:11-25, 51:4-11, 52:16-24, 53:1-6.)

92.    The Defendants also did not disclose this additional income on their Schedules, First Amended Schedules, Second Amended Schedules, SOFA, First Amended SOFA, or Second Amended SOFA.

### *(vi)     Certificate of Deposit and Other Financial Accounts*

93.    Question 17 of Schedules A/B asks the Defendants to disclose all deposits of money, including among others, checking, savings, or other financial accounts, and certificates of deposit.  In response, the Defendants identified four bank accounts: a checking and a savings account at Security Service Federal Credit Union and a checking a savings account at Bank of America.  (*See* DE 1, 16, 84.)

94.    Similarly, Question 20 of the SOFA asks the Defendants to identify any financial accounts or instruments, including among others, checking, savings, or other financial accounts, and certificates of deposit that the Defendants closed, sold, moved or transferred within one (1) year prior to the Petition Date.  In response, the Defendants identified a single account with Texas Capital Bank that was closed.  (*See id.*)

95.    Further, at the Second Meeting of Creditors, Steven was asked if the Defendants had any other bank accounts, to which Steven responded "No."  (*See* Exh 2, 51:12-17.)

96.    Upon information and belief, the Defendants failed to disclose at least four (4) financial accounts or instruments in their Schedules, First Amended Schedules, Second Amended Schedules, SOFA, First Amended SOFA, and Second Amended SOFA, including, but not limited to: (i) a savings account ending in -02000 at Security Service Federal Credit Union in

Steven Wibracht's name; (ii) a savings account ending in -1100 at Security Service Federal Credit Union in Erin Wibracht's name; (iii) a youth savings account ending in -82000 at Security Service Federal Credit Union in the Defendants' names and their minor child's name; and (iv) a Future Builder certificate of deposit account ending in -1080 at Security Service Federal Credit Union held in Erin Wibracht's name.

97.    Upon information and belief, on September 20, 2017, the day the Defendants filed their Bankruptcy Case, Erin Wibracht closed the Future Builder certificate of deposit accounting ending in -1080 at Security Service Federal Credit Union.

### *(vii)    Treasury Bonds*

98.    Question 19 of Schedules A/B asks the Defendants to disclose all government and corporate bonds and other negotiable and non-negotiable instruments.   In response, the Defendants identified a single Bank of America trading account.  (*See* DE 1, 16, 84.)

99.    Plaintiff is informed and believes thereon alleges that the Defendants failed to disclose at least seven (7) Series I United States Treasury Bonds which were issued on or about March 3, 2011 to Steven B. Wibracht.

100.    Plaintiff is informed and believes thereon alleges that Erin Wibracht redeemed the seven (7) Series I post-Petition on December 14, 2017.

### *(viii)    Potential Other Non-Disclosed Sources of Income*

101.    On November 2, 2017, Steven Wibracht testified that a relationship with "the branch of Bank of America" where he would take checks and the branch would give him "counter credit" for them so that the funds would be available immediately.  (*See* Exh 1 92:15-18.)

102.    As such, Plaintiff alleges that Defendants received additional income from various sources that have not yet been identified or disclosed.

B.     **False Statements Regarding the Wibrachts' Personalty**

      *(i)     Allegations Regarding Purchases and Transfers of Weaponry*

103.     In the two years prior to the Petition Date, Steven Wibracht used his personal American Express account -41004 and his Core Logistics American Express account -11005 to purchase approximately $75,000 in guns, ammunition, and other weaponry.

104.     On his Schedules, First Amended Schedules, and Second Amended Schedules, Steven Wibracht states that he only owns $7,795 in guns, ammunition, and other weaponry. (*See* DE 1, 16, 84.)

105.     Under oath, Steven testified that he purchased the weaponry on the American Express cards for Core Logistics.  (*See* Exh 3, 82:15-83:25.)  Core Logistics would then give the guns as gifts to employees and clients, such as subcontractors.  (*See* Exh 3, 84:1-85:25.)

106.     In addition, under oath, Steven testified that he sold several guns in the months prior to the Petition Date.  Steven testified that in June of 2017, he sold two firearms to Jerry and Georgina Hewtty for $11,900.  (*See* Exh 1 14:4-9.)

107.     The sale of the two firearms to the Hewttys was not listed in the Debtors' original Schedules.  (*See* DE 1.)

      *(ii)     Allegations Regarding Jewelry*

108.     Question 12 of Schedules A/B requires the Defendants to list and value their jewelry, which includes "[e]veryday jewelry, costume, jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver."

109.     Initially, in response, the Defendants responded "yes" that they have such personal property, describing it as "[j]ewelry engagement ring, earnings, watch, 2 watches and misc. jewelry wedding rings," and valued it at $12,240.  (*See* DE 1, 16.)

110.    On January 10, 2018, Travelers filed an *Objection* to the Defendants' exemptions, which the Chapter 7 Trustee joined.  (*See* DE 60, 61.)

111.    On February 20, 2018, the Court held a hearing on the objection to the Defendants' exemptions and ordered the Defendants to file Amended Schedules A/B and C by March 14, 2018.

112.    On March 14, 2018, the Defendants filed their Second Amended Schedules.  (*See* DE 84.)

113.    In the Second Amended Schedules, the Defendants decreased the value of their jewelry to $9,300.  (*See* DE 84.)  The Defendants identified the following pieces of jewelry:

| | |
|---|---|
| Breitling men's watch 18k gold/stainless model CB0140 | $2,200.00 |
| Breitling men's watch, 18 k rose gold/stainless model 1 B0100 | $2,500.00 |
| 14K white gold engagement ring with approx. 1.1 ct. princess cut diamond | $2,800.00 |
| 14K white gold wedding band with approx. .5 ctw princess cut diamonds | $250.00 |
| 14K whie [sic] gold earings [sic] with approx. 1.35 ctw princess cut diamonds | $800.00 |
| Men's gold wedding band | $250.00 |
| Misc. costume jewelry consisting of rings, necklases [sic], earnings [sic], etc. (nothing of any significant value | $500.00 |

(*See* DE 84.)

114.    Plaintiff is informed and believes thereon alleges that the Defendants' share a personal American Express account ending in -41004.

115.    Plaintiff is informed and believes thereon alleges that Defendant Erin Wibracht has a personal American Express account ending in -62006.

116.    Plaintiff is informed and believes thereon alleges that Steven Wibracht has an American Express account ending in -11005, which was set-up as a Core Logistics account.

117.    In the two years prior to the Petition Date, the Defendants used their American Express cards to purchase at least $17,000 on jewelry, including the following purchases:

| 9/30/2016 | Diamond and Jewelry Gallery | $10,000.00 | -41004 |
| 11/12/2015 | Moretti's | $5,412.50 | -41004 |
| 5/7/2016 | Tiffany's & Co. | $216.50 | -41004 |
| 6/19/2016 | Tiffany's & Co. | $272.79 | -41004 |
| 12/8/2016 | MontBlanc San Antonio | $1,001.50 | -11005 |
| 12/23/15 | Kendra Scott Design | $422.18 | -62006 |
| 4/25/16 | Kendra Scott Design | $368.05 | -62006 |
| 5/4/2016 | Kendra Scott Design | $346.40 | -62006 |
| 9/14/2016 | Kendra Scott Design | $254.38 | -62006 |
| 12/14/2016 | Kendra Scott Design | $133.20 | -62006 |

118.    Plaintiff is informed and believes thereon alleges that Defendants failed to disclose and value their personal property responsive to Question 12 of Schedules A/B.

*(iii)    Allegations Regarding Clothing*

119.    Question 11 of Schedules A/B requires the Defendants to list and value their clothing, which includes "[e]veryday clothing, furs, leather coats, designer wear, shoes, accessories."  In response, the Defendants respond "yes" that they have such personal property, describing it as "clothing," and valuing it at only $1,000.  (*See* DE 1, 16, 84.)

120.    Plaintiff is informed and believes thereon alleges that the Defendants' share a personal American Express account ending in -41004.

121.    Plaintiff is informed and believes thereon alleges that Defendant Erin Wibracht has a personal American Express account ending in -62006.

122.     Plaintiff is informed and believes thereon alleges that Steven Wibracht has an American Express account ending in -11005, which was set-up as a Core Logistics account.

123.     In the two years prior to the Petition Date, the Defendants used their American Express cards to purchase at least $29,400 in high-end apparel and accessories, including but not limited to custom-made suits, Tory Burch handbags and accessories, and Vera Bradley accessories.

124.     In addition, in the two years prior to the Petition Date, the Defendants also used their American Express cards to purchase clothing from non-high-end stores and Western Apparel in excess of $10,000.

125.     Furthermore, Defendants made numerous purchases at clothing stores with their debit cards, including but not limited to Nordstrom and Saks Fifth Avenue.

126.     Plaintiff is informed and believes thereon alleges that Defendants failed to disclose and value their personal property responsive to Question 11 of Schedules A/B.

*(iv)* ***Allegations Regarding Statements About Household Goods***

127.     Question 6 of Schedules A/B requires the Defendants to list and value their household goods and furnishings, which includes "[m]ajor appliances, furniture, linens, china, kitchenware."  In response, the Defendants respond "yes" that they have such personal property, describe it as "[h]ousehold goods, supplies and furnishings," and value it at only $4,500.  (*See* DE 1, 16, 84.)

128.     Plaintiff is informed and believes thereon alleges that the Defendants' share a personal American Express account ending in -41004.

129.     Plaintiff is informed and believes thereon alleges that Defendant Erin Wibracht has a personal American Express account ending in -62006.

130.    Plaintiff is informed and believes thereon alleges that Steven Wibracht has an American Express account ending in -11005, which was set-up as a Core Logistics account.

131.    In the two years prior to the Petition Date, the Defendants used their American Express cards to purchase at least $10,000 on household goods and home décor items.

132.    Plaintiff is informed and believes thereon alleges that Defendants failed to disclose and value their personal property responsive to Question 8 of Schedules A/B.

*(v)    Allegations Regarding Undisclosed Life Insurance Policies*

133.    Question 31 of Schedule A/B requires the Defendants to disclose their interest in insurance policies.  In the Schedules filed on September 30, 2017, the Defendants did not list any insurance policies.  (*See* DE 1.)

134.    On November 2, 2017, the Defendants were once again asked about if they have an interest in any life insurance policies.  (*See* Exh 1 37:17-24.)  When pressed, Steven Wibracht responded that he knew he had an interest in a State Farm life insurance policy for $100,000.  (*See id.*)

135.    Thereafter, the Defendants filed the Amended Schedules on November 10, 2017, listing the State Farm life insurance policy for $150,000.  (*See* DE 16.)

136.    Upon information and belief, Erin Wibracht had a life insurance policy with Prudential for $2 million.  Erin Wibracht failed to provide information regarding the status of said policy.

**C.    <u>False Statements Regarding the Polaris</u>**

137.    Question 18 of the SOFA asks whether the Defendants sold, traded, or otherwise transferred any property to anyone, other than property in the ordinary course of the Defendants' business, within the two year prior to their Bankruptcy Case.  Defendants responded that in 2017 they transferred a 2016 Polaris and trailer that they owned that was worth approximately $18,000

to satisfy company debts of Core Logistics to Brown Excavation. (*See* DE 1, 16, 84.) Defendants further state that the Polaris was titled in the Steven's name. (*See id.*)

138. On November 2, 2017, Defendant Steven Wibracht testified that he transferred a Polaris titled in his name to Brown Excavation sometime in December 2016/January 2017. (*See* Exh 1 60:3-22.)

139. Brown Excavation did not pay any money to Steven Wibracht for the Polaris. (*See id.*) Steven Wibracht testified that he transferred a Polaris that he personally owned to Brown Excavation for "Core Constructors owed Brown Excavation approximately $27,000. And in the middle -- And while I was still with Core, in trying to benefit Core, make Core work for forgiveness of that -- that loan to – I mean, the money from Brown – the receiv – the receivable to Brown, which is payable to Core, we swapped the Polaris for that payable." (*See id.* 60:7-13.)

140. Steven has not produced any paperwork to document the transaction.

**D.    False Statements Regarding Mahindra Trailer**

141. Question 40 of Schedules A/B asks the Defendants to disclose any machinery, fixtures, equipment, supplies that the Defendants use in their business and tools of their trade. In response, on their Schedules, the Defendants stated that they did not own any such property.

142. On November 2, 2017, Defendant Steven Wibracht testified that he had a Mahindra tractor titled in his name. (*See* Exh 1 80:17-23, 81:16-18.)

143. Then, on November 10, 2017, the Defendants amended their Schedule A/B to list a "Mahindra Tractor with loader attachment and box shredder." (*See* DE 16.)

144. Thereafter, on December 11, 2017, Defendant Steven Wibracht testified that the Mahindra tractor was titled in Core Logistics' name. (*See* Exh 2, 56:10-16.)

145.    The statements on November 2, 2017 and December 11, 2017, and the Defendants' First Amended Schedule A/B cannot all be accurate.

**E.      False Statements Regarding Sale of 2015 Jeep Wrangler**

146.    Question 3 of Schedules A/B requires the Defendants to disclose all cars, vans, trucks, tractors, sport utility vehicles, and motorcycles that they own, lease or have an legal or equitable interest.  In response, Defendants list a 2015 Jeep Wrangler that that they claim they sold to Steven Wibracht's brother in 2016, but it is still titled in Steven's name.  (*See* DE 1, 16, 84.)

147.    On November 2, 2017, Defendant Steven Wibracht testified that he sold the 2015 Jeep Wrangler to 210 DG in 2016.  (*See* Exh 1 12:13-21; 71:10-23.)

148.    On November 15, 2017, Steven Wibracht filed a reaffirmation agreement seeking to reaffirm his obligations to Santander Consumer USA, Inc. for the 2015 Jeep Wrangler.  (*See* DE 19.)  The reaffirmation agreement was approved on February 20, 2018.  (*See* DE 20.)

149.    On December 11, 2017, Defendant Steven Wibracht then testified that Core Logistics sold the 2015 Jeep Wrangler to 210 DG, but that the Jeep is still titled in Steven's name.  (*See* Exh 2, 49:2-21.)

150.    Plaintiff is informed and believes thereon alleges that the bill of sale for the 2015 Jeep Wrangler shows that Core Logistics sold the 2015 Jeep Wrangler to 210 DG.

151.    Defendant Steven Wibracht's testimony and statements under oath regarding who owns the 2015 Jeep Wrangler, who sold the 2015 Jeep Wrangler, and who purchased the 2015 Jeep Wrangler are inconsistent and are also inconsistent with documentation produced by Steven Wibracht in the course of the Bankruptcy Case.

F.    **Allegations Regarding Undisclosed and Undocumented 1966 Chevy Pickup Transactions**

152.    Question 18 of the SOFA asks whether the Defendants sold, traded, or otherwise transferred any property to anyone, other than property in the ordinary course of the Defendants' business, within the two year prior to their Bankruptcy Case.  In the Defendants' SOFA, they did not disclose the transfer of a 1966 Chevy Pickup.  (*See* DE 1.)

153.    On November 2, 2017, the Defendants were asked about their ownership interest in the 1966 Chevy Pickup.  (*See* Exh 1 85:26-87:27.)

154.    Steven Wibracht testified that he purchased the 1966 Chevy, which he fixed-up, and then he "gave" it to someone working for Brown Excavation.  (*See id.* at 85:26-87:25.)

155.    Thereafter, on November 10, 2017, the Defendants amended their SOFA to disclose the transfer of the 1966 Chevy.  (*See* DE 16.)

156.    On December 11, 2017, Steven testified further about the transfer of the 1966 Chevy.  He testified that he "traded" the 1966 Chevy to Brown Excavation in exchange for Brown Excavation allegedly agreeing to pay Core Logistics an additional $25,000 on a project that Core Logistics was working on for Brown Excavation.  (*See* Exh 2, 15:8-15.)

157.    Steven then testified that he "traded" the 1966 Chevy because "[he] needed the money," but then that "[Core Logistics] needed the money."  (*See id.* at 15:18-16:21.)

158.    Steven thereafter testified that he traded the 1966 Chevy because Robert Brown "wanted the truck. He came by my shop.  He had to have it."  (*See id.* at 73:13-16.)

159.    Steven, however, testified that he has no paperwork for this "trade."  (*See id.* at 72:20-25.)

G.    **Allegations Regarding Undisclosed and Undocumented Jeep Rubicon Transactions**

160.    Question 18 of the SOFA asks whether the Defendants sold, traded, or otherwise transferred any property to anyone, other than property in the ordinary course of the Defendants' business, within the two year prior to their Bankruptcy Case.  In the Defendants' SOFA, they did not disclose multiple transactions with Robert Brown in November 2016 and February 2017 involving a Jeep Rubicon.  (*See* DE 1.)

161.    On November 2, 2017, the Defendants were asked about a check written to Robert Brown in November 2016 for $35,000.  (*See* Exh 1 96:2-96:15.)

162.    Defendant Steven Wibracht testified that the check was for his personal purchase of a Jeep Rubicon from Robert Brown for $35,000.  (*See id.* at 96:13-23.)  Defendant Steven Wibracht further testified that he "gave him [Robert Brown] a check for $35,000.  He [Robert Brown] cashed the check.  I [Steven Wibracht] drove the Jeep home."  (*See id.* at 97:3-5.)

163.    Defendant Steven Wibracht also testified that "then [he] needed the money back," so he gave the Jeep Rubicon back to Robert Brown.  (*See id.* at 96:24-25.)  The Defendants, however, then testified that they "sold" the Jeep Rubicon back to Robert Brown because Core Logistics could not pay Brown Excavation approximately $30,000 that Core Logistics allegedly owed Brown Excavation.  (*See id.* at 97:7-18.)

164.    Only after the Defendants were questioned about the $35,000 check at the First Meeting of Creditors – which Steven Wibracht paid Robert Brown ***less than a year prior*** to the Petition Date – did the Defendants subsequently amend their SOFA to disclose the transaction with Robert Brown regarding the Jeep Rubicon.  (*See* DE 16.)

{00343658}                                    25

165.    On December 11, 2017, Defendant Steven Wibracht testified that as a result of the reconveyance of the Jeep Rubicon (originally purchased for $35,000) to satisfy a Core Logistics debt of $30,000 owed to Brown Excavation, Brown Excavation gave Core Logistics a "credit memo" for only $28,000.  (*See* Exh 2, 77:10-15.)  When asked if he had a copy of any of paperwork for this transaction, Steven Wibracht testified that he did not.  (*See id.*)

166.    Defendant Steven Wibracht further testified about the basis for the alleged Core Logistics debt owed to Brown Excavation.  (*See id.* at 80:20-81:19.)  Defendant Steven Wibracht testified that the alleged debt arose from Core Logistics renting generators from Brown Excavation for an apartment project Core Logistics was working on for 210 DG.  (*See id.*)

167.    Steven had previously testified that he had no relationship with 210 DG.  (*See* Exh 1 12:25-13:2.)

168.    However, Steven Wibracht is authorized to sign on 210 DG's bank accounts.

169.    In addition, at the Second Meeting of Creditors, Steven testified that Core Logistics worked on at least one project for 210 DG.  (*See* Exh 2, 31:12-24, 34:21-25.)

170.    Further, Steven Wibracht received money from 210 DG.

171.    In addition, 210 DG paid for the 2015 Jeep Wrangler that Steven Wibracht transferred to his brother, Michael Wibracht.

### H.    Allegations Regarding Undisclosed 2005 Ford

172.    Question 18 of the SOFA asks whether the Defendants sold, traded, or otherwise transferred any property to anyone, other than property in the ordinary course of the Defendants' business, within the two year prior to their Bankruptcy Case.  In the Defendants' SOFA, the Defendants did not initially disclose the sale of a 2005 Ford Excursion in 2016.  (*See* DE 1.)

173.    On November 2, 2017, the Defendants were questioned about their ownership of a 2005 Ford Excursion in the two years preceding the Petition Date.  (*See* Exh 1 89:4-6.)

Defendant Steven Wibracht testified that the 2005 Ford Excursion was sold in 2016 to Carmax for $12,500, and the funds were allegedly used to pay Core Logistics' payroll.  (*See id.* at 89:8-90:2.)

174.    Steven Wibracht testified about the sale noting that he has "the document of the sale … I sold it to Carmax, because I -- I sold it on a Wednesday or Thursday night because I needed the money Friday."  (*See id.* at 89:23-90:2.)

175.    After the UST questioned the Defendants about the 2005 Ford Excursion on November 2, 2017, the Defendants amended their SOFA on November 10, 2017, to disclose the sale of the 2005 Ford Excursion.  (*See* DE 16.)

## I.    Allegations Regarding Undisclosed Executory Contract

176.    Question 1 on Schedule G asks the Defendants to disclose any executory contracts or unexpired leases.  The Defendants responded that they do not have any executory contracts or unexpired leases.  (*See* DE 1.)

177.    On December 11, 2017, Defendant Steven Wibracht testified that he has had an active listing agreement with Shannon Albrecht for several years for the Defendants' real property described in the Defendants' Schedules A/B as "50% undivided interest in 5 acres, Clear Springs, Comal County, Texas, 26609 Donna Elaine, San Antonio, Texas 782561."  (*See* DE 1, 16, 84; *see also* Exh 2, 46:21-23.)

178.    An active listing agreement for the sale of real property is an executory contract.

179.    The active listing agreement with Shannon Albracht is not listed on the Defendants' Schedule G.  (*See* DE 1.)

## J.    Additional False Statements Regarding Ownership Interests

180.    Steven testified that Core Logistics was a fifty-percent owner of Wishing Star Ranch, LLC.  (*See* Exh 1 Tr. 30:7-12.)

181.    Steven's SOFA, First Amended SOFA, and Second Amended SOFA, which he signed under the penalty of perjury, however, list Steven as a member of Wishing Star Ranch, LLC. (*See* DE 1, 16, 84.)

182.    Additionally, Steven Wibracht testified at the First Meeting of Creditors that he had no interests in any limited liability companies. (*See* Exh 1 35:17-36:10.)

183.    Upon information and belief, Steven Wibracht still held an interest in Costa Offshore, LLC as of the Petition Date.

**K.    False Statements Regarding Who Resides at the Defendants' Home**

184.    In response to Question 2 on Schedule J, the Defendants state that as of the Petition Date, in addition to the Defendants and their children, one of the Defendants' mothers lived with them. (*See* DE 1.)

185.    However, Steven testified at the Second Meeting of Creditors that no one else, other than the Defendants, their children, and their nanny, Wendy Hudson lived with them on November 10, 2017, when the Defendants filed their Amended Schedules. (*See* Exh 2, 41:23-25.)

186.    Steven further testified that no one else lived with the Defendants, aside from their children, and possibly their nanny, as of the Petition Date. (*See id.* at 42:1-4.)

187.    Steven's testimony contradicts Defendants sworn statements on Question 2 of Schedule J stating that one of the Defendants' motions lives/lived in the family home. Both sworn statements cannot be true.

**III.    THE WIBRACHTS HAVE FAILED TO KEEP (OR DISCLOSE) ADEQUATE RECORDS**

188.    The Wibrachts are unable or unwilling to provide records from which their financial condition or transactions can be ascertained. The Wibrachts' failure to maintain adequate records is amplified by and stands in contrast to the Wibrachts high lifestyle prior to the

Petition Date.  For example, the Wibrachts owned or controlled no less than four vehicles, including a Ferrari; several Rolex watches; and their bank statements show at least $118,000 deposited into the Defenants' bank accounts that was not accounted for in the Debtors' SOFA (*See* Exh 1 91:25-92:4) in 2016 and $139,000 deposited into the Defendants' bank accounts in 2017 prior to the Petition Date that was not accounted for in the Debtors' (*See id*. 92:5-8)/  More specifically, Travelers avers as follows:

**A.**     **Failure to Keep Information Regarding Income from Core Logistics**

189.     Steven was asked about Core Logistics' income for 2015, 2016, and 2017 prior to his departure, but was unable to provide information about Core Logistics' income.  (*See* Exh 1 18:8-10, 19:8-25.)

190.     Steven further testified that he did not file tax returns in 2016 for Core Logistics. (*See* Exh 1 18:15-20.)

191.     Steven also testified that he had not yet accounted for his income from Core Logistics in 2016.  (*See* Exh 1 18:21-23.)

192.     Steven also testified that as of November 2, 2017, he had not filed his 2016 tax returns.  (*See* Exh 1 19:1-2.)

193.     Steven claimed that he did not know the gross income for Core Logistics because he was just "a field guy," but he "ran the office."  (*See id.* at 20:1-4.)

194.     Steven also later testified during the UST's 2004 Examination that he "managed the finances, managed the operations ... [of Core Logistics]."  (*See* Exh 3, 15:10-15.)

195.     Furthermore, when asked about additional payments that he received from Core Logistics, Steven testified that he does not have the records for Core Logistics to prove why Steven received the additional payments from Core Logistics.  (*See* Exh 2, 13:1-4.)

196. Steven, however, also testified that "I was Core. I was the majority owner of Core. … Core was my life. Core is – me and Core were no different." (*See* Exh 2, 76:13-19.)

**B.** **Failure to Keep Information Regarding the Polaris Transaction**

197. In response to Question 18 on their SOFA, the Defendants disclose that in 2017 they transferred a 2016 Polaris and trailer worth approximately $18,000 to Brown Excavation to satisfy company debts of Core Logistics.

198. However, when asked whether he had any paperwork evidencing the transaction between Steven Wibracht, Core Logistics, and Brown Excavation, Steven Wibracht testified that he had a copy of the title, but when asked whether there was a bill of sale, Steven Wibracht stated "we may have done something. I don't remember." (*See* Exh 2, 71:16-19, 72:14-19.)

**C.** **Failure to Keep Records Regarding the 1966 Chevy Truck Transactions**

199. In addition to failing to disclose the transfer of the 1966 Chevy Truck to Robert Brown/Brown Excavation, Steven also failed to keep any records of the transaction. (*See* Exh 2, 72:20-25.)

**D.** **Failure to Keep Records Regarding Loan from Michael Wibracht**

200. On July 11, 2017, Michael Wibracht – Steven's brother – wrote a check to Steven for $5,000 as a purported "loan." (*See* Exh 2, 14:14-17.)

201. When the UST asked Steven why his brother loaned him money, Steven responded "[b]ecause I didn't have any." (*See id.* at 14:20-22.)

**E.** **Failure to Keep Records Regarding Jeep Rubicon Transactions**

202. On December 11, 2017, Defendant Steven Wibracht testified that as a result of the reconveyance of the Jeep Rubicon (originally purchased for $35,000) to satisfy a Core Logistics debt of $30,000 owed to Brown Excavation, Brown Excavation gave Core Logistics a "credit memo" for only $28,000. (*See* Exh 2, 77:10-15.)

203.    When asked if he had a copy of any of paperwork for this transaction, Steven Wibracht testified that he did not.  (*See id.*)

### F.    <u>Failure to Keep Information Regarding Deposits and Withdrawals Into Bank Accounts and Credit Card Accounts</u>

204.    On December 11, 2017, the Defendants were asked about a $2,500 withdrawal on June 7, 2017, and a $1,500 withdrawal on June 11, 2017, from their Security Service checking account.  (*See* Exh 2, 22:15-25, 23:5-8.)   Steven Wibracht was unable to explain why he withdrew the money or for what purpose he used the funds.  (*See id.*)

205.    Steven Wibracht, however, then testified regarding a $8,000 deposit into his Bank of America checking account, but is unable to confirm whether the funds withdrawn from the Security Service checking account are the same funds deposited into the Bank of America checking account.  (*See id.* at 24:15-25:9.)

206.    The Defendants were questioned further about the purpose of other withdrawals from the Security Service checking account and deposits into the Bank of America checking account in the months preceding their Petition Date.  (*See id.* at 26:11-27:16.)   The Defendants were unable to explain the source of the funds, whether the funds came from the sale of their personal property pre-petition, *e.g.,* sale of guns, or other sources, because they lacked documentation for the transactions.  (*See id.*)

207.    When Steven was asked about his American Express accounts, Steven testified that the Defendants could not access his American Express accounts because he was "locked-out."  (*See* Exh 2, 65:1-7.)

### G.    <u>Refusal to Respond to Questions About Financial Affairs</u>

208.    During the Second Meeting of Creditors, Steven was asked about his and Core Logistics' relationship with 210 DG, his brother's company.

209.    The Defendant's counsel repeatedly instructed Steven not to answer questions posed to Steven regarding his relationship with Core Logistics and 210 DG.  (*See* Exh 2, 35:1-3, 35:25-38:1.)

210.    When Steven was further questioned about his interest in Core Logistics and the value of that interest, including how and why Core Logistics allegedly lost $1 million in 2016, (*see* Exh 2, 86:16-21), Steven's counsel instructed him not to answer the questions (*see id.* at 86:22-87:17.)

## CAUSES OF ACTION

### COUNT I
### FOR DENIAL OF DISCHARGE OF STEVEN AND ERIN WIBRACHT
### 11 U.S.C. § 727(a)(2)(A)

211.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 210.

212.    11 U.S.C. § 727(a)(2)(A) provides that the Court shall deny a debtor a discharge when "with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, the debtor has transferred, removed, destroyed, mutilated or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed … property of the debtor, within one year before the date of the filing of the petition."

213.    By transferring, removing or concealing assets as detailed above, the Defendants transferred, removed, destroyed, mutilated or concealed property within one year before the date of the filing of the Petition with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with the custody of property under this title.

214.    Therefore, the Defendants Steven Brice Wibracht and Erin Michelle Wibracht should be denied their discharge pursuant 11 U.S.C. § 727(a)(2)(A).

## COUNT II
## FOR DENIAL OF DISCHARGE OF STEVEN AND ERIN WIBRACHT
### 11 U.S.C. § 727(a)(2)(B)

215.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 214.

216.    11 U.S.C. § 727(a)(2)(B) provides that the Court shall deny a debtor a discharge when "with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, the debtor has transferred, removed, destroyed, mutilated or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed … property of the estate, after the date of filing of the petition."

217.    By transferring, removing or concealing assets as detailed above, the Defendants transferred, removed, destroyed, mutilated or concealed property of the estate, after the date of the filing the Petition with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with the custody of property under this title.

218.    Therefore, the Defendants Steven Brice Wibracht and Erin Michelle Wibracht should be denied their discharge pursuant 11 U.S.C. § 727(a)(2)(B).

## COUNT III
## FOR DENIAL OF DISCHARGE OF STEVEN AND ERIN WIBRACHT
### 11 U.S.C. § 727(a)(3)

219.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 218.

220.    11 U.S.C. § 727(a)(3) provides that the Court shall deny a debtor a discharge when "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act

was justified under all of the circumstances of the case."

221.    As detailed above, the Defendants concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the Defendants' financial condition or business transactions might be ascertained, and such actions or failures to act were not justified under all of the circumstances of this case.

222.    Therfore, the Defendants Steven Brice Wibracht and Erin Michelle Wibracht should be denied their discharge pursuant 11 U.S.C. § 727(a)(3).

### COUNT IV
### FOR DENIAL OF DISCHARGE OF STEVEN AND ERIN WIBRACHT
### 11 U.S.C. § 727(a)(4)(A)

223.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 222.

224.    11 U.S.C. § 727(a)(4)(A) provides that the Court shall deny a debtor a discharge if "the debtor knowingly and fraudulently made a false oath or account."

225.    Upon information and belief, as detailed above, the Defendants have made false oaths or accounts on their Schedules, First Amended Schedules, and Second Amended Schedules.

226.    Upon information and belief, as detailed above, the Defendants have made false oaths or accounts on their SOFA, their First Amended SOFA, and their Second Amended SOFA.

227.    Upon information and belief, as detailed above, the Defendants have made false oaths or accounts during their testimony during the First Meeting of Creditors, the Second Meeting of Creditors, and the UST's 2004 Examination.

228.    Upon information and belief, as detailed above, these false oaths or accounts were

made knowingly and fraudulently.

229.     For each of these false oaths and accounts, the Defendants Steven Brice Wibracht and Erin Michelle Wibracht should be denied their discharge pursuant 11 U.S.C. § 727(a)(4)(A).

## COUNT V
## FOR DENIAL OF DISCHARGE OF STEVEN AND ERIN WIBRACHT
### 11 U.S.C. § 727(a)(5)

230.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 229.

231.     11 U.S.C. § 727(a)(5) provides that the Court shall deny a debtor a discharge if "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."

232.     As detailed above, the Defendants have failed to explain satisfactorily the loss of assets or deficiency of assets to meet their liabilities.

233.     Because the Defendants have failed to explain satisfactorily, before determination of denial of discharge, the loss of assets or the deficiency of assets to meet their liabilities, the Defendants Steven Brice Wibracht and Erin Michelle Wibracht should be denied their discharge pursuant 11 U.S.C. § 727(a)(5).

## PRAYER

WHEREFORE, Plaintiff Travelers Casualty and Surety Company of America prays for the following relief:

1.     On Count I against the Defendants Steven Brice Wibracht and Erin Michelle Wibracht, for an order by this Court denying the Defendants Steven Brice Wibracht and Erin Michelle Wibracht's discharge from their debts pursuant to 11 U.S.C. § 727(a)(2)(A);

2.      On Count II against the Defendants Steven Brice Wibracht and Erin Michelle Wibracht, for an order by this Court denying the Defendants Steven Brice Wibracht and Erin Michelle Wibracht's discharge from their debts pursuant to 11 U.S.C. § 727(a)(2)(B);

3.      On Count III against the Defendants Steven Brice Wibracht and Erin Michelle Wibracht, for an order by this Court denying the Defendants Steven Brice Wibracht and Erin Michelle Wibracht's discharge from their debts pursuant to 11 U.S.C. § 727(a)(3);

4.      On Count IV against the Defendants Steven Brice Wibracht and Erin Michelle Wibracht, for an order by this Court denying the Defendants Steven Brice Wibracht and Erin Michelle Wibracht's discharge from their debts pursuant to 11 U.S.C. § 727(a)(4);

5.      On Count V against the Defendants Steven Brice Wibracht and Erin Michelle Wibracht, for an order by this Court denying the Defendants Steven Brice Wibracht and Erin Michelle Wibracht's discharge from their debts pursuant to 11 U.S.C. § 727(a)(5); and

6.      For such other and further relief as the Court deems just and proper.

DATE: April 4, 2018           Respectfully submitted,

**WATT TIEDER HOFFAR & FITZGERALD, LLP**
1765 Greensboro Station Place, Suite 1000
McLean, Virginia 22102
Telephone: (703) 749-1000
Facsimile: (703) 893-8029

By: /s/ *Jennifer Larkin Kneeland*
      Jennifer L. Kneeland (*Admitted Pro Hac Vice*)
      Email: jkneeland@watttieder.com

      -AND-

{00343658}

**PULMAN, CAPPUCCIO,**
**PULLEN, BENSON & JONES, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By:      */s/ Thomas Rice*
             Randall A. Pulman
             Texas State Bar No. 16393250
             rpulman@pulmanlaw.com
             Thomas Rice
             Texas State Bar No. 24025613
             trice@pulmanlaw.com


**ATTORNEYS FOR TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA**