IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| STEVEN BRICE WIBRACHT | § | CASE NO. 17-52300-RBK |
| AND ERIN MICHELLE WIBRACHT, | § | CHAPTER 7 |
| | § | |
| DEBTORS. | § | |
| | § | |
| | § | |
| TRAVELERS CASUALTY AND SURETY | § | |
| COMPANY OF AMERICA, PLAINTIFF | § | |
| | § | |
| v. | § | ADVERSARY PROCEEDING |
| | § | NO. 18-05203-RBK |
| STEVEN BRICE WIBRACHT | § | |
| AND ERIN MICHELLE WIBRACHT, | § | |
| DEFENDANTS. | § | |

---

## AMENDED COMPLAINT OBJECTING TO DISCHARGE OF STEVEN BRICE WIBRACHT AND ERIN MICHELLE WIBRACHT

---

**TO THE HONORABLE RONALD B. KING,**

**CHIEF UNITED STATES BANKRUPTCY JUDGE:**

Creditor Travelers Casualty and Surety Company of America ("Travelers" or "Plaintiff") files this Amended Complaint Objecting to the Discharge of Steven Brice Wibracht and Erin Michelle Wibracht (the "Debtors" or "Defendants"), and represents and alleges as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157, and 11 U.S.C. § 727.

2.      This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

3.      Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a).

{00361309}

4.     The deadline for filing a complaint objecting to the Debtors' discharge was April 4, 2018 and Plaintiff's Original Complaint was filed timely.

## PARTIES

5.     Plaintiff, Travelers, is a secured creditor of the Debtors' estate (*see* POC 18), who brings this action pursuant to 11 U.S.C. § 727(c)(1).

6.     Defendants, Steven Brice Wibracht and Erin Michelle Wibracht, are individuals who jointly filed a voluntary petition on September 30, 2017, commencing a case under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas (the "Court"), initiating Case No. 17-52300-RBK (the "Bankruptcy Case").  Service of process may be made by first class U.S. mail, postage prepaid, pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7004(b), on the Defendants at their home address, 536 E. Borgfeld Drive, San Antonio, Texas 78260.

## BACKGROUND FACTS

### A.     The Defendants' Petition, Schedules, and SOFA

7.     On September 30, 2017 (the "Petition Date"), the Defendants filed a Voluntary Petition (the "Petition") for relief under Chapter 7 of the Bankruptcy Code initiating the Bankruptcy Case.  (*See* DE 1.)

8.     The Defendants signed the Petition declaring under penalty of perjury that the information provided in the Petition was true and correct.  (*See id.*)

9.     In addition to the Petition, on the Petition Date, the Defendants filed their Schedules and Statement of Financial Affairs ("SOFA") in the Bankruptcy Case.  (*See id.*)

10.    The Defendants signed the SOFA affirming that they "have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that answers are true and correct."  (*See id.*)

11.     In conjunction with their Schedules, the Defendants signed the Declaration About an Individual Debtor's Schedules affirming that "[u]nder penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct." (*See id.*)

12.     The Defendants testified under oath at a meeting of creditors on November 2, 2017 (the "First Meeting of Creditors").  Defendants testified at the First Meeting of Creditors that they had signed the Petition, Schedules, and SOFA, and that they had read all the information in those documents before they signed them.  (First Meeting of Creditors Transcript 4:16-5:8.)  A true and correct copy of the relevant portions of the First Meeting of Creditors Transcript is attached hereto and incorporated herein as Exhibit "1".

13.     The Defendants further testified that all the information in the Petition, Schedules, and SOFA was true and correct to the best of their knowledge and belief as of the Petition Date. (*See id.* at 5:9-13.)  The Defendants also testified that since the Petition Date they had not thought of any changes that needed to be made to the Schedules or the SOFA, that the Schedules list all of the Defendants' assets and creditors.  (*See id.* at 5:14-6:2.)

14.     On November 10, 2017, after the First Meeting of Creditors, the Defendants filed amended Schedules amending Schedules A/B, C, and D (the "First Amended Schedule"), and SOFA (the "First Amended SOFA").  (*See* DE 16.)

15.     In conjunction with their First Amended Schedules, the Defendants signed the Declaration About an Individual Debtor's Schedules affirming that "[u]nder penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct."  (*See id.*)  The Defendants also signed the First Amended SOFA affirming that they "have read the answers on this *Statement of Financial Affairs* and any attachments, and I

declare under penalty of perjury that answers are true and correct." (*See id.*)

16.     Steven Wibracht testified under oath at a continued meeting of creditors on December 11, 2017 (the "Second Meeting of Creditors").  (*See* Second Meeting of Creditors Transcript 5:13-6:9.)  A true and correct copy of the relevant portions of the Exh 2, is attached hereto and incorporated herein as Exhibit "2".

17.     On March 14, 2018, the Defendants filed their Amended Schedules A/B and C (the "Second Amended Schedules").  (*See* DE 84.)

18.     In conjunction with their Second Amended Schedules, the Defendants signed the Declaration About an Individual Debtor's Schedules affirming that "[u]nder penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct." (*See id.*)

19.     On February 22, 2018, Steven Wibracht testified under oath at an examination under Federal Rule of Bankruptcy Procedure 2004 noticed by the United States Trustee.

## I.     THE WIBRACHTS' RELATIONSHIP WITH CORE LOGISTICS

20.     Prior to and during the year before the Petition Date, Steven was a 50% owner of Core Logistics Services, LLC d/b/a Core Constructors ("Core Logistics") which is a company that performs excavation and site work on construction projects.  (*See* February 22, 2018, Rule 2004 Examination Transcript, 13:12-21.)  A true and correct copy of the relevant portions of the 2004 Examination Transcript is attached hereto and incorporated herein as Exhibit "3".  Steven has produced scant information about Core Logistics.  He testified at his First Meeting of Creditors that he did not know Core Logistics' gross income for 2015, 2016, or during the period of his ownership in 2017.  (*See* Exh 1 18:11-19:25.)  Despite his lack of knowledge about basic information regarding Core, Steven testified that "I was Core.  I was the majority owner of Core. … Core was my life.  Core is – me and Core were no different." (*See* Exh 2, 76:13-19.)

21.     On April 1, 2016, Steven listed his 50% ownership value in Core to be worth $350,000 on a personal financial statement provided to Texas Capital Bank.  (*See* Exh 1 36:11-37:4.)  Later, in October 2016, Steven listed his 50% ownership in Core to be worth $1,000,000 on a personal financial statement signed under penalty of perjury to the U.S. Small Business Association (the "SBA").  (*See* Exh 3, 40:15-41:1.)

22.     Steven testified that he received "nothing" in exchange for relinquishing his ownership interest in Core Logistics to Glen Boltinghouse in March 2017.  (*See* Exh 1 17:19-23.)  Later he testified that he received $20.  (*See* Exh 2, 8:15-19.)  At another time, Steven testified that Mr. Boltinghouse agreed to "indemnify" Steven for debts of Core that Steven was obligated to pay.  (*See* Exh 2, 58:20-24.)  However, Steven testified that he made no investigation or inquiry as to Mr. Boltinghouse's wherewithal to indemnify Steven.  (*See* Exh 2, 60:7-12.)

23.     As such, Steven has removed, destroyed and mutilated his ownership interest in Core Logistics within the year prior the Petition Date; failed to produce or preserve documents from which the financial condition and business transactions of Core might be ascertained without justification; knowingly or fraudulently made false oaths regarding Core Logistics; and failed to satisfactorily explain the loss of the value of his interest in Core Logistics or deficiency of assets to meet liabilities. More specifically, Travelers avers as follows:

### A.     The Ownership Structure of Core Logistics

24.     In 2013, Steven Wibracht acquired an ownership interest in Core Logistics in 2013 as part of buy-out package from his prior employment with Federal Management Solutions. (*See* Exh 3, 11:22-12:20.)

25.     Steven along with three other people, his brother, Michael Wibracht, Glen Boltinghouse, and Raymond Jenkins, each acquired a twenty-five percent (25%) interest in Core Logistics.  (*See* Exh 3, 12:19-20, 15:15-17.)

26.     Shortly thereafter, Steven purchased Raymond Jenkins's twenty-five (25%) ownership interest for $15,000 or $20,000.  (*See* Exh 3, 12:21-13:11.)

27.     As a result, Steven held a fifty percent (50%) ownership interest in Core Logistics and Michael Wibracht and Glen Boltinghouse each only had a twenty-five percent (25%) interest.  (*See* Exh 3, 13:2-5.)

**B.      Core Logistics' Operations and Interest in Wishing Star Ranch, LLC**

28.     Core Logistics performed site work on construction projects as a subcontractor to various general contractors.  (*See* Exh 3, 13:12-21.)

29.     As part of its operations, Core Logistics owned significant amounts of equipment. Steven testified under oath that in March 2017, Core Logistics owned equipment with approximately $750,000 in equity.  (*See* Exh 1 63:13-25.)

30.     However, upon information and belief, some of the equipment owned by Core Logistics may have been titled in Steven Wibracht's name.

31.     During Steven's time as an owner of Core Logistics, Steven "managed the finances, managed the operations and try to – you know, business development."  (*See* Exh 3, 15:10-15.)

32.     In addition to performing site work, Steven testified that Core Logistics was also a fifty-percent owner of Wishing Star Ranch, LLC.  (*See* Exh 1 30:7-12.)

33.     Steven further testified that Wishing Star Ranch, LLC owned approximately 107 acres in real property.  (*See* Exh 1 31:205.)

**C.      The Sale of Steven's Ownership Interest in Core Logistics**

34.     In March 2017, Steven sold his fifty percent (50%) ownership interest to Glen Boltinghouse for $20.  (*See* Exh 3, 42:16.)

35.     Less than a year prior to selling his ownership interest to Glen Boltinghouse, Steven Wibracht prepared a financial statement in April 2016 for Texas Capital Bank.  (*See* Exh 1 6:11-16.)

36.     Steven signed the financial statement under penalty of perjury and valued his fifty percent (50%) ownership interest in Core Logistics at $350,000.  (*See* Exh 1 37:2-4.)

37.     Six months later, and just five months before he sold his ownership interest to Glen Boltinghouse, Steven prepared a personal financial statement to submit to the SBA.  (*See* Exh 3, 40:15-41:1.)  Steven signed the personal financial statement under the penalty of perjury.

38.     In the personal financial statement, Steven valued his fifty-percent (50%) ownership interest at $1,000,000.  (*See id.*)

39.     When asked to elaborate on how he reached the $1,000,000, Steven testified that it was nothing "scientific", but was based on a "cash flow statement" that he either refuses to produce or does not have.  (*See* Exh 3, 41:1-7; 42:23-43:3.)

40.     However, on or about March 16, 2017, Steven Wibracht sold his 50% interest in Core Logistics to Glen Boltinghouse for $20.00.

41.     When asked to elaborate about the sale of his membership interest to Boltinghouse, Steven testified several times under oath that he received "nothing" and that he "didn't get anything in return" for the transfer.  (*See* Exh 1 17:19-22; Exh 2, 7:18-8:19.)

42.     Steven later testified that Mr. Boltinghouse agreed to "indemnify" Steven for debts of Core that Steven was obligated to pay.  (*See* Exh 2, 58:20-24.)  However, Steven testified that he made no investigation or inquiry as to Mr. Boltinghouse's wherewithal to indemnify Steven.  (*See* Exh 2, 60:7-12.)

43.     Steven once again contradicts himself and testified that "Mr. Boltinghouse doesn't personally owe me anything." (*See* Exh 2, 61:13-16.)

**D.      Failure to Preserve the Assets of Core Logistics and Thereby the Value of Wibracht's Ownership Interest Therein**

44.     In addition to selling his membership interest to Botlinghouse for "nothing" just six months before he filed his Bankruptcy Case, Steven failed to preserve the assets of – and thus the value of his membership interest in – Core Logistics.

45.     In April or May of 2017, Wishing Star Ranch, LLC sold the 107 acres.   (*See* Exh 1 31:1-5.)

46.     Upon information and belief, the sale proceeds, after paying the mortgage on the 107 acres, was approximately $93,659.18.

47.     Steven testified that Core Logistics' portion of the sale proceeds was to go to pay down a $35,000 line of credit with Texas Capital Bank, which was guaranteed by Steven, Mr. Boltinghouse, and Steven's brother Michael Wibracht.  (*See* Exh 2, 89:1-90:25.)

48.     Upon information and belief, however, the sale proceeds were not paid to Texas Capital Bank, but were deposited into the bank accounts of 210 Development Group, LLC ("210 DG").

49.     210 DG is a development company owned, in part, by Steven's brother, Michael Wibracht.

50.     Despite stating under oath several times that he has no ownership interest in 210 DG, Steven, nonetheless, has full access and control over 210 DG's bank accounts, including the bank account where the sale proceeds from Wishing Star Ranch real property sale were deposited.

## II. THE WIBRACHTS' FAILURE TO BE FORTHRIGHT AND REFRAIN FROM MAKING FALSE OATHS.

51.     As more fully set forth below, the Wibrachts have failed to accurately disclose their assets and the disposition of such assets, including without limitation, failure to disclose income, an ownership interest in at least one limited liability company, ownership and disposition of a certificate of deposit and treasury bonds, jewelry, guns and weaponry, clothing, a life insurance policy, and equipment. The Wibrachts have made these false statements knowingly and fraudulently with intent to deceive creditors or reckless disregard for the truth.

52.     On a few occasions, the Wibrachts have amended their disclosures to the Court, but only after being caught by Travelers or the U.S. Trustee in a prior false oath.  Because the Wibrachts amended their schedules only after their falsity was revealed, these actions also show that the Wibrachts possessed the requisite intent to support the denial of discharge.

### A. The Wibrachts' Failure to Accurately Report and Disclose Income

53.     In response to Question No. 4 on the Defendants' SOFA, First Amended SOFA, and Second Amended SOFA, the Defendants list their combined income as follows:

|  | Debtor 1 (Steven Wibracht) | Debtor 2 (Erin Wibracht) |
|---|---|---|
| January 1 of the current year until the date you filed for bankruptcy: | $65,742.42 | $9,414.40 |
| For the last calendar year: (January 1 to December 31, 2016) | $200,000.00 | $20,000.00 |
| For the calendar year before that: (January 1 to December 31, 2015) | $143,400.00 | $45,911.00 |

(*See* DE 1, 16, 84.)

### (i) Statements Under Oath About the Source and Amount of the Wibrachts' Income

54.     Erin Wibracht testified that her only source of income prior to filing the Petition was from her work as a teacher, or from insurance for having a baby.  (*See* Exh 1 51:4-11, 52:16-24.)

55.     Steven Wibracht testified under oath that during 2015 his only source of income was from Core Logistics.  (*See* Exh 1 53:1-6.)

56.     Steven Wibracht also testified that his income from Core Logistics in 2015 was $100,000.  (*See* Exh 1 23:14-18.)

57.     Steven further testified that his only source of income derived from employment or from the operation a business in 2016, and the beginning of 2017 was Core Logistics, and that his sole source of income thereafter from employment or from the operation of a business in 2017 was from Brown Excavation and Utilities ("Brown Excavation").  (*See* Exh 1 50:11-25, 53:7-15.)

58.     Steven Wibracht also testified that his income from Core Logistics in 2016 was $150,000.  (*See* Exh 1 23:6-13.)

59.     Steven Wibracht further testified that his income from Core Logistics in 2017 before he left Core Logistics, was $10,000 to $15,000.  (*See* Exh 1 23:23-24:2.)

60.     Steven was specifically asked whether "there [are] any other sources of income derived from your employment or from operating a business for … this period" to which he responded "No." (*See* Exh 1 53:7-15.)

61.     Steven further testified that his current salary with Brown Excavation that commenced when he left Core Logistics is $100,000 a year, paid weekly, with no insurance, pension or bonuses.  (*See* Exh 1 61:4-16.)

62.     Thereafter, Steven testified that the only additional sources of income pre-petition were from:

(a)     the sale of his 2006 Ferrari F430 in April or May of 2017 for $80,000, for which he did not have appraised or otherwise valued before selling (*see* Exh 1 54:1-21);

(b)     the trade-in of a 2015 Chevy 2500 and a 2013 Ford F-350 for a single Ford F-250 (*see* Exh 1 55:4-13);

(c)     the sale of three Rolex watches for $17,000 to Diamond & Jewelry Exchange in the summer of 2017, for which he did not have appraised (*see* Exh 1 57:4-25); and

(d)     guns sold from February 2017 to summer to 2017 for $23,386.02, which were not appraised prior to their sale (*see* Exh 1 58:23-60:2.)

*(ii)     Undisclosed Payments from Brown Excavation*

63.     On February 22, 2016, Steven received a check from Brown Excavation for $45,000.  (*See* Exh 2, 21:12-17.)  The income was not reported on any of the SOFAs filed by the Defendants.  It also contradicts Steven's prior sworn testimony that he only received income from operating Core Logistics in 2016.

64.     Steven testified that he received the $45,000 check from Brown Excavation as a "commission" for selling a utility job to Brown Excavation.  (*See* Exh 2, 21:8-22:3.)  Steven later testified the job included site and utilities work for the project.  (*See* Exh 3, 29:15-16.)

65.     Steven testified that at the time he "sold" Brown Excavation the job and received the $45,000 commission check he was working for Core.  (*See* Exh 2, 22:4-5.)

66.     Steven further testified that the utility job was for subcontract work on a condo projected being developed by 210 DG, Steven's brother's, Michael's, entity.  (*See* Exh 2, 30:17-31:4.)

67.     Steven further testified that Brown Excavation never paid him any other commissions.  (*See* Exh 2, 22:6-8.)

68.     In June 2016, Brown Excavation wrote a check for $37,000 to Steven Wibracht, which was deposited into his Bank of America account.  (*See* Exh 3, 48:11-18.)  The income was not reported on any of the SOFAs filed by the Defendants.  It also contradicts Steven's prior sworn testimony that he only received income from operating Core Logistics in 2016.

69.     Steven could not remember why Brown Excavation paid him $37,000.  (*See id.*)

70.     Upon information and belief, Brown Excavation also wrote a check to Steven Wibracht dated May 12, 2016, for $3,500.  The income was not reported on any of the SOFAs filed by the Defendants.  It also contradicts Steven's prior sworn testimony that he only received income from operations of a business from Core Logistics in 2016.

71.     Steven received the $45,000 check, the $37,000 check, and the $3,500 check from Brown Excavation in 2016, but Steven testified under oath that his only source of income in 2016 was from Core Logistics.  (*See Exh 1 50:11-25.*)

72.     Steven received two additional checks from Brown Excavation in 2017.  The first check was dated June 12, 2017, for $8,000, and the second check was dated August 25, 2017, for $10,000.  The income was not reported on any of the SOFAs filed by the Defendants.

73.     Steven testified that these funds were loans for the Defendants to pay their bankruptcy counsel.  (*See id.* at 50:22-51:19.)

74.     Steven then admitted that the $18,000 "loaned" from Brown Excavation was not specifically listed on his Schedule F.  (*See id.* at 55:10-12.)

75.     The Defendants did not disclose any of these additional payments from Brown Excavation in their Schedules, First Amended Schedules, their Second Amended Schedules, their SOFA, their First Amended SOFA, or the Second Amended SOFA as income.

### *(iii)     Payments from 210 DG*

76.     During the First Meeting of Creditors, Steven was asked if he ever received any money or payments from 210 Developers, to which he responded "No."  (*See* 1st 341 Tr. 46:2-4.)

77.     Upon information and belief, from January 1, 2015 to the Petition Date, Steven received at least $1,300 from 210 DG, including but not limited to the following amounts:

| | |
|---|---|
| 1/30/2015 | $150.00 |
| 3/30/2015 | $150.00 |
| 5/6/2015 | $150.00 |
| 8/14/2015 | $300.00 |
| 6/30/2016 | $300.00 |
| 9/9/2016 | $250.00 |

78.    Steven, however, testified that in 2015 and 2016, he only received income from Core Logistics.  (*See* Exh 1 50:11-25, 53:1-6.)

79.    The Defendants also did not disclose this additional income on their Schedules, First Amended Schedules, Second Amended Schedules, SOFA, First Amended SOFA, or Second Amended SOFA.

### *(iv)    Undisclosed Non-Payroll Payments from Core Logistics*

80.    In addition to his payroll payments from Core Logistics, Steven received at least $540,000 from Core Logistics from January 1, 2015 through March 2017, which he failed to disclose.

81.    The additional payments from Core Logistics were paid by check made out to Steven, or to "Cash", which Steven would then sign.

82.    When asked about the additional payments from Core Logistics, Steven testified under oath that the payments were to repay loans he made to Core Logistics, or to reimburse him for charges made on his personal American Express account -41004 for the benefit of Core Logistics.   (*See* Exh 1 23:6-24:1, 50:20-23, 53:15, 58:18-21, 92:5-13, 94:1-10; Exh 2, 9:5-10:1, 11:4, 14:1, 64:8-68:5, 99:25-100:11.)

83.    More specifically, Steven was asked about a check written by Core Logistics to Steven Wibracht in March 2016 for $42,000.  (*See* Exh 2, 9:5-10:1.)

84.    Steven testified that the purpose of the check was "[t]o pay an American Express bill."  (*See id.*)

85.    However, when pressed, Steven Wibracht changed his testimony and stated that the check was to repay a loan.  (*See id.* at 9:17-21, 11:20-24.)

86.    Steven further testified under oath that he would use his personal American Express account -41004 because Core Logistics' American Express account -11005 had an $80,000 credit limit.  (*See* Exh 2, 99:25-100:11.)

87.    From September 2015 through March 2017, Steven Wibracht paid at least $423,898.76 to his personal American Express account -41004, of which at least $250,000 was for personal expenses.

88.    From September 2015 through March 2017, Steven also used his Core Logistics American Express account -11005, of which at least $91,000 was for personal expenses.

89.    The Defendants did not disclose this additional income on their Schedules, First Amended Schedules, Second Amended Schedules, SOFA, First Amended SOFA, or Second Amended SOFA.

*(v)    Tax Refunds*

90.    Upon information and belief, the Defendants received at least $47,081.11 in federal tax refunds from January 1, 2015 to the Petition Date, including but not limited to the following refunds:

| 2/23/2015 | Federal Tax Refund | $3.11 |
| 11/6/2015 | Federal Tax Refund | $ 13,554.00 |
| 2/11/2016 | Federal Tax Refund | $ 5,708.00 |
| 2/11/2016 | Federal Tax Refund | $ 27,816.00 |

91.     During this time, the Defendants testified that their only source of income was from Core Logistics and Erin Wibracht's employment as a teacher. (*See* Exh 1 50:11-25, 51:4-11, 52:16-24, 53:1-6.)

92.     The Defendants also did not disclose this additional income on their Schedules, First Amended Schedules, Second Amended Schedules, SOFA, First Amended SOFA, or Second Amended SOFA.

### (vi)     *Certificate of Deposit and Other Financial Accounts*

93.     Question 17 of Schedules A/B asks the Defendants to disclose all deposits of money, including among others, checking, savings, or other financial accounts, and certificates of deposit. In response, the Defendants identified four bank accounts: a checking and a savings account at Security Service Federal Credit Union and a checking a savings account at Bank of America. (*See* DE 1, 16, 84.)

94.     Similarly, Question 20 of the SOFA asks the Defendants to identify any financial accounts or instruments, including among others, checking, savings, or other financial accounts, and certificates of deposit that the Defendants closed, sold, moved or transferred within one (1) year prior to the Petition Date. In response, the Defendants identified a single account with Texas Capital Bank that was closed. (*See id.*)

95.     Further, at the Second Meeting of Creditors, Steven was asked if the Defendants had any other bank accounts, to which Steven responded "No." (*See* Exh 2, 51:12-17.)

96.     Upon information and belief, the Defendants failed to disclose at least four (4) financial accounts or instruments in their Schedules, First Amended Schedules, Second Amended Schedules, SOFA, First Amended SOFA, and Second Amended SOFA, including, but not limited to: (i) a savings account ending in -02000 at Security Service Federal Credit Union in

Steven Wibracht's name; (ii) a savings account ending in -1100 at Security Service Federal Credit Union in Erin Wibracht's name; (iii) a youth savings account ending in -82000 at Security Service Federal Credit Union in the Defendants' names and their minor child's name; and (iv) a Future Builder certificate of deposit account ending in -1080 at Security Service Federal Credit Union held in Erin Wibracht's name.

97.     Upon information and belief, on September 20, 2017, the day the Defendants filed their Bankruptcy Case, Erin Wibracht closed the Future Builder certificate of deposit accounting ending in -1080 at Security Service Federal Credit Union.

### *(vii)    Treasury Bonds*

98.     Question 18 of Schedules A/B asks the Defendants to disclose all government and corporate bonds and other negotiable and non-negotiable instruments.    In response, the Defendants identified a single Bank of America trading account.  (*See* DE 1, 16, 84.)

99.     Plaintiff is informed and believes thereon alleges that the Defendants failed to disclose at least seven (7) Series I United States Treasury Bonds which were issued on or about March 3, 2011 to Steven B. Wibracht.

100.    Plaintiff is informed and believes thereon alleges that Erin Wibracht redeemed the seven (7) Series I post-Petition on December 14, 2017.

### *(viii)    Potential Other Non-Disclosed Sources of Income*

101.    On November 2, 2017, Steven Wibracht testified that a relationship with "the branch of Bank of America" where he would take checks and the branch would give him "counter credit" for them so that the funds would be available immediately.  (*See* Exh 1 92:15-18.)

102.    As such, Plaintiff alleges that Defendants received additional income from various sources that have not yet been identified or disclosed.

**B.**     **False Statements Regarding the Wibrachts' Personalty**

 **(i)**  ***Allegations Regarding Purchases and Transfers of Weaponry***

103. In the two years prior to the Petition Date, Steven Wibracht used his personal American Express account -41004 and his Core Logistics American Express account -11005 to purchase approximately $75,000 in guns, ammunition, and other weaponry.

104. On his Schedules, First Amended Schedules, and Second Amended Schedules, Steven Wibracht states that he only owns $7,795 in guns, ammunition, and other weaponry. (*See* DE 1, 16, 84.)

105. Under oath, Steven testified that he purchased the weaponry on the American Express cards for Core Logistics. (*See* Exh 3, 82:15-83:25.) Core Logistics would then give the guns as gifts to employees and clients, such as subcontractors. (*See* Exh 3, 84:1-85:25.)

106. In addition, under oath, Steven testified that he sold several guns in the months prior to the Petition Date. Steven testified that in June of 2017, he sold two firearms to Jerry and Georgina Hewtty for $11,900. (*See* Exh 1 14:4-9.)

107. The sale of the two firearms to the Hewttys was not listed in the Debtors' original Schedules. (*See* DE 1.)

 **(ii)**  ***Allegations Regarding Jewelry***

108. Question 12 of Schedules A/B requires the Defendants to list and value their jewelry, which includes "[e]veryday jewelry, costume, jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver."

109. Initially, in response, the Defendants responded "yes" that they have such personal property, describing it as "[j]ewelry engagement ring, earnings, watch, 2 watches and misc. jewelry wedding rings," and valued it at $12,240. (*See* DE 1, 16.)

110.    On January 10, 2018, Travelers filed an *Objection* to the Defendants' exemptions, which the Chapter 7 Trustee joined.  (*See* DE 60, 61.)

111.    On February 20, 2018, the Court held a hearing on the objection to the Defendants' exemptions and ordered the Defendants to file Amended Schedules A/B and C by March 14, 2018.

112.    On March 14, 2018, the Defendants filed their Second Amended Schedules.  (*See* DE 84.)

113.    In the Second Amended Schedules, the Defendants decreased the value of their jewelry to $9,300.  (*See* DE 84.)  The Defendants identified the following pieces of jewelry:

| | |
|---|---|
| Breitling men's watch 18k gold/stainless model CB0140 | $2,200.00 |
| Breitling men's watch, 18 k rose gold/stainless model 1 B0100 | $2,500.00 |
| 14K white gold engagement ring with approx. 1.1 ct. princess cut diamond | $2,800.00 |
| 14K white gold wedding band with approx. .5 ctw princess cut diamonds | $250.00 |
| 14K whie [sic] gold earings [sic] with approx. 1.35 ctw princess cut diamonds | $800.00 |
| Men's gold wedding band | $250.00 |
| Misc. costume jewelry consisting of rings, necklases [sic], earrings [sic], etc. (nothing of any significant value | $500.00 |

(*See* DE 84.)

114.    Plaintiff is informed and believes thereon alleges that the Defendants' share a personal American Express account ending in -41004.

115.    Plaintiff is informed and believes thereon alleges that Defendant Erin Wibracht has a personal American Express account ending in -62006.

116.    Plaintiff is informed and believes thereon alleges that Steven Wibracht has an American Express account ending in -11005, which was set-up as a Core Logistics account.

117.    In the two years prior to the Petition Date, the Defendants used their American Express cards to purchase at least $17,000 on jewelry, including the following purchases:

| 9/30/2016 | Diamond and Jewelry Gallery | $10,000.00 | -41004 |
|-----------|------------------------------|------------|--------|
| 11/12/2015 | Moretti's | $5,412.50 | -41004 |
| 5/7/2016 | Tiffany's & Co. | $216.50 | -41004 |
| 6/19/2016 | Tiffany's & Co. | $272.79 | -41004 |
| 12/8/2016 | MontBlanc San Antonio | $1,001.50 | -11005 |
| 12/23/15 | Kendra Scott Design | $422.18 | -62006 |
| 4/25/16 | Kendra Scott Design | $368.05 | -62006 |
| 5/4/2016 | Kendra Scott Design | $346.40 | -62006 |
| 9/14/2016 | Kendra Scott Design | $254.38 | -62006 |
| 12/14/2016 | Kendra Scott Design | $133.20 | -62006 |

118.    Plaintiff is informed and believes thereon alleges that Defendants failed to disclose and value their personal property responsive to Question 12 of Schedules A/B.

### (iii)    Allegations Regarding Clothing

119.    Question 11 of Schedules A/B requires the Defendants to list and value their clothing, which includes "[e]veryday clothing, furs, leather coats, designer wear, shoes, accessories."  In response, the Defendants respond "yes" that they have such personal property, describing it as "clothing," and valuing it at only $1,000.  (*See* DE 1, 16, 84.)

120.    Plaintiff is informed and believes thereon alleges that the Defendants' share a personal American Express account ending in -41004.

121.    Plaintiff is informed and believes thereon alleges that Defendant Erin Wibracht has a personal American Express account ending in -62006.

122.    Plaintiff is informed and believes thereon alleges that Steven Wibracht has an American Express account ending in -11005, which was set-up as a Core Logistics account.

123.    In the two years prior to the Petition Date, the Defendants used their American Express cards to purchase at least $29,400 in high-end apparel and accessories, including but not limited to custom-made suits, Tory Burch handbags and accessories, and Vera Bradley accessories.

124.    In addition, in the two years prior to the Petition Date, the Defendants also used their American Express cards to purchase clothing from non-high-end stores and Western Apparel in excess of $10,000.

125.    Furthermore, Defendants made numerous purchases at clothing stores with their debit cards, including but not limited to Nordstrom and Saks Fifth Avenue.

126.    Plaintiff is informed and believes thereon alleges that Defendants failed to disclose and value their personal property responsive to Question 11 of Schedules A/B.

### (iv)    Allegations Regarding Statements About Household Goods

127.    Question 6 of Schedules A/B requires the Defendants to list and value their household goods and furnishings, which includes "[m]ajor appliances, furniture, linens, china, kitchenware."  In response, the Defendants respond "yes" that they have such personal property, describe it as "[h]ousehold goods, supplies and furnishings," and value it at only $4,500.  (*See* DE 1, 16, 84.)

128.    Plaintiff is informed and believes thereon alleges that the Defendants' share a personal American Express account ending in -41004.

129.    Plaintiff is informed and believes thereon alleges that Defendant Erin Wibracht has a personal American Express account ending in -62006.

130.    Plaintiff is informed and believes thereon alleges that Steven Wibracht has an American Express account ending in -11005, which was set-up as a Core Logistics account.

131.    In the two years prior to the Petition Date, the Defendants used their American Express cards to purchase at least $10,000 on household goods and home décor items.

132.    Plaintiff is informed and believes thereon alleges that Defendants failed to disclose and value their personal property responsive to Question 8 of Schedules A/B.

*(v)*    ***Allegations Regarding Undisclosed Life Insurance Policies***

133.    Question 31 of Schedule A/B requires the Defendants to disclose their interest in insurance policies.  In the Schedules filed on September 30, 2017, the Defendants did not list any insurance policies.  (*See* DE 1.)

134.    On November 2, 2017, the Defendants were once again asked about if they have an interest in any life insurance policies.  (*See* Exh 1 37:17-24.)  When pressed, Steven Wibracht responded that he knew he had an interest in a State Farm life insurance policy for $100,000.  (*See id.*)

135.    Thereafter, the Defendants filed the Amended Schedules on November 10, 2017, listing the State Farm life insurance policy for $150,000.  (*See* DE 16.)

136.    Upon information and belief, Erin Wibracht had a life insurance policy with Prudential for $2 million.  Erin Wibracht failed to provide information regarding the status of said policy.

C.    **False Statements Regarding the Polaris**

137.    Question 18 of the SOFA asks whether the Defendants sold, traded, or otherwise transferred any property to anyone, other than property in the ordinary course of the Defendants' business, within the two years prior to their Bankruptcy Case.  Defendants responded that in 2017 they transferred a 2016 Polaris and trailer that they owned that was worth approximately

$18,000 to satisfy company debts of Core Logistics to Brown Excavation. (*See* DE 1, 16, 84.) Defendants further state that the Polaris was titled in the Steven's name. (*See id.*)

138.   On November 2, 2017, Defendant Steven Wibracht testified that he transferred a Polaris titled in his name to Brown Excavation sometime in December 2016/January 2017. (*See* Exh 1 60:3-22.)

139.   Brown Excavation did not pay any money to Steven Wibracht for the Polaris. (*See id.*)  Steven Wibracht testified that he transferred a Polaris that he personally owned to Brown Excavation for "Core Constructors owed Brown Excavation approximately $27,000. And in the middle -- And while I was still with Core, in trying to benefit Core, make Core work for forgiveness of that -- that loan to – I mean, the money from Brown – the receiv – the receivable to Brown, which is payable to Core, we swapped the Polaris for that payable." (*See id.* 60:7-13.)

140.   Steven has not produced any paperwork to document the transaction.

**D.**     **False Statements Regarding Mahindra Trailer**

141.   Question 40 of Schedules A/B asks the Defendants to disclose any machinery, fixtures, equipment, supplies that the Defendants use in their business and tools of their trade.  In response, on their Schedules, the Defendants stated that they did not own any such property.

142.   On November 2, 2017, Defendant Steven Wibracht testified that he had a Mahindra tractor titled in his name.  (*See* Exh 1 80:17-23, 81:16-18.)

143.   Then, on November 10, 2017, the Defendants amended their Schedule A/B to list a "Mahindra Tractor with loader attachment and box shredder."  (*See* DE 16.)

144.   Thereafter, on December 11, 2017, Defendant Steven Wibracht testified that the Mahindra tractor was titled in Core Logistics' name.  (*See* Exh 2, 56:10-16.)

145.     The statements on November 2, 2017 and December 11, 2017, and the Defendants' First Amended Schedule A/B cannot all be accurate.

### E.     False Statements Regarding Sale of 2015 Jeep Wrangler

146.     Question 3 of Schedules A/B requires the Defendants to disclose all cars, vans, trucks, tractors, sport utility vehicles, and motorcycles that they own, lease or have a legal or equitable interest.  In response, Defendants list a 2015 Jeep Wrangler that that they claim they sold to Steven Wibracht's brother in 2016, but it is still titled in Steven's name.  (*See* DE 1, 16, 84.)

147.     On November 2, 2017, Defendant Steven Wibracht testified that he sold the 2015 Jeep Wrangler to 210 DG in 2016.  (*See* Exh 1 12:13-21; 71:10-23.)

148.     On November 15, 2017, Steven Wibracht filed a reaffirmation agreement seeking to reaffirm his obligations to Santander Consumer USA, Inc. for the 2015 Jeep Wrangler.  (*See* DE 19.)  The reaffirmation agreement was approved on February 20, 2018.  (*See* DE 20.)

149.     On December 11, 2017, Defendant Steven Wibracht then testified that Core Logistics sold the 2015 Jeep Wrangler to 210 DG, but that the Jeep is still titled in Steven's name.  (*See* Exh 2, 49:2-21.)

150.     Plaintiff is informed and believes thereon alleges that the bill of sale for the 2015 Jeep Wrangler shows that Core Logistics sold the 2015 Jeep Wrangler to 210 DG.

151.     Defendant Steven Wibracht's testimony and statements under oath regarding who owns the 2015 Jeep Wrangler, who sold the 2015 Jeep Wrangler, and who purchased the 2015 Jeep Wrangler are inconsistent and are also inconsistent with documentation produced by Steven Wibracht in the course of the Bankruptcy Case.

F.   **Allegations Regarding Undisclosed and Undocumented 1966 Chevy Pickup Transactions**

152.   Question 18 of the SOFA asks whether the Defendants sold, traded, or otherwise transferred any property to anyone, other than property in the ordinary course of the Defendants' business, within the two years prior to their Bankruptcy Case.  In the Defendants' SOFA, they did not disclose the transfer of a 1966 Chevy Pickup.  (*See* DE 1.)

153.   On November 2, 2017, the Defendants were asked about their ownership interest in the 1966 Chevy Pickup.  (*See* Exh 1 85:26-87:27.)

154.   Steven Wibracht testified that he purchased the 1966 Chevy, which he fixed-up, and then he "gave" it to someone working for Brown Excavation.  (*See id.* at 85:26-87:25.)

155.   Thereafter, on November 10, 2017, the Defendants amended their SOFA to disclose the transfer of the 1966 Chevy.  (*See* DE 16.)

156.   On December 11, 2017, Steven testified further about the transfer of the 1966 Chevy.  He testified that he "traded" the 1966 Chevy to Brown Excavation in exchange for Brown Excavation allegedly agreeing to pay Core Logistics an additional $25,000 on a project that Core Logistics was working on for Brown Excavation.  (*See* Exh 2, 15:8-15.)

157.   Steven then testified that he "traded" the 1966 Chevy because "[he] needed the money," but then that "[Core Logistics] needed the money."  (*See id.* at 15:18-16:21.)

158.   Steven thereafter testified that he traded the 1966 Chevy because Robert Brown "wanted the truck. He came by my shop.  He had to have it."  (*See id.* at 73:13-16.)

159.   Steven, however, testified that he has no paperwork for this "trade."  (*See id.* at 72:20-25.)

### G.    <u>Allegations Regarding Undisclosed and Undocumented Jeep Rubicon Transactions</u>

160.    Question 18 of the SOFA asks whether the Defendants sold, traded, or otherwise transferred any property to anyone, other than property in the ordinary course of the Defendants' business, within the two years prior to their Bankruptcy Case. In the Defendants' SOFA, they did not disclose multiple transactions with Robert Brown in November 2016 and February 2017 involving a Jeep Rubicon. (*See* DE 1.)

161.    On November 2, 2017, the Defendants were asked about a check written to Robert Brown in November 2016 for $35,000. (*See* Exh 1 96:2-96:15.)

162.    Defendant Steven Wibracht testified that the check was for his personal purchase of a Jeep Rubicon from Robert Brown for $35,000. (*See id.* at 96:13-23.) Defendant Steven Wibracht further testified that he "gave him [Robert Brown] a check for $35,000. He [Robert Brown] cashed the check. I [Steven Wibracht] drove the Jeep home." (*See id.* at 97:3-5.)

163.    Defendant Steven Wibracht also testified that "then [he] needed the money back," so he gave the Jeep Rubicon back to Robert Brown. (*See id.* at 96:24-25.) The Defendants, however, then testified that they "sold" the Jeep Rubicon back to Robert Brown because Core Logistics could not pay Brown Excavation approximately $30,000 that Core Logistics allegedly owed Brown Excavation. (*See id.* at 97:7-18.)

164.    Only after the Defendants were questioned about the $35,000 check at the First Meeting of Creditors – which Steven Wibracht paid Robert Brown ***less than a year prior*** to the Petition Date – did the Defendants subsequently amend their SOFA to disclose the transaction with Robert Brown regarding the Jeep Rubicon. (*See* DE 16.)

165.    On December 11, 2017, Defendant Steven Wibracht testified that as a result of the reconveyance of the Jeep Rubicon (originally purchased for $35,000) to satisfy a Core Logistics debt of $30,000 owed to Brown Excavation, Brown Excavation gave Core Logistics a "credit memo" for only $28,000.  (*See* Exh 2, 77:10-15.)  When asked if he had a copy of any of paperwork for this transaction, Steven Wibracht testified that he did not.  (*See id.*)

166.    Defendant Steven Wibracht further testified about the basis for the alleged Core Logistics debt owed to Brown Excavation.  (*See id.* at 80:20-81:19.)  Defendant Steven Wibracht testified that the alleged debt arose from Core Logistics renting generators from Brown Excavation for an apartment project Core Logistics was working on for 210 DG.  (*See id.*)

167.    Steven had previously testified that he had no relationship with 210 DG.  (*See* Exh 1 12:25-13:2.)

168.    However, Steven Wibracht is authorized to sign on 210 DG's bank accounts.

169.    In addition, at the Second Meeting of Creditors, Steven testified that Core Logistics worked on at least one project for 210 DG.  (*See* Exh 2, 31:12-24, 34:21-25.)

170.    Further, Steven Wibracht received money from 210 DG.

171.    In addition, 210 DG paid for the 2015 Jeep Wrangler that Steven Wibracht transferred to his brother, Michael Wibracht.

**H.    Allegations Regarding Undisclosed 2005 Ford**

172.    Question 18 of the SOFA asks whether the Defendants sold, traded, or otherwise transferred any property to anyone, other than property in the ordinary course of the Defendants' business, within the two years prior to their Bankruptcy Case.  In the Defendants' SOFA, the Defendants did not initially disclose the sale of a 2005 Ford Excursion in 2016.  (*See* DE 1.)

173.    On November 2, 2017, the Defendants were questioned about their ownership of a 2005 Ford Excursion in the two years preceding the Petition Date.  (*See* Exh 1 89:4-6.)

Defendant Steven Wibracht testified that the 2005 Ford Excursion was sold in 2016 to Carmax for $12,500, and the funds were allegedly used to pay Core Logistics' payroll.  (*See id.* at 89:8-90:2.)

174.    Steven Wibracht testified about the sale noting that he has "the document of the sale … I sold it to Carmax, because I -- I sold it on a Wednesday or Thursday night because I needed the money Friday."  (*See id.* at 89:23-90:2.)

175.    After the UST questioned the Defendants about the 2005 Ford Excursion on November 2, 2017, the Defendants amended their SOFA on November 10, 2017, to disclose the sale of the 2005 Ford Excursion.  (*See* DE 16.)

### I.    <u>Allegations Regarding Undisclosed Executory Contract</u>

176.    Question 1 on Schedule G asks the Defendants to disclose any executory contracts or unexpired leases.  The Defendants responded that they do not have any executory contracts or unexpired leases.  (*See* DE 1.)

177.    On December 11, 2017, Defendant Steven Wibracht testified that he has had an active listing agreement with Shannon Albrecht for several years for the Defendants' real property described in the Defendants' Schedules A/B as "50% undivided interest in 5 acres, Clear Springs, Comal County, Texas, 26609 Donna Elaine, San Antonio, Texas 782561."  (*See* DE 1, 16, 84; *see also* Exh 2, 46:21-23.)

178.    An active listing agreement for the sale of real property is an executory contract.

179.    The active listing agreement with Shannon Albracht is not listed on the Defendants' Schedule G.  (*See* DE 1.)

### J.    <u>Additional False Statements Regarding Ownership Interests</u>

180.    Steven testified that Core Logistics was a fifty-percent owner of Wishing Star Ranch, LLC.  (*See* Exh 1 Tr. 30:7-12.)

181.    Steven's SOFA, First Amended SOFA, and Second Amended SOFA, which he signed under the penalty of perjury, however, list Steven as a member of Wishing Star Ranch, LLC.  (*See* DE 1, 16, 84.)

182.    Additionally, Steven Wibracht testified at the First Meeting of Creditors that he had no interests in any limited liability companies.  (*See* Exh 1 35:17-36:10.)

183.    Upon information and belief, Steven Wibracht still held an interest in Costa Offshore, LLC as of the Petition Date.

**K.    <u>False Statements Regarding Who Resides at the Defendants' Home</u>**

184.    In response to Question 2 on Schedule J, the Defendants state that as of the Petition Date, in addition to the Defendants and their children, one of the Defendants' mothers lived with them.  (*See* DE 1.)

185.    However, Steven testified at the Second Meeting of Creditors that no one else, other than the Defendants, their children, and their nanny, Wendy Hudson lived with them on November 10, 2017, when the Defendants filed their Amended Schedules.  (*See* Exh 2, 41:23-25.)

186.    Steven further testified that no one else lived with the Defendants, aside from their children, and possibly their nanny, as of the Petition Date.  (*See id.* at 42:1-4.)

187.    Steven's testimony contradicts Defendants sworn statements on Question 2 of Schedule J stating that one of the Defendants' motions lives/lived in the family home.  Both sworn statements cannot be true.

**III.    THE WIBRACHTS HAVE FAILED TO KEEP (OR DISCLOSE) ADEQUATE RECORDS**

188.    The Wibrachts are unable or unwilling to provide records from which their financial condition or transactions can be ascertained.  The Wibrachts' failure to maintain adequate records is amplified by and stands in contrast to the Wibrachts' high lifestyle prior to

the Petition Date.  For example, the Wibrachts owned or controlled no less than four vehicles, including a Ferrari; several Rolex watches; and their bank statements show at least $118,000 deposited into the Defendants' bank accounts that was not accounted for in the Debtors' SOFA (*See* Exh 1 91:25-92:4) in 2016 and $139,000 deposited into the Defendants' bank accounts in 2017 prior to the Petition Date that was not accounted for in the Debtors' (*See id.* 92:5-8).  More specifically, Travelers avers as follows:

### A.    Failure to Keep Information Regarding Income from Core Logistics

189.    Steven was asked about Core Logistics' income for 2015, 2016, and 2017 prior to his departure, but was unable to provide information about Core Logistics' income.  (*See* Exh 1 18:8-10, 19:8-25.)

190.    Steven further testified that he did not file tax returns in 2016 for Core Logistics. (*See* Exh 1 18:15-20.)

191.    Steven also testified that he had not yet accounted for his income from Core Logistics in 2016.  (*See* Exh 1 18:21-23.)

192.    Steven also testified that as of November 2, 2017, he had not filed his 2016 tax returns.  (*See* Exh 1 19:1-2.)

193.    Steven claimed that he did not know the gross income for Core Logistics because he was just "a field guy," but he "ran the office."  (*See id.* at 20:1-4.)

194.    Steven also later testified during the UST's 2004 Examination that he "managed the finances, managed the operations ... [of Core Logistics]."  (*See* Exh 3, 15:10-15.)

195.    Furthermore, when asked about additional payments that he received from Core Logistics, Steven testified that he does not have the records for Core Logistics to prove why Steven received the additional payments from Core Logistics.  (*See* Exh 2, 13:1-4.)

196.     Steven, however, also testified that "I was Core.  I was the majority owner of Core. … Core was my life.  Core is – me and Core were no different."  (*See* Exh 2, 76:13-19.)

### B.     Failure to Keep Information Regarding the Polaris Transaction

197.     In response to Question 18 on their SOFA, the Defendants disclose that in 2017 they transferred a 2016 Polaris and trailer worth approximately $18,000 to Brown Excavation to satisfy company debts of Core Logistics.

198.     However, when asked whether he had any paperwork evidencing the transaction between Steven Wibracht, Core Logistics, and Brown Excavation, Steven Wibracht testified that he had a copy of the title, but when asked whether there was a bill of sale, Steven Wibracht stated "we may have done something.  I don't remember."  (*See* Exh 2, 71:16-19, 72:14-19.)

### C.     Failure to Keep Records Regarding the 1966 Chevy Truck Transactions

199.     In addition to failing to disclose the transfer of the 1966 Chevy Truck to Robert Brown/Brown Excavation, Steven also failed to keep any records of the transaction.  (*See* Exh 2, 72:20-25.)

### D.     Failure to Keep Records Regarding Loan from Michael Wibracht

200.      On July 11, 2017, Michael Wibracht – Steven's brother – wrote a check to Steven for $5,000 as a purported "loan."  (*See* Exh 2, 14:14-17.)

201.     When the UST asked Steven why his brother loaned him money, Steven responded "[b]ecause I didn't have any."  (*See id.* at 14:20-22.)

### E.     Failure to Keep Records Regarding Jeep Rubicon Transactions

202.     On December 11, 2017, Defendant Steven Wibracht testified that as a result of the reconveyance of the Jeep Rubicon (originally purchased for $35,000) to satisfy a Core Logistics debt of $30,000 owed to Brown Excavation, Brown Excavation gave Core Logistics a "credit memo" for only $28,000.  (*See* Exh 2, 77:10-15.)

203.    When asked if he had a copy of any of paperwork for this transaction, Steven Wibracht testified that he did not.  (*See id.*)

**F.      Failure to Keep Information Regarding Deposits and Withdrawals Into Bank Accounts and Credit Card Accounts**

204.    On December 11, 2017, the Defendants were asked about a $2,500 withdrawal on June 7, 2017, and a $1,500 withdrawal on June 11, 2017, from their Security Service checking account.  (*See* Exh 2, 22:15-25, 23:5-8.)   Steven Wibracht was unable to explain why he withdrew the money or for what purpose he used the funds.  (*See id.*)

205.    Steven Wibracht, however, then testified regarding a $8,000 deposit into his Bank of America checking account, but is unable to confirm whether the funds withdrawn from the Security Service checking account are the same funds deposited into the Bank of America checking account.  (*See id.* at 24:15-25:9.)

206.    The Defendants were questioned further about the purpose of other withdrawals from the Security Service checking account and deposits into the Bank of America checking account in the months preceding their Petition Date.  (*See id.* at 26:11-27:16.)   The Defendants were unable to explain the source of the funds, whether the funds came from the sale of their personal property pre-petition, *e.g.,* sale of guns, or other sources, because they lacked documentation for the transactions.  (*See id.*)

207.    When Steven was asked about his American Express accounts, Steven testified that the Defendants could not access his American Express accounts because he was "locked-out."  (*See* Exh 2, 65:1-7.)

**G.      Refusal to Respond to Questions About Financial Affairs**

208.    During the Second Meeting of Creditors, Steven was asked about his and Core Logistics' relationship with 210 DG, his brother's company.

209.    The Defendant's counsel repeatedly instructed Steven not to answer questions posed to Steven regarding his relationship with Core Logistics and 210 DG.  (*See* Exh 2, 35:1-3, 35:25-38:1.)

210.    When Steven was further questioned about his interest in Core Logistics and the value of that interest, including how and why Core Logistics allegedly lost $1 million in 2016, (*see* Exh 2, 86:16-21), Steven's counsel instructed him not to answer the questions (*see id.* at 86:22-87:17.)

### CAUSES OF ACTION

### COUNT I
### FOR DENIAL OF DISCHARGE OF STEVEN AND ERIN WIBRACHT
### 11 U.S.C. § 727(a)(2)(A)

211.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 210.

212.    11 U.S.C. § 727(a)(2)(A) provides that the Court shall deny a debtor a discharge when "with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, the debtor has transferred, removed, destroyed, mutilated or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed … property of the debtor, within one year before the date of the filing of the petition."

213.    By transferring, removing or concealing assets as detailed above, the Defendants transferred, removed, destroyed, mutilated or concealed property within one year before the date of the filing of the Petition with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with the custody of property under this title.

214.    Specifically, the allegations that support a denial of the Defendants' discharge under 11 U.S.C. § 727(a)(2)(A) include, but are not limited to, paragraphs 5, 7-50, 72, 75, 80-89,

93-97, 101-140, 146-175, 180-182, 189-210.

215.    Therefore, the Defendants Steven Brice Wibracht and Erin Michelle Wibracht should be denied their discharge pursuant 11 U.S.C. § 727(a)(2)(A).

## COUNT II
## FOR DENIAL OF DISCHARGE OF STEVEN AND ERIN WIBRACHT
### 11 U.S.C. § 727(a)(2)(B)

216.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 215.

217.    11 U.S.C. § 727(a)(2)(B) provides that the Court shall deny a debtor a discharge when "with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, the debtor has transferred, removed, destroyed, mutilated or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed … property of the estate, after the date of filing of the petition."

218.    By transferring, removing or concealing assets as detailed above, the Defendants transferred, removed, destroyed, mutilated or concealed property of the estate, after the date of the filing the Petition with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with the custody of property under this title.

219.    Specifically, the allegations that support a denial of the Defendants' discharge under 11 U.S.C. § 727(a)(2)(B) include, but are not limited to, paragraphs 5, 7-19, 51, 98-100.

220.    Therefore, the Defendants Steven Brice Wibracht and Erin Michelle Wibracht should be denied their discharge pursuant 11 U.S.C. § 727(a)(2)(B).

**COUNT III**
**FOR DENIAL OF DISCHARGE OF STEVEN AND ERIN WIBRACHT**
**11 U.S.C. § 727(a)(3)**

221.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 220.

222.    11 U.S.C. § 727(a)(3) provides that the Court shall deny a debtor a discharge when "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."

223.    As detailed above, the Defendants concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the Defendants' financial condition or business transactions might be ascertained, and such actions or failures to act were not justified under all of the circumstances of this case.

224.    Specifically, the allegations that support a denial of the Defendants' discharge under 11 U.S.C. § 727(a)(3) include, but are not limited to, paragraphs 5, 7-210.

225.    Therefore, the Defendants Steven Brice Wibracht and Erin Michelle Wibracht should be denied their discharge pursuant 11 U.S.C. § 727(a)(3).

**COUNT IV**
**FOR DENIAL OF DISCHARGE OF STEVEN AND ERIN WIBRACHT**
**11 U.S.C. § 727(a)(4)(A)**

226.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 225.

227.    11 U.S.C. § 727(a)(4)(A) provides that the Court shall deny a debtor a discharge

if "the debtor knowingly and fraudulently made a false oath or account."

228.    Upon information and belief, as detailed above, the Defendants have made false oaths or accounts on their Schedules, First Amended Schedules, and Second Amended Schedules.

229.    Upon information and belief, as detailed above, the Defendants have made false oaths or accounts on their SOFA, their First Amended SOFA, and their Second Amended SOFA.

230.    Upon information and belief, as detailed above, the Defendants have made false oaths or accounts during their testimony during the First Meeting of Creditors, the Second Meeting of Creditors, and the UST's 2004 Examination.

231.    Upon information and belief, as detailed above, these false oaths or accounts were made knowingly and fraudulently.

232.    Specifically, the allegations that support a denial of the Defendants' discharge under 11 U.S.C. § 727(a)(4)(A) include, but are not limited to, paragraphs 5, 7-210.

233.    For each of these false oaths and accounts, the Defendants Steven Brice Wibracht and Erin Michelle Wibracht should be denied their discharge pursuant 11 U.S.C. § 727(a)(4)(A).

## COUNT V
## FOR DENIAL OF DISCHARGE OF STEVEN AND ERIN WIBRACHT
### 11 U.S.C. § 727(a)(5)

234.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 233.

235.    11 U.S.C. § 727(a)(5) provides that the Court shall deny a debtor a discharge if "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."

236.    As detailed above, the Defendants have failed to explain satisfactorily the loss of

assets or deficiency of assets to meet their liabilities.

237.     Specifically, the allegations that support a denial of the Defendants' discharge under 11 U.S.C. § 727(a)(5) include, but are not limited to, paragraphs 5, 7-210.

238.     Because the Defendants have failed to explain satisfactorily, before determination of denial of discharge, the loss of assets or the deficiency of assets to meet their liabilities, the Defendants Steven Brice Wibracht and Erin Michelle Wibracht should be denied their discharge pursuant 11 U.S.C. § 727(a)(5).

## **PRAYER**

WHEREFORE, Plaintiff Travelers Casualty and Surety Company of America prays for the following relief:

1.     On Count I against the Defendants Steven Brice Wibracht and Erin Michelle Wibracht, for an order by this Court denying the Defendants Steven Brice Wibracht and Erin Michelle Wibracht's discharge from their debts pursuant to 11 U.S.C. § 727(a)(2)(A);

2.     On Count II against the Defendants Steven Brice Wibracht and Erin Michelle Wibracht, for an order by this Court denying the Defendants Steven Brice Wibracht and Erin Michelle Wibracht's discharge from their debts pursuant to 11 U.S.C. § 727(a)(2)(B);

3.     On Count III against the Defendants Steven Brice Wibracht and Erin Michelle Wibracht, for an order by this Court denying the Defendants Steven Brice Wibracht and Erin Michelle Wibracht's discharge from their debts pursuant to 11 U.S.C. § 727(a)(3);

4.     On Count IV against the Defendants Steven Brice Wibracht and Erin Michelle Wibracht, for an order by this Court denying the Defendants Steven Brice Wibracht and Erin Michelle Wibracht's discharge from their debts pursuant to 11 U.S.C. § 727(a)(4);

5.     On Count V against the Defendants Steven Brice Wibracht and Erin Michelle

Wibracht, for an order by this Court denying the Defendants Steven Brice Wibracht and Erin

Michelle Wibracht's discharge from their debts pursuant to 11 U.S.C. § 727(a)(5); and

      6.      For such other and further relief as the Court deems just and proper.


DATE: May 25, 2018           Respectfully submitted,

                **WATT TIEDER HOFFAR & FITZGERALD, LLP**
                1765 Greensboro Station Place, Suite 1000
                McLean, Virginia 22102
                Telephone: (703) 749-1000
                Facsimile: (703) 893-8029

                By:  */s/ Jennifer Larkin Kneeland*
                      Jennifer L. Kneeland (*Admitted Pro Hac Vice*)
                      Email: jkneeland@watttieder.com

                    -AND-

                **PULMAN, CAPPUCCIO,**
                **PULLEN, BENSON & JONES, LLP**
                2161 NW Military Highway, Suite 400
                San Antonio, Texas  78213
                www.pulmanlaw.com
                (210) 222-9494 Telephone
                (210) 892-1610 Facsimile

                By:    */s/ Thomas Rice*
                      Randall A. Pulman
                      Texas State Bar No. 16393250
                      rpulman@pulmanlaw.com
                      Thomas Rice
                      Texas State Bar No. 24025613
                      trice@pulmanlaw.com


                **ATTORNEYS FOR TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document was transmitted Via CM/ECF on May 25th, 2018 to the following attorney of record for Defendants as set forth below:

***Via CM/ECF*** *marty@seidlerlaw.com; ecfseidlerlaw@yahoo.com*
Martin Seidler
Law Offices of Martin Seidler
One Elm Place, Suite E504
11107 Wurzbach Road
San Antonio, Texas 78230
***Counsel to Defendants***

*/s/ Thomas Rice*
Thomas Rice

# EXHIBIT 1

## Selected Excerpts from Transcript of Section 341 First Meeting of Creditors November 2, 2017

1          UNITED STATES BANKRUPTCY COURT
              WESTERN DISTRICT OF TEXAS
2                SAN ANTONIO DIVISION

3

In Re:                          )
4                               ) Case No. 17-52300-RBK
STEVEN BRICE WIBRACHT &         )
5   ERIN MICHELLE WIBRACHT,      ) CHAPTER 7
                                )
6   Debtors.                     )

7

8   *****************************************************

9                   NOVEMBER 2, 2017

10  *****************************************************

11

12

13          On the 2nd day of November, 2017, the following

14  proceedings came on to be heard in the above-entitled

15  cause before Jose Rodriguez, Trustee, held at the

16  Federal Bankruptcy Court, 615 East Houston, San Antonio,

17  Texas 78205;

18          Proceedings reported by stenotype machine;

19  Reporter's Record produced by computer-aided

20  transcription.

21

22

23

24

25

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2   CHAPTER 7 PANEL TRUSTEE:

 3          JOSE C. RODRIGUEZ
            342 West Woodlawn, Suite 103
 4          San Antonio, Texas  78212
            PHONE:  210.738.8881
 5          E-MAIL:  Jrodlaw@sbcglobal.net

 6   FOR STEVEN BRICE WIBRACHT AND ERIN MICHELLE WIBRACHT:

 7          MARTIN WARREN SEIDLER
            LAW OFFICES OF MARTIN SEIDLER
 8          11107 Wurzbach Road, Suite 504
            San Antonio, Texas  78230
 9          PHONE:  210.694.0300
            E-MAIL:  Marty@seidlerlaw.com
10
     FOR TRAVELERS INSURANCE:
11
            JENNIFER LARKIN KNEELAND
12          WATT, TIEDER, HOFFAR & FITZGERALD, LLP
            1765 Greensboro Station Place
13          McLean Virginia  22102
            PHONE:  703.749.1026
14          FAX:  703.893.8029
            E-MAIL:  Jkneeland@watttieder.com
15
            - and -
16
            THOMAS RICE
17          PULMAN, CAPPUCCIO, PULLEN, BENSON & JONES, LLP
            2161 Northwest Military Highway, Suite 400
18          San Antonio, Texas  78213
            PHONE:  210.222.9494
19          FAX:  210.892.1610
            E-MAIL:  Trice@pulmanlaw.com
20
     ALSO PRESENT:
21
              ANN KILLIAN,
22            U.S. Trustee's Office;

23            ALLEN WILSON,
              For Brazos Reserve, LLC;
24
              MS. JULIE VERASTEGUI,
25            Certified Court Reporter.
```

1            MR. SEIDLER: You need to see the

2 declaration for the W-2?

3            TRUSTEE: No, no, no. I was on the other

4 screen. Thank you, though.

5            And the numbers on those Social Security

6 cards do match the numbers that are on the petition, so

7 I'm going to hand those items back to you.

8            Have you both had a chance to read the

9 bankruptcy information sheet before today's meeting?

10            MR. WIBRACHT: Yes, sir.

11            MRS. WIBRACHT: Yes.

12            TRUSTEE: Do either of you have any

13 remaining questions concerning that notice?

14            MR. WIBRACHT: No.

15            MRS. WIBRACHT: No.

16            TRUSTEE: Mr. Seidler has in front of you

17 a signature page on a petition.

18            Mr. Wibracht, is that your signature?

19            MR. WIBRACHT: Yes.

20            TRUSTEE: Mrs. Wibracht, is that your

21 signature?

22            MRS. WIBRACHT: Yes.

23            TRUSTEE: Now, before the two of you

24 signed off on that document, did you have a chance to

25 read the petition, the schedules and all the statements

```
 1    that were prepared and filed on your behalf?
 2                MR. WIBRACHT:  Yes.
 3                MRS. WIBRACHT:  Yes.
 4                TRUSTEE:  Are you both personally familiar
 5    with all the information that you're disclosing in these
 6    schedules and statements?
 7                MRS. WIBRACHT:  Yes.
 8                MR. WIBRACHT:  Yes.
 9                TRUSTEE:  Is this information true and
10    correct, to the best of your knowledge and belief, as of
11    the date of the filing of the case?
12                MRS. WIBRACHT:  Yes.
13                MR. WIBRACHT:  Yes.
14                TRUSTEE:  Now, since the filing of the
15    case, have you thought of any changes or corrections
16    that have come to mind that you need to make to any of
17    these schedules and statements?
18                MRS. WIBRACHT:  No.
19                MR. WIBRACHT:  No.
20                TRUSTEE:  Do these schedules as filed show
21    a list of all of your property?
22                MRS. WIBRACHT:  Yes.
23                MR. WIBRACHT:  Yes.
24                TRUSTEE:  And, likewise, do these
25    schedules as filed show a list of all of your creditors?
```

1          MRS. WIBRACHT:  Yes.

2          MR. WIBRACHT:  Yes.

3          TRUSTEE:  Have either of you previously

4    filed for bankruptcy protection?

5          MRS. WIBRACHT:  No.

6          MR. WIBRACHT:  No.

7          TRUSTEE:  And are either of you subject to

8    a domestic support obligation?

9          MRS. WIBRACHT:  No.

10          MR. WIBRACHT:  No.

11          TRUSTEE:  Thank you.  I believe we have

12    some interested parties.

13          So who wants to begin?  Mr. Wilkens?

14          MR. WILKENS:  James Wilkens.  I represent

15    Steve and Paula Usinger [phonetic].  They sold a lot to

16    the debtors.  It's a lot at River Crossing.

17          And the schedule -- the reason why I'm

18    here is just to advise you that the debt to my clients

19    was approximately 35,000 and some change, and the

20    debtors listed the value at 70,000.  My clients believe

21    it's probably worth around 100,000.

22          So you'll need to notice it as an asset

23    case and let everybody file a claim.

24          TRUSTEE:  Okay.  Thank you.

25          Is there someone else?  Yes, sir?

```
 1                    MR. TREVINO:  I represent --
 2                    TRUSTEE:  Why don't you come over here so
 3    that they can see you and you can see them?
 4                    MR. TREVINO:  All right.  Musquiz
 5    Construction.
 6                    TRUSTEE:  Could you spell that?
 7                    MR. TREVINO:  M-U-S-Q-U-I-Z.  And he --
 8    And he --
 9                    TRUSTEE:  Okay.  Hold on a second.
10                    MR. SEIDLER:  Come closer so we can hear
11    you better.
12                    TRUSTEE:  Yeah.  Have a seat.  Musquiz
13    Construction?
14                    MR. TREVINO:  Yeah.
15                    TRUSTEE:  And your name?
16                    MR. TREVINO:  It's Javier Trevino.
17                    TRUSTEE:  And, Mr. Trevino, what is your
18    relationship with Musquiz Construction?
19                    MR. TREVINO:  He's my neighbor.
20                    TRUSTEE:  And you have a question?
21                    MR. TREVINO:  Yeah.  Mr. Musquiz is owed
22    $30,000 by Mr. -- I can't pronounce his last name.
23                    TRUSTEE:  "Wibracht."
24                    MR. TREVINO:  Yeah.  So -- And he has gone
25    through a lot of -- Like I tell you, he's my neighbor.
```

1   Last night he told me, "Can you just come and

2   represent?"  And that's what I'm doing.

3              TRUSTEE:  Okay.

4              MR. TREVINO:  So he just -- like I said,

5   he -- he really went through a lot of suffering and all

6   this other stuff because of whatever -- all the other

7   things that he had to pay because he didn't -- you know,

8   because Mr. Wibracht didn't pay him.

9              TRUSTEE:  Okay.  The purpose of this

10  meeting is to ask any questions you might have of the

11  debtors concerning the debts or concerning their

12  financial disclosures that they have made.

13             MR. TREVINO:  The only thing Mr. Musquiz

14  told me was if --

15             TRUSTEE:  No.  Wait.  Wait.  That is a

16  question that you have to ask.  Do you have any specific

17  question you would like to ask?

18             MR. TREVINO:  Would you like to pay with

19  one of your tractors?

20             MR. SEIDLER:  The answer is no.  There are

21  two tractors.  There's a Mahindra and another one, and

22  we're giving them back to the creditor.

23             But it's my understanding that Musquiz

24  Construction did business with a company called Core

25  Logistics and Mr. Wibracht doesn't owe the money.  I

```
 1   think it's Core Logistics, and that's out of business.

 2             So maybe there was a disconnect here,

 3   because I'm just -- I asked Mr. Wibracht, "Who is this

 4   guy?" and he said, "Well, it sounds like" --

 5             He -- Mr. Wibracht got out of Core

 6   Constructor -- Core Logistics.  He was in it for a

 7   little while; then he got out and it continued to do

 8   business.  So maybe that -- that's -- that's the

 9   confusion.  But to my understanding, Mr. Wibracht

10   personally never dealt with Musquiz Construction, so it

11   must have been Core.

12             MR. TREVINO:  I don't know.  He got the --

13             TRUSTEE:  Yes.  No, no.  I understand.

14   And here's what -- The point he's trying to make is, the

15   debtors are then -- are -- they are here presenting

16   themselves as debtors in their personal names, and if

17   there's a corporate name or a partnership name or any

18   other kind of name, a business, and it's a legal entity,

19   the claim that Musquiz might have might not be directed

20   at them and might be directed at another company --

21             MR. TREVINO:  Okay.

22             TRUSTEE:  -- or another business.

23             Now, this is a proof-of-claim process, and

24   if you want, you can wait for me and I'll be happy to

25   explain what can be done at a later point.  If you -- If
```

```
 1    you want to get some information or you want some

 2    information --

 3                    MR. TREVINO:  I'll do that.

 4                    TRUSTEE:  -- I'll be happy to provide

 5    that.

 6                    MR. TREVINO:  Okay.  Thank you.

 7                    TRUSTEE:  Thank you.  Just wait, and I'll

 8    be happy to visit with you.

 9                    So is there -- are there any other

10    questions?

11                    MS. KNEELAND:  Yes.

12                    MR. RICE:  Jose, Tom Rice on behalf of

13    Travelers.  I just want to clarify something that

14    Mr. Wilkens had asked.

15                    Where on Schedule A is this lot in

16    River Crossing listed?  Which of the four properties are

17    listed on Schedule A as the lot in River Crossing?

18                    MR. WIBRACHT:  235 Steeplebrook.

19                    TRUSTEE:  It's on Page 2, Item 1.3.

20                    MR. SEIDLER:  Do you have a copy of the

21    schedules?  I can show you mine.

22                    MR. RICE:  Just I didn't see that -- we

23    didn't see the cross-reference.  We were trying to

24    figure it out.

25                    TRUSTEE:  That's your only question?
```

```
 1                    MR. RICE:  That's all I have.

 2                    MS. KNEELAND:  No.  We have some more.

 3                    TRUSTEE:  Oh, you have some more?

 4                    MS. KNEELAND:  My name is

 5     Jennifer Kneeland.  Good morning.  And I'm here on

 6     behalf of Travelers, as well.

 7                           EXAMINATION

 8     BY MS. KNEELAND.

 9         Q.   How many vehicles do you own?

10         A.   Me personally?  Two.

11         Q.   Okay.

12         A.   I have a Range Rover.  That's a lease.

13                    MR. SEIDLER:  She was just asking you a

14     number.

15                    MR. WIBRACHT:  Okay.

16         Q.   (By Ms. Kneeland) Okay.  Can you describe the

17     two vehicles that you just identified?

18         A.   A 2016 F-250 and a 2007 Toyota Sequoia.

19         Q.   Okay.  A minute ago you just mentioned a Range

20     Rover.

21         A.   It's a lease.

22         Q.   The Range Rover is a lease.

23              And then repeat the -- the other vehicles

24     that you own.

25                    MR. SEIDLER:  Here they are.  Starts here
```

1    and ends right here.

2                    MR. WIBRACHT:  A 2016 F-250 and a 2007

3    Toyota Sequoia.

4                    MR. SEIDLER:  The schedules say it's a

5    2010.  We may have the wrong year.

6        Q.    (By Ms. Kneeland) It's a 2016?

7        A.    '7.

8        Q.    '7.

9                    Okay.  And are there any other vehicles in

10   yours household?

11       A.    A 2016 Range Rover lease.

12       Q.    Any others?

13       A.    No.  Well, specifically to the 2015 Jeep

14   Wrangler, the vehicle was sold to 210 Development Group.

15   And this 2013 Toyota Corolla, I was a cosigner.

16       Q.    Uh-huh.

17       A.    My sister has that vehicle.

18       Q.    So you're pointing to Item 3.4, the Jeep

19   Wrangler that you said was sold --

20       A.    Yes.

21       Q.    -- to 210 Development Group.  What --

22       A.    Back in 2016.

23       Q.    What is 210 Development Group?

24       A.    A development company here in San Antonio.

25       Q.    And what is your relationship with 210

```
 1    Development Group?

 2         A.    My personal relationship?   Nothing.

 3         Q.    You have no personal relationship

 4    to 210 Development Group?

 5         A.    I mean, I have a personal relationship to one

 6    of the owners.

 7         Q.    Who are the owners of 210 Development Group?

 8         A.    Michael Wibracht and Mark Tolley.

 9         Q.    Who is Michael Wibracht?

10         A.    My brother.

11         Q.    He's an older brother or younger brother?

12         A.    Older brother.

13         Q.    And who is the other person that you mentioned?

14         A.    Mark Tolley.

15         Q.    Mark Tolley.

16               Could you spell his last name?

17         A.    T-O-L-L-E-Y, I believe.

18         Q.    When in 2016 did you sell the Jeep Wrangler to

19    210 Development Group?

20               MR. SEIDLER:  Do you know?

21               MR. WIBRACHT:  It's --

22               MRS. WIBRACHT:  I don't know.

23               MR. SEIDLER:  Wait a minute.  Just off the

24    top of your head.

25               MR. WIBRACHT:  I think it was February of
```

341 First Meeting of Creditors                    Steven Brice Wibracht: United States Bankruptcy Court

```
 1    '16.
 2         Q.    (By Ms. Kneeland) Why did you sell the vehicle
 3    to 210 Development Group?
 4         A.    Because Michael was the one driving it.
 5         Q.    Why did you acquire the vehicle if your brother
 6    was driving it?
 7         A.    Because he was going through a divorce and
 8    didn't have a vehicle to haul around his four kids.
 9         Q.    Okay.  What was the consideration exchanged for
10    the vehicle?
11         A.    He took over payments, the whole thing.
12         Q.    Did you speak to the -- the note holder for the
13    vehicle with respect to this arrangement?
14         A.    No.
15         Q.    So the note holder thinks that you have the
16    vehicle and that you are responsible for making the
17    payments, correct?
18         A.    Correct.
19         Q.    And how much is the property worth?
20         A.    Whatever -- I mean, I don't -- 25, 30 grand.
21    It's a 2015 Jeep Wrangler.
22         Q.    Okay.  I'm sorry.  I couldn't hear your answer.
23         A.    I mean, 25,000.  I don't know.
24         Q.    25?  I thought you said 25 or 30 grand.  Is
25    that correct?
```

1      A.    25 to 30 grand.   I don't know what it's worth.

2      Q.    Okay.

3      A.    I mean, I don't know how many miles are on it.

4 I don't know.

5      Q.    Okay.   And you said it was a 2015, or --

6      A.    '15.

7      Q.    -- what's the year?

8             Okay.   What about the Toyota Corolla?

9      A.    That was -- I cosigned for my sister on that

10 vehicle, and I guess it was probably 2012 when I bought

11 it -- or when she bought it, and she was -- needed a

12 cosigner.

13      Q.    Are there still payments owing on this vehicle?

14      A.    Yeah.   I think there's 2800 bucks, or

15 something, she still owes on it.

16      Q.    And how is the vehicle titled?

17      A.    To my knowledge, it's Amanda Wibracht.

18      Q.    If it's titled as Amanda Wibracht, why did you

19 list it on your schedules?

20             MRS. WIBRACHT:   Because we cosigned on it.

21             MR. WIBRACHT:   Yeah.

22      Q.    (By Ms. Kneeland) Okay.   Going back to the Jeep

23 Wrangler.   Who made the payments on the Wrangler before

24 you sold it to 210 Developers?

25      A.    Core Constructors.

1       Q.   Core Constructors?  What's that?

2       A.   It was a site company that I used to be

3  involved with.

4       Q.   And how were you involved with it?

5       A.   I was one of the owners.

6       Q.   When did you become an owner of Core

7  Constructors?

8       A.   Sometime in August of 2013, I believe.

9       Q.   Does Core Constructors go by any other name?

10      A.   I think the Core Logistics Services D/B/A Core

11  Constructors.

12      Q.   How much of Core Constructors or Core Logistics

13  did you own?

14      A.   At what time?  In August of 2013?

15      Q.   At the beginning, yes.

16      A.   25 percent.

17      Q.   25 percent.

18           And at any time did your ownership

19  interest in this entity change from 25 percent?

20      A.   Yes.

21      Q.   And when?

22      A.   I don't know the exact date.  Sometime in 2014

23  I believe it changed.

24      Q.   And what did it change to become?

25      A.   50.

```
 1        Q.    50 percent.

 2              Who are the other owners of Core

 3   Constructors or Core Logistics?

 4        A.    Presently?  Today?

 5        Q.    No.  At 2015, when your ownership changed to

 6   20 -- to 50 percent, who were the other owners?

 7        A.    Michael Wibracht and Glenn Boltinghouse.

 8        Q.    And what percentages of the company did they

 9   own at that time?

10        A.    30 to 20.

11        Q.    Okay.  And do you continue to have an ownership

12   interest in Core Constructors or Core Logistics?

13        A.    No.

14        Q.    And when did you cease becoming an owner of

15   that entity?

16        A.    March.

17        Q.    Of this year?

18        A.    Of this year.

19        Q.    What did you get in exchange for relinquishing

20   your ownership interest in that entity?

21        A.    Nothing.

22        Q.    You got nothing?

23        A.    (Shaking head.)

24        Q.    Who did you give your interest to?

25        A.    Glenn Boltinghouse.
```

1    Q.    Did you have the -- Did you have Core

2  Constructors and Core Logistics appraised or valued at

3  any time when you transferred 50 percent of your

4  interest to Glenn Boltinghouse?

5    A.    No.

6    Q.    Why not?

7    A.    Because it was upside down.

8    Q.    How much money did Core Constructors make in

9  2016?  The gross income.

10    A.    I don't know off the top of my head.

11    Q.    Can you give me a ballpark gross income for

12  2016 for Core Constructors or Core Logistics?

13    A.    Gross?  I have no idea.  I mean, I could

14  probably give you a ballpark on net.

15    Q.    Did you file tax returns in 2016 for this

16  entity?

17    A.    I have not personally filed, no.

18    Q.    Were they filed for this entity?

19    A.    Well, it was a partnership, LLC, so it's all

20  past due.

21    Q.    So how did you account for the income of Core

22  Constructors or Core Logistics in 2016?

23    A.    I haven't yet.

24    Q.    Would that be found on your tax return?

25    A.    Yes.

1    Q.    Did you file your taxes for 2016?

2    A.    I have not filed yet.

3    Q.    Have you filed them for 2015?

4    A.    Correct.

5    Q.    Did you account for your income for this

6   company on -- in 2015 on your tax returns?

7    A.    Yes.

8    Q.    And what was the gross income for Core

9   Logistics or Core Constructors in 2015?

10          MR. SEIDLER:  Do you know?

11          MR. WIBRACHT:  I don't know off the top of

12   my head.  I don't know off the top of my head.

13    Q.    (By Ms. Kneeland) What was the gross income for

14   Core Constructors or Core Logistics during the course of

15   2017 prior to your transfer of your interest to

16   Mr. Boltinghouse?

17    A.    It was in bad shape.

18    Q.    My question was:  What was the income of the

19   business, the gross --

20    A.    I don't know.  From January 1 to March -- to

21   March of '17, I don't know.

22    Q.    Isn't it true that in the month of February

23   2017, its income was $300,000 for the month?

24    A.    I have no idea.  I mean, gross?  Net?  I -- I

25   have no idea.

1     Q.    Did you -- What was your responsibilities with

2   Core Logistics?

3     A.    I was a field guy.  I ran the office, all of

4   it.  I mean, we had bookkeeping.

5     Q.    You ran the office and you were the field guy.

6               How many employer -- employees did Core

7   Logistics have?

8     A.    Approximately 25 to 30.

9     Q.    25 to 30?

10              How many employees did it have when you

11  gave your interest to Mr. Boltinghouse?

12    A.    Maybe 12 to 14.

13    Q.    In addition to being a field guy and working in

14  the front office, what other duties did you have?

15    A.    Get work, secure contracts.

16    Q.    Get work and secure contracts.

17              What were some of the contracts and work

18  that you secured?

19              MR. SEIDLER:  I'm going to object.  I

20  think we're getting outside the scope of a 341 meeting

21  and the debtors' assets and liabilities.  You're talking

22  about an entity in which he sold his interest before

23  filing the bankruptcy, and maybe you ought to take

24  Mr. Boltinghouse's deposition, who owns the company now,

25  but --

1    MS. KNEELAND:  Actually, he says he gave

2  his interest to Mr. Boltinghouse, so you're looking at a

3  fraudulent conveyance, which is something that the

4  trustee should be very aware of.

5    MR. SEIDLER:  No, I don't think he said

6  that.  He said he --

7    MS. KNEELAND:  Yes, he did.

8    MR. SEIDLER:  -- got nothing for it, but

9  there was a partnership -- excuse me -- a membership

10  interest agreement, which was furnished to the trustee.

11    MS. KNEELAND:  Are you testifying on

12  behalf of the debtors?

13    MR. SEIDLER:  No.  I'm supporting my

14  objection and instruct the witness not to answer on

15  something beyond the realm of a relevant inquiry at a

16  341 meeting.

17    TRUSTEE:  I think -- I think there's --

18  you both raise good points, and I think there's some

19  definite questions on whether or not that could be

20  considered a -- an avoidable transfer.  I do have this.

21  I don't know if this has been provided to -- I did

22  receive that.

23    Now, the question is on the value of the

24  interest, and I don't see anything on the value.  And I

25  think that's her point that she's trying to establish;

1  was there a value.  And -- And your point is, well, this

2  has been disclosed.

3           But I think it would -- at least, if you

4  could focus some of your questions to value, and if he

5  says he does not know, maybe we would have to follow up

6  with some additional requests for information.  I think

7  that's the best way to do it.  We definitely don't want

8  to do a full-blown deposition today.

9           MS. KNEELAND:  Very well.

10           TRUSTEE:  Okay.

11      Q.    (By Ms. Kneeland) So what did you base your

12  value of your ownership interest in Core Logistics on

13  when you just testified that you gave the interest to

14  Mr. Boltinghouse?

15      A.    Based on the financial information we had, the

16  work in progress that we had, I knew that the company

17  had no value because it was 60 days from being in a

18  negative cash position and on the brink of bankruptcy.

19      Q.    Didn't you testify earlier that Core Logistics

20  was paying for a Jeep Wrangler -- paying the car

21  payments on a Jeep Wrangler?

22      A.    Sometime in 2015.

23      Q.    What other debts was Core Logistics paying that

24  were not related to the business?

25      A.    It didn't pay any debts not related to the

```
 1   business.   I mean, the Jeep Wrangler was being driven by

 2   one of the owners.

 3       Q.    So Core Logistics was paying for the vehicles

 4   for its owners?

 5       A.    Some of them.

 6       Q.    What income did you personally derive from Core

 7   Logistics in 2016?

 8       A.    A W-2 income minus whatever the, you know, K-1.

 9       Q.    Approximately how much?

10       A.    150 grand.

11       Q.    150,000 that you earned from Core Logistics in

12   2015?

13       A.    (Nodding head.)

14       Q.    How much did you earn from Core Logistics in

15   2016?

16       A.    Oh, 2015 is what you asked?   That was probably

17   like a 100 grand.

18       Q.    100,000 in 2015?

19       A.    (Nodding head.)

20       Q.    What much about in 2016?   How much did you earn

21   from Core Logistics in 2016?

22       A.    Approximately 150,000.

23       Q.    And so far this year, in 2017, how much have

24   you earned from Core Logistics?   How much has it paid

25   you?
```

1      A.    Currently --

2      Q.    At the time you transferred your interest to

3   Mr. Boltinghouse.

4      A.    I mean, that's -- construction equipment.

5      Q.    Does Core Logistics own an interest in an LLC

6   called Wishing Star Ranch?

7      A.    Yes.  Well, Wishing Star Ranch is, I think,

8   defunct now.

9      Q.    How much interest in Wishing Star Ranch does

10  Core Logistics own?

11     A.    As of the member transfer agreement, it was

12  50 percent.

13     Q.    And what property does Wishing Star Ranch own?

14     A.    Currently, nothing.

15     Q.    What property did Wishing Star Ranch own?

16     A.    They owned a piece of property over in Seguin.

17  Maybe it's listed in here.  It was a piece of property

18  off of Wishing Star Drive.

19     Q.    Can you describe the property, please?

20     A.    It's 107 acres, I believe.

21     Q.    107 acres?

22     A.    Yeah.  Rural.

23     Q.    When did it acquire 107 acres?

24     A.    I believe that was in 2013, 2014.  Early '14,

25  yeah.

1   Q.   2013, 2014.

2            When did it dispose of 107 acres?

3   A.   2017.

4   Q.   In 2017?  When in 2017?

5   A.   I believe it closed in April or May.

6   Q.   Okay.  Who was the purchaser of the 107 acres

7 that Wishing Star Ranch owned?

8   A.   I don't know.  It was listed with a real estate

9 agent.  I don't know who purchased it.

10   Q.   You don't know who purchased it?

11   A.   No.

12   Q.   What was the purchase price?

13   A.   I don't know that either.  I will tell you

14 exactly what I do know, is that --

15            MR. SEIDLER:  All she asked you was who

16 the purchaser is.

17            MR. WIBRACHT:  I don't know.

18   Q.   (By Ms. Kneeland) Tell me what you know.

19   A.   I just know that this agreement got executed.

20            MR. SEIDLER:  And you're referring to

21 what?

22            MR. WIBRACHT:  The membership interest

23 purchase agreement.  That Core Logistics piece of the

24 sale price went to repay a portion of the line of credit

25 at Texas Capital Bank.

1          MR. SEIDLER:  I think he said he didn't

2   own any --

3          MR. WIBRACHT:  Is that what you're asking?

4   I did not have --

5       Q.    (By Ms. Kneeland) Yes.  My answer [sic] is:  Do

6   you stand behind your answer of "no" in response to

7   Question 19?  That's my --

8       A.    Yes.

9       Q.    That's my question to you.

10      A.    Yes.

11      Q.    Okay.  Are you aware that on April 1st of 2016

12  you provided a personal financial statement to Compass

13  Bank in which you listed $350,000 in non-publicly-traded

14  securities that you owned?

15      A.    I couldn't tell you the date, but I'm sure

16  that -- I know I provided Compass Bank a...

17      Q.    So the listing of $350,000 in

18  non-publicly-traded securities that you disclosed to

19  Compass Bank, what were you referring to?

20      A.    Probably Core Logistics.  Without seeing them,

21  that would be my assumption.

22      Q.    Only Core, or any other interest in

23  non-publicly-traded securities made up the $350,000?

24      A.    What was the date?

25      Q.    April 1st of 2016.

1    A.    That was the only company I owned at the time.

2    Q.    Okay.  So on April 1, 2016, you were listing

3  your value in Core at 350,000?

4    A.    Yes.

5    Q.    I want to turn your attention to Question 31 on

6  Schedule B.  It deals with interest and insurance

7  policies.  Your answer to Question 31 was "no."

8            Do you stand behind that answer?

9            MR. SEIDLER:  We're looking for it.

10            (Sotto voce discussion between

11  Mr. Wibracht and Mr. Seidler.)

12            MR. SEIDLER:  Well, health, disability and

13  life insurance, health savings accounts, that's what she

14  wants to know.  Those are the examples.

15            MR. WIBRACHT:  No.  Yes, I stand by my

16  answer.

17    Q.    (By Ms. Kneeland) You have no interest in life

18  insurance policies?

19    A.    No.  I mean, I may have 100,000-dollar policy

20  with State Farm or something.

21    Q.    You may have 100,000-dollar policy with State

22  Farm?

23            MR. SEIDLER:  Do you know?

24            MR. WIBRACHT:  I know I do.

25            MR. SEIDLER:  Do you?  Okay.  It wasn't

1    A.    No.

2    Q.    Have you ever received any money or payments

3  from 210 Developers, LLC?

4    A.    No.

5    Q.    1875 Thompson Place, LLC.  Are you familiar

6  with this entity?

7    A.    That was a Michael Padron deal.  I mean, I know

8  what it is.  I know it's an apartment complex, but I

9  never --

10              MR. SEIDLER:  The question is:  Were you

11  involved with it?

12              MR. WIBRACHT:  No.

13    Q.    (By Ms. Kneeland) You ever received any money

14  or payments from 1875 Thompson Place, LLC?

15    A.    No.

16    Q.    Okay.  And Jamco Group 8, LLC?

17    A.    No.

18    Q.    You have no involvement with that company?

19    A.    No.

20    Q.    Jamco Group 4, LLC.  Do you have any

21  involvement with that company?

22    A.    No.

23    Q.    HCV Holdings, LLC.  Do you have any

24  involvement?

25    A.    No.

1    Q.   Do you know who has involvement in these

2    entities that I've just listed?

3    A.   Yes.

4    Q.   And who?

5    A.   Mike Padron.

6    Q.   For all of the ones I've just listed?

7    A.   Potentially.

8    Q.   Is there anybody else aside from Michael

9    Padron?

10   A.   Joe Muniz.

11        MR. SEIDLER:   That's what she's going for.

12   Q.   (By Ms. Kneeland) Joe Muniz.

13        Aside from Michael Padron and Mr. Muniz,

14   anyone else?

15   A.   I mean, ma'am, I don't -- I mean, I just know

16   those were the two -- two wheels.  I mean, I don't know

17   who else may or may not.

18   Q.   That's fine.

19        How about Towerland Holdings, LLC?  Do you

20   have an interest in that company?

21   A.   No.

22   Q.   Do you know who does?

23   A.   I'd be speculating.

24   Q.   Isn't it true you're involved with a company

25   called Costa Offshore, LLC?

```
 1        Q.   I want to turn to your statement of financial
 2   affairs.
 3             At Part 2, you list your gross income for
 4   this year, up through your petition date, of $65,742.42.
 5   Is this correct?
 6             MR. SEIDLER:  We're looking for that page.
 7             MS. KNEELAND:  Sure.  Take your time.
 8             MR. SEIDLER:  January 1st to the date of
 9   bankruptcy, 65,742.
10             MR. WIBRACHT:  Uh-huh.
11        Q.   (By Ms. Kneeland) And what were the sources of
12   income that comprised this 65,000-dollar figure?
13        A.   Core and Brown Excavation.
14        Q.   Core and Brown Excavation?
15        A.   Correct.
16        Q.   Did you receive money from any other source
17   other than Core or Brown Excavation?
18        A.   As far as income -- W-2 income, or something
19   like that?
20        Q.   The question is:  Did you have any income from
21   employment or from operating a business during this
22   year?
23        A.   No.  Those are the only two.
24        Q.   So Core and Brown?
25        A.   Correct.
```

1       Q.   And those two -- those two receipt -- sources

2   of income totaled the 65,000 here?

3       A.   Correct.

4             MS. KNEELAND:  Okay.  And, Mrs. Wibracht,

5   you're listed at $9,414; is that correct?

6             MRS. WIBRACHT:  Yes.

7             MS. KNEELAND:  And what's the source of

8   that?

9             MRS. WIBRACHT:  For this year?

10            MS. KNEELAND:  Correct.

11            MRS. WIBRACHT:  Comal ISD.  I'm a teacher.

12      Q.   (By Ms. Kneeland) Okay.  For 2016, you list

13  $200,000, Mr. Wibracht, as your gross income with an

14  asterisk that says "estimated."

15            Why did you estimate your income for 2016?

16      A.   Because I don't -- I don't have all the

17  documents yet.

18      Q.   What documents do you have?

19      A.   I've got W-2s.  That's it.

20      Q.   W-2s from whom?

21      A.   From Core.

22      Q.   From Core.

23      A.   And from --

24            MRS. WIBRACHT:  Medina Valley ISD.

25            MR. WIBRACHT:  -- Medina Valley, where my

1   wife worked.

2       Q.   (By Ms. Kneeland) Okay.  What documents are you

3   missing?

4       A.   I don't have K-1s.  I don't know what -- I

5   don't know -- I have don't have the Core documents yet.

6       Q.   You don't have the Core documents.

7            Who's working on the Core documents?

8       A.   I don't know.  I'm trying to get them.  The CPA

9   apparently hasn't been paid.

10      Q.   Who's the CPA?

11      A.   Hanke.

12      Q.   Can you spell that?

13      A.   H-A-N-K-E, I believe.

14      Q.   He's here in San Antonio?

15      A.   Yes.

16           MS. KNEELAND:  And, Mrs. Wibracht, you're

17  listed at $20,000 with an asterisk as estimated for your

18  income in 2016.

19           Why did you estimate that?

20           MRS. WIBRACHT:  I had a baby, and so some

21  of it was from insurance and things like that.  And so

22  it was estimated what I made for that half of the year,

23  because it wasn't exact because I didn't work that whole

24  year.

25           MS. KNEELAND:  Okay.  Congratulations.

1    Q.    (By Ms. Kneeland) In 2015, Mr. Wibracht, you

2  list $143,400.

3              What are the sources of that income?

4    A.    Core.

5    Q.    Core.  Any other source in 2015?

6    A.    No.

7    Q.    Okay.  So you've testified, if I can summarize

8  it -- and please let me know if I'm wrong -- that the

9  income here that you listed in response to Question 4 on

10  your statement of financial affairs is comprised of Core

11  and, for this year, for Brown Excavation.

12              Are there any other sources of income

13  derived from your employment or from operating a

14  business for these -- this period?

15    A.    No.

16    Q.    Okay.  Moving down to the bottom of the page,

17  you say that you -- the question is:  "Did you receive

18  any other income during this year or the two previous

19  years?"

20              So we're talking about other income not

21  related to operating a business or from your employment,

22  correct?

23    A.    Correct.

24    Q.    Okay.  You list a Ferrari for $80,000 that you

25  disposed of.

| | | |
|---|---|---|
| 1 | | When did you sell the Ferrari? |
| 2 | A. | April or May of this year. |
| 3 | Q. | Who did you sell it to? |
| 4 | A. | I sold it back to the person I bought it from. |
| 5 | Q. | And who is the person you bought it from? |
| 6 | A. | Silverstone Auto Group. |
| 7 | Q. | Was the car subject to a car payment? |
| 8 | A. | Yes. |
| 9 | Q. | And how much? |
| 10 | A. | How much was owed on it when I sold it? |
| 11 | Q. | Correct. |
| 12 | A. | 80,000. |
| 13 | Q. | And you sold it for 80,000? |
| 14 | A. | Correct. |
| 15 | Q. | So it was a wash? |
| 16 | A. | Correct. |
| 17 | Q. | Okay.  Did you have an appraisal or any type of |
| 18 | | valuation of the car before you sold it? |
| 19 | A. | No.  I mean, I had an idea of what it's worth |
| 20 | | based on NADA, CarFax, Car Trader.  You know, it's not |
| 21 | | real hard to -- |
| 22 | Q. | What was the year and model of the Ferrari? |
| 23 | A. | 2006 Ferrari F430. |
| 24 | Q. | I'm sorry.  I was coughing.  Could you -- |
| 25 | A. | 2006 Ferrari F430. |

```
 1        Q.   Did the Ferrari have any special upgrades --

 2        A.   No.

 3        Q.   -- or features?

 4             The second item that you listed as sources

 5   of income were "Ford/Chevy, Ford," $68,500.  Do you see

 6   that?

 7        A.   Yes.

 8        Q.   Can you more specifically describe that

 9   notation?

10        A.   I traded a 2015 Chevy 2500 and a 2013 Ford

11   F-350.  I traded both of those vehicles in on a single

12   Ford F-250.

13        Q.   Okay.  And so the two vehicles, the value of

14   those was $68,500?

15             MR. SEIDLER:  That's the payoff.

16             MR. WIBRACHT:  There it is right there.  I

17   mean, we were off a little bit.

18             (Sotto voce discussion between

19   Mr. Wibracht and Mr. Seidler.)

20             MR. WIBRACHT:  The cash -- The trade-in

21   was 73,500.

22             MR. SEIDLER:  No, no, no.  That's --

23   That's the payoff.  The gross trade-in --

24             MR. WIBRACHT:  Gross trade-in was 73,000.

25   The payoff was 67,600.
```

```
 1    $60,886.02.

 2              Can you describe these items, please?

 3       A.    Rolex watches and guns.

 4       Q.    Okay.  Did you have the Rolex watch appraised?

 5       A.    Did I have them appraised?  No.

 6       Q.    Who did you sell them to?

 7       A.    Diamond & Jewelry Exchange.

 8       Q.    How much did you get for them?

 9       A.    Let me see.  I think I wrote it down.  17,000.

10       Q.    How many watches were there?

11       A.    Three.

12       Q.    Three Rolex watches for $17,000?

13       A.    Correct.

14       Q.    Where is the Diamond & Jewelry Exchange

15    located?

16       A.    I-10 and Huebner.

17       Q.    I'm sorry?

18       A.    I-10 and Huebner.

19       Q.    When did you sell these watches?

20       A.    A couple of months.  In 2017.

21       Q.    In 2017.  What month in 2017?

22       A.    I don't remember exactly now.  I don't

23    remember.

24       Q.    Summer?

25       A.    Summer.
```

1    Q.   What did you do with the $17,000?

2    A.   Paid bills.

3    Q.   What bills did you pay?

4    A.   I'd have to look back at that.  It's on my -- I

5    mean, I deposited money in the bank.  It's on the bank

6    statements.

7    Q.   When did you deposit the money in the bank?

8    A.   Probably the day I sold them.  There's two

9    different occasions.  There's two different

10   transactions.  I sold one and then I sold two.  It was

11   probably June, July, or somewhere like that.  June or

12   July is probably...

13   Q.   June or July.

14        And what bank account did you deposit the

15   money in?

16   A.   Bank of America.

17   Q.   Bank of America.

18        And then you said you paid bills.  Do you

19   recall what bills you paid?

20   A.   I paid my American Express card.  I use my

21   American Express card for everything.

22   Q.   So you paid your Amex.

23        Okay.  Aside from the Rolex watches, what

24   were the guns that you sold?

25   A.   A .338 Sako rifle, 6.5 Creedmoor (inaudible) --

```
1              THE COURT REPORTER:  I'm sorry?

2              TRUSTEE:  Whoa, whoa, whoa.  Take a little

3   time.

4        Q.   (By Ms. Kneeland) It's okay.

5              MR. WIBRACHT:  I mean, she doesn't have a

6   copy of this?

7        Q.   (By Ms. Kneeland) No, I don't.

8              MR. WIBRACHT:  .338 Sako --

9              TRUSTEE:  What number are you referring to

10  on that so she can follow along?

11             MR. SEIDLER:  Statement of affairs,

12  Question 18, bottom of Page 8, Drury's Guns, Hot Wells

13  Boulevard, San Antonio.  There's a list of the guns for

14  $23,386.02, sold in 2017.

15             MS. KNEELAND:  Thank you.

16       Q.   (By Ms. Kneeland) When in 2017?

17       A.   February through summer, probably.

18       Q.   And what did you do with the proceeds of the

19  sale?

20       A.   Paid bills.  Deposited it in the bank.

21       Q.   What bank account did you deposit the money

22  into?

23       A.   Bank of America.

24       Q.   And what bills did you pay?

25       A.   I mean, I don't -- household bills.
```

1    Q.   Did you have the guns appraised?

2    A.   No.

3    Q.   On the same page, you talk about the transfer

4    of a Polaris worth $18,000 to Brown Excavation.

5         What did you get in exchange for

6    transferring the Polaris to Brown Excavation?

7    A.   Core Constructors owed Brown Excavation

8    approximately $27,000.  And in the middle -- And while I

9    was still with Core, in trying to benefit Core, make

10   Core work for forgiveness of that -- that loan to -- I

11   mean, the money from Brown -- the receiv -- the

12   receivable to Brown, which is payable to Core, we

13   swapped the Polaris for that payable.

14   Q.   So the Polaris was titled in your name?

15   A.   Correct.

16   Q.   And you gave it to Brown Excavation to satisfy

17   the debts of Core?

18   A.   Correct.

19   Q.   When did you do this?

20   A.   December/January of --

21   Q.   2017?

22   A.   -- '16 -- '16/'17.

23   Q.   Okay.  And you now work for Brown Excavation,

24   correct?

25   A.   Correct.

```
 1        Q.   And what is your position with Brown
 2    Excavation?
 3        A.   Operations manager.
 4        Q.   And what is your compensation arrangement with
 5    Brown?
 6        A.   100,000 a year.
 7        Q.   How often are you paid?
 8        A.   Weekly.
 9        Q.   Do you have any other benefits?
10             MR. SEIDLER:  Do you mean like insurance
11    or pension or --
12             MS. KNEELAND:  Bonuses, things like that.
13             MR. WIBRACHT:  No.
14        Q.   (By Ms. Kneeland) Your answer was "no"?
15        A.   Health insuran -- I mean, I don't even have
16    health insurance right now.
17        Q.   Okay.  You talk about the sale of silver
18    bullion.  When did you sell silver bullion?
19        A.   Let me see.
20             MR. SEIDLER:  It should be in here.
21             MR. WIBRACHT:  It was this year, during
22    the summer.
23        Q.   (By Ms. Kneeland) Did you have it appraised?
24        A.   (Shaking head.)
25             TRUSTEE:  The answer is "no"?
```

```
 1   you had valued at $750,000 last year.  What was the debt
 2   on that equipment?
 3                    MR. WIBRACHT:  Is Komatsu here?
 4                    MR. SEIDLER:  I don't know.
 5                    Do you know what the debt is?
 6                    MR. WIBRACHT:  I mean, it -- it was
 7   approximately -- I want to say about two and a half
 8   million.
 9        Q.   (By Ms. Kneeland) Two and a half million?
10        A.   Uh-huh.
11        Q.   And who was the creditor?
12        A.   Komatsu Caterpillar Financial.  Komatsu --
13        Q.   How did you come up with the value -- I'm sorry
14   to interrupt you.
15                    How did you come up with the value of
16   $750,000?
17        A.   That was approximately the amount.  Because
18   when we split, that was about what we owned in equipment
19   that was free and clear.  You know, that was about the
20   difference between the encumbrance amount and the un --
21   what it was worth market value versus what was owed on
22   it.
23        Q.   I see.  So the equipment is worth more than the
24   two and a half million, that Core has?
25        A.   That Core had.
```

```
 1        A.    The three schools.

 2        Q.    Okay.  Just for sake of example, when Cadence

 3   McShane would pay you on a high school job, did you have

 4   a decision-making ability about where those funds went

 5   after that?

 6        A.    Yes.

 7        Q.    Is that true on all five of those projects?

 8        A.    Yes.

 9        Q.    Thank you.

10              So going back to the -- the Wrangler, I

11   believe you said you transferred that in 2016.

12        A.    Yes.

13        Q.    And prior to transferring that, you said your

14   brother used it, correct?

15        A.    Correct.

16        Q.    I think you testified it had to do with him

17   having several kids.  He needed transportation for his

18   kids?

19        A.    Yes.

20        Q.    Is that -- Is that accurate?

21        A.    Yes.

22        Q.    It was titled in your name, though?

23        A.    Yes.

24        Q.    So would you say your brother used it primarily

25   for personal use?
```

```
 1    used it?

 2         A.    Tyler.

 3         Q.    Do you know his last name?

 4         A.    No.

 5         Q.    And did -- was Core the only one that made the

 6    payments on that Polaris until you sold it?

 7         A.    There was never a payment on it.

 8         Q.    They just bought it outright?

 9         A.    They bought it outright, yeah.

10         Q.    And then I believe you said there was another

11    asset that you owned personally that Core made payments

12    on or paid for.

13         A.    (Shaking head.)

14         Q.    Just the Polaris?

15         A.    And the F-350.

16         Q.    And the F-350.

17         A.    Oh, yeah, there is.  The Mahindra tractor.

18         Q.    What is the Mahindra tractor?

19         A.    A Mahindra tractor.

20         Q.    It was titled --

21         A.    A farm -- farm tractor.

22         Q.    Whose name was it titled under?

23         A.    Mine.

24         Q.    When was it purchased?

25         A.    About the same time, March of '16.
```

```
 1        Q.    What did you use it for?

 2        A.    We used it to shred the field.  We used it to

 3   shred for work.  It was bought for work.  It was cheaper

 4   to buy it personally than it was under a commercial

 5   account.  Interest rates were better cheap -- was better

 6   personally.  There was more incentives to buy it

 7   personally.  It was less expensive.  There was more

 8   rebates.

 9        Q.    Did you ever use it for your own personal use?

10        A.    No.

11        Q.    Did you --

12        A.    Glenn did.  It stayed at his house.  It's at

13   his house right now.

14              MR. SEIDLER:  Glenn who?

15              MR. WIBRACHT:  Boltinghouse.

16        Q.    (By Mr. Wilson) Is it still titled in your

17   name?

18        A.    Yes.

19        Q.    Has he paid you for it?

20        A.    No.

21        Q.    How much is it worth?

22        A.    I think we paid 22,000 for it.

23        Q.    Is there any lien on that?

24        A.    Yes.

25        Q.    All right.  Who has the lien?
```

1    Q.    Okay.  On --

2              TRUSTEE:  You've got to answer.

3              MR. WIBRACHT:  "No."

4              TRUSTEE:  Okay.  Thanks.

5    Q.    (By Ms. Killian) On the guns, watches, what you

6    have is $60,886.  So I have received the one receipt

7    from Drury's Gun Shop, and the total was $4,545.

8              Was there any other guns that --

9    A.    There was -- Yeah.  The -- The checks went in

10   my Bank of America account.

11   Q.    Okay.  Do you -- If there's any other receipts

12   for any other guns, can you give that to your attorney

13   for me --

14   A.    Yes.

15   Q.    -- please?

16             And you don't have a 2016 tax return?

17   A.    No.

18   Q.    Will it be completed or prepared anytime soon?

19   A.    I -- I need to get with an accountant or my

20   CPA, but I don't -- I mean, I've just got to...

21   Q.    Okay.  Would you be able to provide the W-2s

22   that you said you had from Core Logistics?

23   A.    Yes.

24   Q.    Okay.  Let me go through the --

25             Okay.  In the lasts two years, have you

1   owned a 1966 Chevrolet truck?

2     A.   Yes.

3     Q.   Did you sell it?

4     A.   Yes.

5     Q.   When did you sell it?

6     A.   About three months after I bought it.

7     Q.   Which was when?

8          MRS. WIBRACHT:  I don't know.  It all

9   blurs together.

10         MR. WIBRACHT:  I may -- I think I've got a

11  picture of it.

12     Q.   (By Ms. Killian) Yeah.  Is this it?

13     A.   That would be on the day --

14     Q.   Fully restored?

15     A.   Yeah, that's it.  But I took a picture of it

16  the day I bought it.

17         MRS. WIBRACHT:  And sent it to me, right?

18         MR. WIBRACHT:  I'm sure.

19         MR. SEIDLER:  Did you take one the day you

20  sold it?  That would help.

21         MR. WIBRACHT:  I don't have it.

22     Q.   (By Ms. Killian) Was it sold in 2017?

23     A.   No.

24     Q.   So it was sold in 2016?

25     A.   It was sold in twenty -- possibly -- yes, 2016.

1    Q.   If you could find -- Do you have any of the

2    information of what you sold it for?

3    A.   We were doing a project downtown San Antonio

4    and it was V Trade [phonetic], and the utility sub that

5    was on it is Brown Excavation, who I now work for today.

6          We had a contract.  He was on top.  He had

7    the -- We were a sub to Brown on the job.

8    Q.   Okay.

9    A.   So he got paid by the GC.  He paid us.  He came

10   to the shop and he saw the truck in our shop, and he

11   told me he had to have it.  I gave him the truck, and he

12   increased the value of my contract by $26,000.

13   Q.   Is there any documentation for that?

14   A.   (Shaking head.)  But, I mean, that's -- that's

15   what happened.

16   Q.   Okay.

17        MR. SEIDLER:  Did you sign the title over

18   to V Trade?

19        MR. WIBRACHT:  Yes.  No, I signed the

20   title over to Brown Excavation -- to Brown -- Robert

21   Brown.  He's got the truck.  I mean, it's sitting at his

22   house.

23   Q.   (By Ms. Killian) And that was 2016.  Well, if

24   there's any documents that you have for that, that would

25   be great.

1   was going to be a correction on the Toyota Sequoia.  It

2   should be a 2007?

3       A.   It's a 2007, yes, ma'am.

4       Q.   Okay.  In the last two years, have you owned a

5   2005 Ford Excursion?

6       A.   Yes.

7       Q.   When did you buy it and when did you sell it?

8       A.   I sold it in 2016, and that money went back

9   into Core.

10      Q.   But it was in your name, right?

11      A.   (Nodding head.)

12      Q.   So you deposited -- Do you know how much it

13  was?

14              MRS. WIBRACHT:  It was to make payroll.

15              MR. WIBRACHT:  Deposit was to make

16  payroll, but --

17              MR. SEIDLER:  But she wants to know how

18  much you got for it.

19              MR. WIBRACHT:  For the Excursion?

20              MR. SEIDLER:  Yeah.

21              MR. WIBRACHT:  12,500.  Purchase price was

22  19,900.

23      Q.   (By Ms. Killian) Do you have any documents for

24  that?

25      A.   I have the document of the sale, yeah.  I sold

1    it to Carmax, because I -- I sold it on a Wednesday or

2    Thursday night because I needed the money Friday.

3        Q.    Okay.  So if you could give that to your

4    attorney...

5        A.    Yeah.  The sale documents?

6        Q.    Yes.

7        A.    Yeah.

8        Q.    In the last two years, have you owned a 2011 --

9    it's a utility trailer.  It was registered in 2017.

10       A.    Yes.

11       Q.    Do you still have it?

12       A.    No.

13       Q.    What happened to it?

14       A.    That went with the -- the Polaris.

15       Q.    The ATV?

16       A.    Yeah.  They were bought as a package.  It's a

17   trailer to -- to haul the ATV.

18       Q.    Okay.  A 1986 black trailer registered in 2016.

19       A.    A 1986?

20       Q.    Uh-huh.

21       A.    I have no idea what that is.

22       Q.    It says a Top Hat Industries black trailer.

23   And I can try and get the DMV records if you don't have

24   any --

25       A.    A 1986 Top Hat?  That's a Core trailer.

```
 1        Q.   Is that -- It's like an enclosed trailer?   Is
 2   that what it --
 3        A.   No.   It's a -- It's like a 22-foot gooseneck.
 4        Q.   But it was registered in your name?
 5        A.   Yeah.
 6        Q.   Okay.
 7                  MS. KILLIAN:   I'm sorry.   I'll make it
 8   quick.
 9                  TRUSTEE:   That's all right.
10                  MS. KILLIAN:   It's been a long day.
11        Q.   (By Ms. Killian) Let me -- Real quick, on your
12   income.  So if I'm looking at your bank statements and,
13   let's say, I'm on 2017 when you have -- you had 65,742
14   of wages in 2017, so if -- when I see SWBC payroll
15   deposits for you, is that Core?
16        A.   That's Core.
17        Q.   Okay.
18        A.   It was -- SWBC was our -- was our PEO company,
19   and then we changed from SWBC to Lone Star.
20        Q.   Okay.  So the other deposits that aren't
21   payroll from the school or the SWBC, they're just
22   deposits, like a counter-deposit, were those from all
23   the stuff that you sold that are reflected here?
24        A.   (Nodding head.)
25        Q.   So for 2017, deposits that are not clearly
```

```
 1   identified as payroll were $118,811.

 2                  Does that sound correct?

 3      A.   Probably one of -- one of those counter

 4   credits.

 5      Q.   Well, this was 2017.  For 2016, for just

 6   deposits, I have 139,000.  So those would be for items

 7   you were selling?

 8      A.   Not necessarily.

 9      Q.   What were the other sources of income?

10      A.   When I use my personal American Express card --

11   because we had a corporate card and a personal card, and

12   there was times when I used -- our corporate -- the

13   corporate side would be tapped out and I would use

14   personal.  So the company would issue me a check.

15                  And the relationship I had at the branch

16   of Bank of America where I would take the checks, they

17   would give me a counter credit for them so the funds

18   would be there available immediately.

19                  So some of those counter credits are

20   actually company check deposits as reimbursement checks,

21   and a couple of those were previous-year IRS returns,

22   because I had --

23                  MR. SEIDLER:  Refunds.

24                  MR. WIBRACHT:  Refunds.  Because I had

25   huge losses in '14 or '15.
```

```
 1        Q.   (By Ms. Killian) Well, I think the payments

 2   that I have for the American Express were over $158,000.

 3   Does that sound right?

 4        A.   I'm sure.

 5        Q.   Would you be able to provide any of the

 6   statements of what was purchased with the American

 7   Express?

 8        A.   With my personal American Express?  I mean, I

 9   don't think they -- I think they've got me locked out

10   now.

11             MRS. WIBRACHT:  Yeah.  We actually cannot

12   access the account.  So I guess we could call and see if

13   they can give us the statement.

14             MR. SEIDLER:  We'll sign an authorization.

15             MS. KILLIAN:  Okay.  I'll do that.

16        Q.   (By Ms. Killian) Okay.  I have the gold and

17   silver that you gave me before.

18             The other documents that you gave me were

19   about a Porsche.  So I don't have any Porsche that

20   were --

21        A.   That's the Ferrari.

22             MR. SEIDLER:  I wrote "Porsche," but

23   that's the Ferrari?  I'm sorry.  I got my cars mixed up.

24        Q.   (By Ms. Killian) Okay.  So there really wasn't

25   anything in here.  It was just you were just going to
```

```
 1              MR. SEIDLER:  That, we know we can't.

 2        Q.    (By Ms. Killian) Okay.  Any of the source

 3   documents for the deposits.  There was also a really

 4   large check.  There was a -- Hold on.

 5              At the end of November -- It was November

 6   2016.  There was a check for $35,000.  It was check 669.

 7   Do you know what that was for?

 8        A.    It was written to Robert Brown.

 9        Q.    To who?

10        A.    Robert Brown.

11        Q.    Robert Brown?

12        A.    Uh-huh.

13        Q.    Who is Robert Brown?

14        A.    Brown Excavation.

15        Q.    Why did you pay him $35,000?

16        A.    I bought a Jeep from him.

17        Q.    Is that the Jeep that's on your schedules?

18        A.    (Shaking head.)

19        Q.    What Jeep is that?

20        A.    It's -- He has, like, a 2013 Rubicon.

21        Q.    I don't know what that is.

22        A.    It's just like a Wrangler.

23        Q.    Okay.

24        A.    And then I needed the money back, so he got his

25   Jeep back.  We never transferred titles; we never did
```

1   anything.

2               MR. SEIDLER:  I didn't understand.  So --

3       Q.   (By Ms. Killian) So say that again.

4       A.   I gave him a check for $35,000.  He cashed the

5   check.  I drove the Jeep home.

6       Q.   Okay.

7       A.   About 45 days later, I didn't -- Core didn't

8   have the money to pay him and it was approximately

9   30,000, and he said, "That's fine.  Just give me my Jeep

10  back."

11      Q.   And he wrote you a check for -- gave you the

12  money back?

13      A.   I didn't make -- Core did not pay him the money

14  that Core owed him.

15              MRS. WIBRACHT:  So we had to sell the Jeep

16  back to him to make --

17              MR. WIBRACHT:  I sold the Jeep back to him

18  to --

19      Q.   (By Ms. Killian) So in February of 2017, when I

20  see a deposit of 35,000, what is that?

21      A.   What -- Was it on, like, the 13th or 14th?

22      Q.   It's February 2nd, 2017.

23      A.   Let me -- Can I see?

24      Q.   Let me get the statement.

25      A.   It was a company check.  I paid American

```
 1              UNITED STATES BANKRUPTCY COURT
                  WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3

    In Re:                        )
 4                                ) Case No. 17-52300-RBK
    STEVEN BRICE WIBRACHT &       )
 5  ERIN MICHELLE WIBRACHT        ) CHAPTER 7
                                  )
 6  Debtors.                      )

 7

    ****************************************************
 8            COURT REPORTER'S CERTIFICATE
                   NOVEMBER 2, 2017
 9  ****************************************************

10

11              I, JULIE VERASTEGUI, Certified Court

12  Reporter, in and for the State of Texas, do hereby

13  certify that the above and foregoing contains a true and

14  correct transcription of all portions of evidence and

15  other proceedings requested by counsel for the parties

16  to be included in this Reporter's Record, in the

17  above-styled cause, all of which occurred during the

18  bankruptcy hearing proceedings and were reported by me.

19              I further certify that this Reporter's

20  Record of the proceedings truly and correctly reflects

21  the exhibits, if any, offered by the respective parties.

22              I further certify that the total cost

23  for the preparation of the Reporter's Record is

24  $_____ and was paid by _____

25  _____.
```

| | |
|---|---|
| 1 | Certified to by me this _____ day of |
| 2 | _____, 2017. |
| 3 | |
| 4 | _____ |
| 5 | JULIE VERASTEGUI, Texas CSR 7637<br>Expiration Date:  12/31/18 |
| 6 | Firm Registration No. 93<br>Hoffman Reporting & Video Service |
| 7 | The Locust Street Professional Building<br>206 East Locust Street |
| 8 | San Antonio, Texas 78212<br>Phone:  210.736.3555<br>Fax:  210.736.6679 |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

# EXHIBIT 2

**Selected Excerpts from Transcript of
Continued Section 341 First Meeting of Creditors
December 11, 2017**

1    IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE WESTERN DISTRICT OF TEXAS
2              SAN ANTONIO DIVISION

3

     IN RE:                        )
4                                  )  CASE NO. 17-52300-rbk
     STEVEN BRICE WIBRACHT AND     )
5    ERIN MICHELLE WIBRACHT,       )
                                   )
6         Debtors.                 )  CHAPTER 7
     _____)
7

8    *************************************

9              341 MEETING

10      FIRST MEETING OF CREDITORS

11         DECEMBER 11, 2017

12   *************************************

13

14        THIS 341 FIRST MEETING OF CREDITORS, was

15   taken in the above styled and numbered cause on

16   Monday the 11th day of December, 2017 from 1:07 p.m.

17   to 3:00 p.m., before PAMELA SUE PETERSON, Certified

18   Shorthand Reporter in and for the State of Texas,

19   reported by stenographic and computer-aided

20   transcription, at the U.S. Bankruptcy Court in the

21   U.S. Post Office Building, 615 East Houston,

22   Room 333, San Antonio, Texas 78205, pursuant to the

23   Texas Rules of Civil Procedure and the provisions

24   stated on the record or attached hereto.

25

```
 1    APPEARANCES OF COUNSEL:

 2    For Debtor STEVEN BRICE WIBRACHT AND ERIN MICHELLE
      WIBRACHT:
 3
      LAW OFFICES OF MARTIN W. SEIDLER
 4    BY:  MARTIN W. SEIDLER, ESQUIRE
      One Elm Place
 5    Suite 504-E
      11107 Wurzbach Road
 6    San Antonio, Texas 78230
      (210) 694-0300
 7    marty@seidlerlaw.com

 8
      For Creditor TRAVELERS:
 9
      WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
10    BY:  JENNIFER LARKIN KNEELAND, ATTORNEY AT LAW
      1765 Greensboro Station Place
11    Suite 1000
      McLean, Virginia 22012
12    (703) 749-1026
      jkneeland@watttieder.com
13
      and
14
      PULMAN, CAPPUCCIO, PULLEN, BENSON & JONES, L.L.P.
15    BY:  THOMAS RICE, ESQUIRE
      2161 Northwest Military Highway
16    Suite 400
      San Antonio, Texas 78213
17    (210) 222-9494
      trice@pulmanlaw.com
18

19    Also Present:

20    STEVEN BRICE WIBRACHT
           Debtor
21
      JOSE RODRIGUEZ
22         Chapter 7 Trustee

23    KEVIN EPSTEIN, ESQUIRE
           U.S. Trustee's Office
24

25
```

```
 1      APPEARANCES (Continued):

 2    ANN KELLIAN
             U.S. Trustee's Office
 3
      PAMELA SUE PETERSON
 4           Certified Shorthand Reporter

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        SAN ANTONIO, TEXAS, MONDAY, DECEMBER 11, 2017

 2                        1:07 P.M.

 3

 4            THE COURT:  These are the meetings that are

 5    scheduled meetings of creditors scheduled for today.

 6    Today is the 11th day of December 2017.  The meetings

 7    that are scheduled for 1:00 p.m., the first meeting

 8    is Tract No. 1.  This is Case Number 17-52300, Steven

 9    Brice Wibracht and Erin Michelle Wibracht; and

10    Mr. Seidler is the attorney of record, Mr. Martin

11    Seidler, and everybody is present.

12            Mr. Wibracht, if I could, would you raise

13    your right hand again, please.

14            Do you solemnly swear or affirm to tell the

15    truth, the whole truth, and nothing but the truth?

16            MR. WIBRACHT:  Yes.

17            THE COURT:  Thank you.  Once again, your

18    name for the record.

19            MR. WIBRACHT:  Steven Wibracht.

20            THE COURT:  Mr. Wibracht, this meeting was

21    re-called to allow folks to get some additional

22    information and have some time to review it, and

23    there's two parties, at least two parties here

24    present to ask some questions.

25            And I would assume -- Mr. Epstein?
```

1  MR. EPSTEIN: Yes, I'll ask for the

2  U.S. Trustee.

3  THE COURT: Okay. He's appearing on behalf

4  of the United States Trustee, and I'm going to allow

5  him the opportunity to ask you some questions at this

6  point. Thank you.

7

8  STEVEN BRICE WIBRACHT,

9  having been first duly sworn, testified as follows:

10

11  EXAMINATION

12  BY MR. EPSTEIN:

13  Q.   My name is Kevin Epstein. I'm an attorney

14  with the United States Trustee.

15  MR. SEIDLER: Do you want to move forward

16  so the microphone can pick you up? Sit next to

17  Mr. Wibracht.

18  THE COURT: Or you can sit up here, if you

19  want. Either way he will see you, and you'll see

20  him.

21  Q.   BY MR. EPSTEIN: Mr. Wibracht, you used to

22  have an interest in a company called Core Logistics;

23  correct?

24  A.   Yes.

25  Q.   What was your interest in Core Logistics?

```
 1        A.    50 percent.

 2        Q.    You were the 50 percent owner?

 3        A.    Correct.

 4        Q.    And who owned the other 50 percent?

 5        A.    Michael Wibracht and Glen Boultinghouse.

 6        Q.    And how much did they each own?

 7        A.    30 and 20.

 8        Q.    Who owned 30 and who owned 20?

 9        A.    Michael owned 30 and Glen owned 20.

10        Q.    And what did Core Logistics do?

11        A.    Commercial site work.

12        Q.    You no longer -- are you still an owner of

13   Core Logistics?

14        A.    No.

15        Q.    Why not?

16        A.    Transferred my shares to Glen

17   Boultinghouse.

18        Q.    Why did you transfer your shares to Glen

19   Boultinghouse?

20        A.    Because he refused to let me take over his

21   shares.

22        Q.    And --

23        A.    I offered to buy him out, let him out, but

24   he didn't want out.  He threatened a restraining

25   order against me, so I said, "If that's what you
```

1  want, then you take the whole thing."  He took the

2  whole thing.

3      Q.    And you just basically gave him the

4  company?  You didn't get anything in return; correct?

5      A.    Correct.

6      MR. SEIDLER:  There's a document that says

7  the terms of the transfer that you have.

8      MR. EPSTEIN:  Right, $20.00 or something

9  was the consideration or something like that.

10      THE REPORTER:  Sorry, I apologize, but can

11  we close that door?

12      THE COURT: Sure.  I'm going to do it right

13  now.

14      THE REPORTER:  Okay.  Thank you.

15      Q.    BY MR. EPSTEIN:  I have a copy of the

16  document right here.  The total value -- purchase,

17  the $20 and you and your brother both sold your

18  shares; is that correct?

19      A.    Right.

20      Q.    How long had you -- how long had Core

21  Logistics been in business?

22      A.    I got ownership in 2013.

23      Q.    And had Mr. Boultinghouse always been a

24  20 percent owner?

25      A.    No, he became owner at the same time I did.

1       Q.   And what led to the breakup?  Why did you

2  want to buy him out in the first place?

3       A.   We didn't get along anymore, reached an

4  impasse, professional impasse and...

5       Q.   Now, when I -- we received some -- some

6  documents from Bank of America, some checks on the

7  account.  And I see a number of times where you wrote

8  checks to yourself.  I'm going to show you here, I'll

9  show you one from March 2016.  You tell me if the

10  signature on the check is yours.

11       A.   Yes.

12       Q.   And it says it's from Steven Wibracht.  I

13  mean, you signed the check and it's for you for

14  $42,000.  What was the reason you wrote the check to

15  yourself?

16       A.   To pay an American Express bill.

17       Q.   So when it says, "repay loan," that means

18  pay an American Express bill?

19       A.   I mean, it could have been a loan.  I don't

20  know that specific one, but I mean, I -- personally I

21  put over a hundred thousand dollars.

22       THE COURT:  Is that a Core check or his

23  personal checking account?

24       MR. EPSTEIN:  It's a check from Core

25  Logistic Services signed by the debtor here, made out

1   to Steven Wibracht.

2             MS. KELLIAN:  There's a Bates number on the

3   bottom.

4             THE WITNESS:  When I left, Core still owed

5   me like 70-something thousand.

6        Q.   BY MR. EPSTEIN:  So you said you lent the

7   debtor about a hundred thousand dollars or more than

8   a hundred thousand dollars?

9             MR. SEIDLER:  Core, not the debtor.

10            MR. EPSTEIN:  Core, I'm sorry.  Yeah, thank

11  you.  Thank you for correcting me.

12       Q.   BY MR. EPSTEIN:  So when did you lend Core

13  a hundred thousand dollars?

14       A.   The first year was probably a hundred grand

15  and then it was several other times.  And then I was

16  using my personal American Express to fund the

17  managed cash flow of the business.

18       Q.   What would you put on the American Express?

19       A.   Equipment rental, fuel, pretty much

20  anything that would take American Express, I used

21  American Express.

22       Q.   One of the documents we have not yet

23  received is the American Express statements.  When we

24  look at those, will those -- your American Express

25  statements, will they show -- will they be all

1    Core-Logistics-related or will there be a mixture of

2    personal?

3        A.   Mixture.

4        Q.   And were these loans that you made to the

5    company, were they documented?

6        A.   Yes.

7        Q.   How did -- how did you document them?

8        A.   Our bookkeeper would put it in that they

9    paid X bill with Steven's personal American Express.

10   He ran a GL account.  When I left my GL account said

11   I was owed 77,000 bucks or so.

12          MR. SEIDLER:  Those are Core's records.

13          THE WITNESS:  Core's records.

14        Q.   BY MR. EPSTEIN:  So the -- was the amount

15   that Core owed you, was that always for amounts you

16   advanced on your American Express or did you actually

17   put money into the Core bank accounts?

18        A.   No, I wrote personal checks.  In 2013 I

19   emptied my 401-K and wrote a check to Core.

20        Q.   Now, on this check here, the one we're

21   talking about for $42,000, who decided how much you

22   would get paid from Core Logistics?

23        A.   I didn't get paid anything.  It's repaying

24   a loan.

25        Q.   And who -- I mean, was that the amount of

1   that month's bill -- Amex bill or what did that

2   represent?

3        A.   It could have been that I needed $10,000

4   back on 130,000 that was owed to me.

5        Q.   So who decided how much -- I mean, any -- I

6   mean, I'll point out, I'm looking at one from April

7   that's for $25,000 and one from May that's for

8   $18,000.  Who decided how much each check would be

9   for?

10       A.   I did.

11       Q.   Then did you sign all the checks for the

12   business at the time?

13       A.   Yeah, everybody had, but I signed most of

14   them.

15            Our equipment rental is 35,000 a month, and

16   I used my American Express.

17       Q.   And so when I'm looking at a $56,000 check

18   you wrote from the Core Logistics account to yourself

19   in June of 2016 and it says, "repay loan," on the

20   bottom, what was that for?

21       A.   Same thing.

22            MR. SEIDLER:  Would the Core records have

23   more detail on this?

24            THE WITNESS:  Every check that was written

25   is on ledger.

1      MR. SEIDLER:  On the Core ledger?

2      THE WITNESS:  Sure.

3      MR. SEIDLER:  And you don't have those?

4      THE WITNESS:  No.

5      MR. SEIDLER:  Okay.  Who does?

6      THE WITNESS:  Core.

7      Q.    BY MR. EPSTEIN:  And, Mr. Boultinghouse is

8   in charge of Core now?

9      A.    Correct.

10      Q.    And the "repay loan" that's in the memo

11   line, did you type that in there or did somebody else

12   do that for you?

13      A.    No, we have a lady that does that for us.

14      MR. SEIDLER:  Do you know her name?

15      THE WITNESS:  Roxanne Hensley.

16      MR. SEIDLER:  Spell the last name.

17      THE WITNESS:  H-e-n-s-l-e-y.

18      MR. SEIDLER:  H-e-n-s-l-e-y.  Roxanne?

19      THE WITNESS:  Yes.

20      MR. SEIDLER:  Roxanne Hensley.  And she was

21   the Core bookkeeper?

22      THE WITNESS:  Uh-huh.  She did all of our

23   accounts receivable, accounts payable.

24      Q.    BY MR. EPSTEIN:  And did you instruct her

25   how much to put on the check?

1    A.    Yes.

2    Q.    And did you instruct her to put "repay

3    loan" on the bottom or did she do that on her own?

4    A.    She did that on her own.

5    Q.    From the Bank of America account, we see a

6    check from Jerry Hewtty and Georgina Hewtty for

7    $11,900 to you in June of 2017.  Do you know what

8    that's for?

9    A.    Purchase of firearms, two firearms.

10   Q.    On July 11th, 2017, Michael Wibracht --

11   who's your brother; correct?

12         Go ahead and say "yes," please.

13   A.    Yes.

14   Q.    We have a check from him for $5,000 to you.

15   It says "loan" in the memo line.  Do you know what

16   that was for?

17   A.    A loan.

18   Q.    Did you lend him money?

19   A.    He loaned me money.

20   Q.    He was lending you.  Why was he lending you

21   money?

22   A.    Because I didn't have any.  That was

23   about -- what date was it?

24   Q.    It said July 11th, 2017.

25         I think we had -- there was a short

1   discussion last month, but I wanted to make sure I

2   understand.  You used to own a -- did you own a 1966

3   Chevy pickup?

4        A.   Correct.

5        Q.   Okay.  When did you purchase that vehicle?

6        A.   I believe it was sometime in 2015.  I don't

7   own it any longer.

8        Q.   Uh-huh.  How much did you pay for it when

9   you bought it?

10        A.   I want to say 17,000.

11        Q.   Did you pay cash or was there a loan

12   against the car?

13        A.   I paid for it with my American Express.

14        Q.   And why did you buy the vehicle?

15        A.   Pleasure.

16        Q.   And you still own the vehicle?

17        A.   No.

18        Q.   Did you sell the vehicle?

19        A.   I traded the vehicle.

20        Q.   Who did you trade the vehicle to?

21        A.   Traded it to a contractor that we were

22   doing work with, that we were a sub to him.

23             MR. SEIDLER:  Do you know the contractor's

24   name?

25             THE WITNESS:  Brown Excavation.

1   Q.   BY MR. EPSTEIN:  And you say "we."  Who is

2   "we"?  "We were doing work with."

3        A.   Core was doing work as a sub to Brown.

4        Q.   And so you sold it to --

5        A.   I traded to him for $25,000 to put back

6   into the company.

7        Q.   So did this erase a $25,000 debt owed to

8   Brown; is that what you're saying?

9        A.   No.  At the time, it was a $25,000 gain for

10  the company.  He paid us 25 -- he paid Core $25,000

11  additional for me giving him title to the truck.

12       Q.   So he --

13            MR. SEIDLER:  Brown did?

14            THE WITNESS:  Yes.

15       Q.   BY MR. EPSTEIN:  All right.  Let make sure

16  I've got this straight.  He paid $25,000 to Core and

17  you gave him title to the...

18       A.   To the truck.

19       Q.   Truck.  And why did you do that?

20       A.   Because I needed the money.  The company

21  needed the money.

22       Q.   Now, I know on your schedules there's a

23  debt listed to Travelers in the amount of

24  $17 million.  What is that about?

25       A.   An indemnity agreement that I signed in

```
 1   April of 2013.
 2        Q.    And why do you owe money to Travelers?
 3        MR. SEIDLER:  Do you think you do?  He's
 4   asking you that.
 5        THE WITNESS:  I don't believe that it's
 6   anywhere close to 17 million because I was terminated
 7   from my employment at that company in July of the
 8   same year.
 9        Q.    BY MR. EPSTEIN:  Which company is this?
10        A.    Mapco FMS, WPS Group.
11        Q.    So you worked there for two months?
12        A.    I was on the indemnity agreement for like a
13   hundred days.
14        Q.    So you worked for a company called Mapco
15   and you signed an indemnity agreement while you were
16   there?
17        A.    Correct.  Yes.
18        Q.    And what went wrong to put 17 million or
19   whatever amount it is --
20        A.    I left in 2013.  I was -- I was fired.
21   Actually found out I was fired because my company
22   credit card didn't work at the gas station and went
23   back to the office and was told to get my expletive
24   out of here and get your stuff out of your office and
25   you're gone.
```

1   And then we negotiated a severance

2   agreement -- I guess back up a little bit.

3   Late 2012 I became a minority partner in

4   that company.  Didn't work out.  There was one,

5   two -- three of us that left, four total left, three

6   of us had small equity pieces.  And in July of the

7   following year -- 20- -- late 2012 became a partner.

8   July 2013 I was asked to leave.

9   MR. SEIDLER:  I thought it was June.

10  THE WITNESS:  July.

11  MR. SEIDLER:  June, July.

12  THE WITNESS:  I think it was July the 26th.

13  Q.   BY MR. EPSTEIN:  Did they buy out your

14  interest?

15  A.   It was small.  That money was --

16  MR. SEIDLER:  Is that a "yes"?

17  THE WITNESS:  Yes.

18  MR. SEIDLER:  Okay.

19  Q.   BY MR. EPSTEIN:  And for how much did they

20  buy out your interest?

21  A.   It was Core, and I want to say about

22  25 grand.

23  Q.   And was that -- was Mapco in the same

24  business that Core was in?

25  A.   No.

1    Q.    What did Mapco do?

2    A.    They're a general contractor.

3    Q.    And Core -- and Core was doing what?  I'm

4  sorry, I didn't hear.

5    A.    Commercial site work.

6         MR. SEIDLER:  Mr. Epstein asked you a

7  question about how this debt arose to Travelers, and

8  I don't think he got a full answer for that.  You

9  told him you were fired but you didn't explain

10  what -- how the indemnity -- you said the indemnity

11  was only for two or three months.  When did the

12  alleged liability arise?  I think that's what he

13  wanted to know.

14         THE WITNESS:  After -- sometime after --

15  the bone of contention between Travelers and -- part

16  of the reason for this bankruptcy is Travelers is

17  holding me accountable for an indemnity agreement

18  from, I believe, 2008 or 2009 all the way to today.

19         MR. SEIDLER:  When did the alleged

20  liability arise?  I think that's what he wanted to

21  know.

22         THE WITNESS:  Sometime after 2013.  Then we

23  started experiencing bonding and actually funding.  I

24  mean, from the -- from the documentation I've seen

25  they started paying out.

```
 1   was that other -- that document?  That document.  I

 2   sold it around in June of '17.  So I bought it in

 3   '16.

 4        Q.   Bought in September of 2016.  June of 2017.

 5   When did you leave Core Logistics?

 6        A.   March.

 7        Q.   Of which year?

 8        A.   '17.

 9        Q.   March of '17.  And when you purchased the

10   Ferrari did you get a loan to purchase the Ferrari?

11        A.   Yes.

12        Q.   Got a check here from Brown Excavation

13   dated February 22nd, 2016, made out to you for

14   $45,000.  Do you know why Brown Excavation wrote you

15   a check, you personally a check for $45,000 in

16   February of 2016?

17        A.   Yes.

18        Q.   Can you tell me why?

19        A.   I sold a job for them.

20        Q.   You did what?

21        A.   Sold a job for them.

22        Q.   And what does that mean?  What is selling a

23   job?  I'm not familiar with that term.

24        A.   A utility job.

25        Q.   And they paid -- so this was like a
```

```
 1   referral fee or what is it?

 2        A.   Commission.

 3        Q.   Commission.

 4             And you were working for Core at this time?

 5        A.   Correct.

 6        Q.   Did you get -- did you ever -- did Brown

 7   ever pay you any other commissions?

 8        A.   No.

 9        Q.   The -- all right.  I've talked with your

10   counsel before -- before this meeting.  We're still

11   waiting to get some other documents from American

12   Express and I think maybe Bank of America.  We just

13   got some information from Texas Capital today.

14             Actually, let me ask you a couple of quick

15   questions before I finish up.  In your -- from your

16   Security Service account, on June 7th, 2017, you

17   withdrew $2500 in cash.  Do you have any idea -- do

18   you know why you withdrew the cash that day?

19             MR. SEIDLER:  When was it?  June?

20             MR. EPSTEIN:  June 7, 2017.

21             MR. SEIDLER:  2500 from Security Service?

22        Q.   BY MR. EPSTEIN:  Do you know why you

23   withdrew the cash that day?

24             You have to answer audibly.

25        A.   I have no idea.
```

1       MR. SEIDLER:  Of how much?

2       THE WITNESS:  11,400 deposited.

3    Q.    BY MR. EPSTEIN:  So do you know why you

4  withdrew $3,500 in cash on August 11th from Security

5  Service Federal Credit Union?

6    A.    To pay my American Express bill on August

7  the 13th.

8    Q.    I'll ask the question:  So what did you do

9  with the $3500 that you got out of Security Service?

10   A.    Put it in the bank.

11   Q.    Did you -- like could you transfer between

12  accounts or did you actually have to take cash out

13  and then put the cash in the Bank of America?

14   A.    I have no idea.  That's my wife's account.

15   Q.    Which one's your wife's account?

16   A.    Security Service.

17   Q.    So who -- so to get 3,500 out of that

18  account --

19   A.    I'm on it.  I mean, I can go take money

20  out.  But I go to Security Service or go to Bank of

21  America and deposit it.

22   Q.    So is -- in this instance, would you

23  have -- I mean, $3500 is a decent amount of cash to

24  have on you.  You mean instead of wiring between the

25  two or having some kind of transfer --

 1   McShane?

 2          MR. SEIDLER:  She wants to know exact

 3   dates.

 4          THE WITNESS:  I don't know exact dates.

 5      Q.   BY MS. KNEELAND:  What was the most recent

 6   time that Core did work for Cadence McShane?

 7      A.   They were doing work with Cadence McShane

 8   when I left.

 9          MR. SEIDLER:  Which was when?  What year?

10          THE WITNESS:  The date of the separation

11   agreement.

12          MR. SEIDLER:  Which was?

13          THE WITNESS:  March something.

14          MR. SEIDLER:  Of '17, '16 -- March 17th;

15   correct?

16          THE WITNESS:  Correct.

17      Q.   BY MS. KNEELAND:  Okay.  Did Brown

18   Excavation get the work on the utility job from

19   Cadence McShane on the same project or on a same

20   project that Core was also working on?

21      A.   Yes.

22      Q.   And what project was that?

23      A.   The project downtown here.  I don't even

24   remember what the name of it was.  It was build -- a

25   building down here.  It didn't end up getting

1   finished.   Construction halted like halfway through

2   the job.

3       Q.   Okay.   So there's a building downtown that

4   you don't know the name of where construction halted

5   halfway.   What type of construction was it?

6       A.   Site utility work.

7       Q.   Site utility work.

8            And what was being built?

9       A.   There was supposed to be a five-story

10  condo.

11      Q.   Five-story condo.

12           And who was the condo -- who was the owner

13  or the developer of the five-story condo?

14      A.   210 Development.   And then there was two

15  other players involved.   It was right across the

16  street from -- right on the other side of 35 by the

17  McDonald's.

18      Q.   Okay.   And who are the other players

19  involved?

20      A.   I don't know.

21      Q.   210 Development is an entity that is owned

22  and controlled by your brother Michael Wibracht,

23  isn't it?

24      A.   Correct.

25      Q.   Do you know why the five-story condo wasn't

1  Logistics worked indirectly or directly with

2  210 Developers or any entity that your brother might

3  have owned or controlled?

4         MR. SEIDLER:  We're talking about what

5  period of time?  Because Core was in business for

6  years.  So are you going back 10 years?

7         MS. KNEELAND:  Well, he testified that he

8  became in ownership in Core in 2013; right?

9         MR. SEIDLER:  But you didn't limit your

10  questions as to that.  If you want him to answer, you

11  need to fix a time period.

12        MS. KNEELAND:  Sure.  I'm happy to do that.

13        MR. SEIDLER:  Okay.

14     Q.    BY MS. KNEELAND:  So it's correct that

15  Core -- you came into ownership of Core in 2013;

16  right?

17     A.    Yes.

18     Q.    Okay.  So my question pertains to the

19  period in time from 2013 to the present.

20     A.    What was your question?

21     Q.    Were there any projects in addition to the

22  I-35 project that Core did work directly or

23  indirectly for any company that your brother owns,

24  controls or was involved in?

25     A.    Yes.

1      Q.    Okay.  Which projects are those?

2           MR. SEIDLER:  Going to instruct the witness

3   not to answer.  We're way outside the scope of what

4   this debtor's debts and assets and transfers are.

5   You're going between a corporation in which he no

6   longer has any interest and his brother, and that's

7   outside the scope of a 341 exam.  You want to take

8   Core's deposition or Michael Wibracht's, that's fine.

9   But I would object and instruct the witness not to

10   answers because that's way beyond the scope of the

11   341 exam on this man's assets and liabilities.

12           THE COURT:  Can you focus your question?

13   Are you asking about transfers or specific items that

14   you would focus and link up to the schedules or

15   statements?

16           MS. KNEELAND:  Well, I think the question

17   as posed is valid and is appropriate for a 341

18   meeting.  Because, as Mr. Epstein has signaled, there

19   were transfers back and forth between Steven and his

20   brother Michael and I'm trying to understand the

21   extent to which those transfers occurred.  And from

22   2013 to now is getting within a fraudulent conveyance

23   transfer prefer period, which would be an asset of

24   the estate.

25           MR. SEIDLER:  Your question doesn't address

1  specific transfers.  Wants to know about overall

2  relationships.  And whether you're talking about a

3  business relationship or an ex-girlfriend or ex-wife,

4  it doesn't make any difference.  It's outside the

5  scope of the relevant inquiry.

6         THE COURT:  Is this a general question?

7  Are you focusing on a particular time period?

8         MS. KNEELAND:  Well, I can't ask about

9  specific transfers because I have to have the

10 groundwork, of course, and the question to establish

11 the groundwork is, what projects did Core work on

12 from 2013 to the present that were for or on behalf

13 of or related to entities that his brother Michael

14 Wibracht owned.

15         MR. SEIDLER:  You're still fishing.  I

16 instruct the witness not to answer.  You want to talk

17 about specific transfers, he will be glad to answer.

18 But you're out of the ballpark here.

19         MS. KNEELAND:  I can't discuss a specific

20 transfer because your client is the one that holds

21 all the information and he's not providing it to me.

22         MR. SEIDLER:  Ask him a specific question,

23 specific transfer, he'll give it to you.  But just to

24 go on a witch hunt, you know...

25         MS. KNEELAND:  I understand that's quite

```
 1   circular, but we can bring it up with the Judge, if

 2   that's what you're saying and you're instructing your

 3   client not to answer.  If that is what is happening,

 4   please say so on the record and we will take it up at

 5   a later time.

 6            MR. SEIDLER:  I think that's been

 7   generate -- you want to know a specific transfer,

 8   we'll be glad to have him address it.  But to ask

 9   about the transactions between two parties which are

10   not before this Court is beyond the scope.

11            THE COURT:  I think that's been clarified.

12            And if you can draw it into the specifics

13   of the schedules and statements and information

14   provided or if you have any other specific questions

15   related to that.

16            MS. KNEELAND:  That's fine.

17            MR. SEIDLER:  We'll be glad to answer

18   those.

19            MS. KNEELAND:  Very well.

20            Before I move on, I just want to confirm

21   for the record.

22       Q.   BY MS. KNEELAND:  So is it the case that

23   you are accepting your attorney's instruction not to

24   answer the question that has been posed to you at

25   this time?
```

1     A.    Yes.

2     Q.    Okay.  Very well.  Okay.

3           In response to Mr. Epstein's question

4  earlier in the afternoon, you said that you lent Core

5  a hundred thousand dollars in the first year.  And I

6  wanted to understand what the first year meant to

7  you.

8     A.    The first 365 days.

9     Q.    Of which calendar year, please?

10    A.    2013, 2014.

11    Q.    So from January 1, 2013, to December 31st

12  of 2013 your contention is that you lent Core a

13  hundred thousand dollars?

14    A.    No.

15    Q.    Okay.  Could you please explain what your

16  contention is.

17    A.    The first 365 days that I owned Core.

18    Q.    Okay.  Could you spell that out.

19          MR. SEIDLER:  I think he just did.

20          THE WITNESS:  The first 365 days that I

21  owned interest in Core.

22    Q.    BY MS. KNEELAND:  So when did you acquire

23  your interest in Core?

24    A.    I don't have the exact date.

25    Q.    Okay.  You said that you emptied your 401-K

1  true and correct and complete?

2      A.   No.

3      Q.   And the same is for the Statement of

4  Financial Affairs filed on the same day.  Do you

5  recall signing those under penalty of perjury?

6      A.   Yes.

7      Q.   Okay.  Do you reside at 536 East Borgfeld

8  Road?

9      A.   Yes.

10      Q.   Okay.  How many square feet is your home?

11      A.   2600, 2700.

12      Q.   How many bedrooms?

13      A.   Four.

14      Q.   And bathrooms?

15      A.   Three.

16      Q.   Who lives in the home?

17      A.   Me, my wife and my kids and my nanny.

18      Q.   And your nanny?  Who's your nanny?

19      A.   Wendy Hudson.

20      Q.   Wendy Hudson.

21           Anybody else live in your home?

22      A.   Not right now.

23      Q.   Did anyone else live in your home on

24  November the 10th?

25      A.   No.

1    Q.    Did anyone else aside from those listed

2    here live in your home when you filed this bankruptcy

3    petition?

4    A.    I don't know if Wendy was there yet, but I

5    think she was.

6    Q.    Okay.  And how much do you pay your nanny?

7    A.    500 bucks a week.

8    Q.    And does she have a bedroom --

9    A.    Yes.

10   Q.    -- there?

11         Do you give her room and board?

12   A.    Yeah.

13   Q.    And then how -- what are the hours that she

14   cares for your children?

15   A.    Whatever I work.

16   Q.    Okay.  And what are those?

17   A.    Sometimes 3:00 in the morning to when I get

18   home.  I mean, my work hours and my wife's work

19   hours.

20   Q.    For --

21   A.    She's a teacher.

22   Q.    For $500 a week?

23         She's a teacher.  So does she work in a

24   school system.

25   A.    My wife?  Yes.

1    11 U.S.C. 2d. 541.

2             THE COURT:  There's no need yet.  There's

3    some big liens apparently on this.

4             MR. SEIDLER:  It's not his own property.

5             MS. KNEELAND:  Very well.

6         Q.   BY MS. KNEELAND:  Your 50 percent undivided

7    interest in five acres in Clear Springs.  You say in

8    your amended schedule that a hundred percent of the

9    property is worth $95,000 more or less.

10            Do you recall saying that in your amended

11   schedules?

12        A.   Correct.

13        Q.   How did you go about valuing the property?

14        A.   That's what the real estate agent that

15   listed for sale for the last five years.

16        Q.   And what's the real estate agent's name?

17        A.   Shannan Albrecht.

18        Q.   And she's had it listed for sale for

19   several years, you say?

20        A.   (Nods head in an up-and-down motion.)

21        Q.   Do you have an active listing agreement

22   with Ms. Albrecht?

23        A.   I believe so.

24        Q.   Okay.  And who else owns the property aside

25   from yourself?

1  property?

2           THE WITNESS:   2015 Jeep Wrangler.

3           MR. SEIDLER:   VIN number what?

4           THE WITNESS:   1C4HJWEG9FL677404.

5           MR. SEIDLER:   And that's the one counselor

6  is asking you about?

7           THE WITNESS:   Correct.

8       Q.   BY MS. KNEELAND:   Okay.   So now we're

9  saying that the property was titled in the name of

10  Core and sold to 210 Development?

11           MR. SEIDLER:   He's saying this is a bill of

12  sale that he's reading from.

13       Q.   BY MS. KNEELAND:   Okay.   And can you tell

14  me who the seller is?

15       A.   Core Constructors.

16       Q.   And who's the buyer?

17       A.   210 Development.

18       Q.   Okay.   So then why in the schedules which

19  you say under penalty of perjury that the property,

20  that the car is still titled in your name?

21       A.   It is titled in my name.

22       Q.   I thought you said the seller was Core?

23           MR. SEIDLER:   It is in the bill of sale.

24           THE WITNESS:   It is in the bill of sale.

25  It's the same conversation we had last time.   It

1    Q.    At her house.

2          Do you ever drive that car?

3    A.    No.

4    Q.    Okay.  And this is a vehicle that you're

5    attempting to reaffirm the debt on?

6    A.    Yes.

7    Q.    Who pays the insurance on the vehicle?

8    A.    My sister.

9    Q.    And are you the only co-signor?  Is your

10   wife a co-signor as well?

11   A.    No.

12   Q.    On your amended schedules you list, under

13   question 17, deposits of money, two accounts at Bank

14   of America and two at Security Service FCU.

15         Are there any other bank accounts that you

16   have?

17   A.    No.

18   Q.    Okay.  Question 18, you identify a Bank of

19   America trading account with $980 in it.

20         Is that the balance in the account or is

21   that the value of the stocks?

22   A.    That's the total value.  I don't know what

23   the cash versus stock difference is.  And I don't

24   know what it is today.  It changes every day.

25   Q.    What stocks do you own in the Bank of

1    Q.   Okay.  Okay.  Question 40 on your

2    schedules, Schedule B, talking about machinery

3    fixtures, equipment, supplies you use in business and

4    tools of your trade.  That's where you load -- you

5    listed your Mahindra tractor, which you said is in

6    the possession of Mr. Glen Boultinghouse.  And when

7    we were here at the beginning, if you remember, you

8    described additional equipment, excavators and it

9    seemed like heavy equipment.

10        Did you own those pieces of equipment in

11   your own name?

12   A.   No.

13   Q.   No, they were in Core's name?

14   A.   Okay.

15        MR. SEIDLER:  Is that a "yes" or a "no"?

16        THE WITNESS:  They were in Core's name.

17   Q.   BY MS. KNEELAND:  Okay.  Is there any other

18   business-related property that you have?

19        MR. SEIDLER:  Any other in addition to

20   what?

21   Q.   BY MS. KNEELAND:  Well, you said in your

22   schedules, on question 44, any business-related

23   property you did not already list.  And your answer

24   was no.

25        Do you stand behind that answer?

```
 1        A.    About 70 grand.

 2        Q.    $70,000?

 3              MR. SEIDLER:  In addition to the indemnity

 4   provisions.

 5              THE WITNESS:  In addition to the indemnity

 6   provisions.

 7              MR. SEIDLER:  You're getting sued by these

 8   nice people for how much money?

 9              THE WITNESS:  17 million.

10              MR. SEIDLER:  So does he owe you 17 million

11   if you have to pay it out?

12              THE WITNESS:  Plus 70,000.

13              MR. SEIDLER:  17 million plus 17,000;

14   correct?

15              THE WITNESS:  70,000.

16              MR. SEIDLER:  70,000.  Excuse me.

17              THE WITNESS:  17 million plus 70,000.

18              MR. SEIDLER:  If the 17 million settled?

19              THE WITNESS:  Correct.

20        Q.    BY MS. KNEELAND:  So you made an agreement

21   with Mr. Boultinghouse that he would indemnify you

22   for any claims arising from Core at the time that you

23   conveyed your interest to him; correct?

24        A.    Correct.

25        Q.    And that was in the spring of 2017?
```

1    Q.    17 different companies in their group.

2          So what --

3    A.    What I know them for is demo and abatement.

4  But they do a lot of other stuff, but I don't know --

5  I mean, I know they cleaned up -- they probably

6  cleaned up the BP oil spill.

7    Q.    Okay.  Aside from your belief that

8  Mr. Boultinghouse was going to partner with Alamo 1,

9  did you do any other type of investigation to

10  determine that Mr. Boultinghouse would actually be

11  able to indemnify you for claims arising from Core?

12    A.    No.

13    Q.    You say --

14          MS. KNEELAND:  I'm sorry, do you need to

15  take a break?

16          MR. SEIDLER:  No, I'm just looking up

17  Alamo 1 because I've never heard of it either.

18          MS. KNEELAND:  Oh, okay.  Okay.  I saw him

19  looking at your phone.  I want to make sure I wasn't

20  interrupting communications.

21          MR. SEIDLER:  No.

22    Q.    BY MS. KNEELAND:  Various uncollectable

23  claims against Core Logistics is another listing of

24  claims that you've made on your schedules.  You've

25  put $70,000 as a price on this.

1      What types of uncollectable claims against

2  Core are you referring to?

3      A.   Can I see that?

4      Q.   You want to see some of my handwriting

5  here.

6      A.   That's okay.  I won't read it.  Where are

7  we?  Right here?

8      Q.   Correct.

9      A.   Various uncollectable -- that's just this

10  year.

11      Q.   Is that $70,000, is that what was on --

12      A.   That's encompassing that whole entire line.

13      Q.   Okay.  So that also encompasses what

14  Mr. Boultinghouse owes you?

15      A.   Mr. Boultinghouse doesn't personally owe me

16  anything.  His company does.

17          MR. SEIDLER:  That's the same, Alamo 1, the

18  number one?

19          THE WITNESS:  That's it.

20          MS. KNEELAND:  Okay.  Thank you.

21          MR. SEIDLER:  A remediation company.

22          MS. KNEELAND:  You can Google it,

23  apparently.

24          MR. SEIDLER:  Yeah.

25          MS. KNEELAND:  So just to catch up on your

1    I don't know specifically on that.

2        Q.    How many American Express accounts do you

3    have?

4        A.    Zero now.

5        Q.    On the petition date how many American

6    Express cards?

7        A.    I didn't have any.  My wife had one.

8        Q.    You did not have any American Express

9    cards?

10       A.    I had a card but it was attached to her

11   account.

12       Q.    So the American Express was in Erin's name

13   and you had a card?

14       A.    Correct.

15       Q.    So when you were answering Mr. Epstein's

16   questions this morning you were saying you were

17   paying American Express, how do you reconcile that

18   with the fact that you just told me you didn't have

19   an American Express account?

20       A.    I mean, it's my wife's.

21            MR. SEIDLER:  Could you sign on it?

22            THE WITNESS:  I had a card with my name on

23   it tied to my wife's account.

24            MR. SEIDLER:  Okay.

25       Q.    BY MS. KNEELAND:  And that was the only

1   personal account with American Express?

2       A.   She had two.  She had her -- she had one by

3   herself and then she had another one with me.

4       Q.   Okay.  How much is owed on each of the

5   accounts?

6       A.   I don't -- I don't have access to it

7   anymore.  I mean, I did it online, and it's all gone.

8           MR. SEIDLER:  Here's one.

9           THE WITNESS:  That's -- that's --

10          MR. SEIDLER: Okay.

11          THE WITNESS:  -- 1900 bucks.

12          MR. SEIDLER:  19 what?

13          THE WITNESS:  1929.

14          MR. SEIDLER:  Is that what's on the

15  schedules?

16          THE WITNESS:  I believe so.

17          MR. SEIDLER:  Okay.  And it came from

18  where?

19          THE WITNESS:  Experian.

20          MR. SEIDLER:  Credit report?

21          THE WITNESS:  Correct.

22          MR. SEIDLER:  Okay.

23      Q.   BY MS. KNEELAND:  Did Core Logistics have

24  an American Express account?

25      A.   Yes.

1    Q.    And who could use the Core Logistics

2    American Express account?

3    A.    Anyone.

4    Q.    When you say "anyone," could you be more

5    specific, please.

6    A.    I mean, the girls in the office used it.  I

7    used it.  Michael used it.

8    Q.    Did you walk around with a card in your

9    wallet?

10   A.    Yes.

11   Q.    In your amended Statement of Financial

12   Affairs you list a lawsuit filed against you by

13   American Express.  The nature of the suit you listed

14   as a guarantee.  Whose American Express liability did

15   you guarantee?

16   A.    Core's.

17   Q.    Core's.

18         And how much was the lawsuit that -- for

19   that you list here?

20   A.    Whatever it says there.

21   Q.    Well, that's my trouble, it does not say

22   what the amount of the lawsuit was for.

23         MR. SEIDLER:  Were you ever served for that

24   lawsuit?

25         THE WITNESS:  I don't think so.  It was

```
 1   just a demand.
 2         Q.   BY MS. KNEELAND:  You have a case number.
 3   It is 2017 CI 1814 -- excuse me -- 18145.
 4         MR. SEIDLER:  That's correct.  We may have
 5   picked it up from the docket for that detail.
 6         Q.   BY MS. KNEELAND:  So you don't know how
 7   much the lawsuit listed on your Statement of
 8   Financial Affairs sought?  How much is claimed?
 9         MR. SEIDLER:  Let's see.  Do you know how
10   much American Express lawsuit is for?
11         THE WITNESS:  I mean, I know a guess.
12         MR. SEIDLER:  No, have you ever seen the
13   lawsuit?
14         THE WITNESS:  I've seen a demand letter.
15         MR. SEIDLER:  No.  The question is, she
16   wants to know, have you ever seen the lawsuit?
17         THE WITNESS:  No.
18         MR. SEIDLER:  Then you don't --
19         THE WITNESS:  To my knowledge, I don't know
20   if there is a lawsuit.
21         Q.   BY MS. KNEELAND:  Well, you signed under
22   penalty of perjury that there is a lawsuit that you
23   are named on as a guarantor.  Is your testimony that
24   the American Express liability that you guaranteed
25   was Core's?
```

1        MR. SEIDLER:  Do you understand the

2   question, guarantee liability?

3        THE WITNESS:  Yes, I do have a guarantee

4   liability from Core or -- from -- to American Express

5   from Core.

6        Q.   BY MS. KNEELAND:  Have you guaranteed

7   anyone else's liability to American Express?

8        A.   Clarify the question.

9        Q.   Yeah.  Is there any other person or entity

10  from whom you guaranteed a debt to American Express?

11       A.   No.

12       Q.   Question 12 of your Statement of Financial

13  Affairs asks, "In the year before bankruptcy was any

14  of your property in the possession of an assignee for

15  the benefit of creditors, a court-appointed receiver

16  and custodian or any other official?"

17        You remember that question?  And you wrote

18  no.  Isn't it true that at the end of July all of

19  your assets were under an asset injunction order

20  entered by Judge Ezra in the Western District of

21  Texas?

22        MR. SEIDLER:  Your assets she's asking.

23       Q.   BY MS. KNEELAND:  Any indemnity action

24  where Travelers is the plaintiff -- actually, we're

25  the defendant in that matter.

1        THE WITNESS:  No.

2        MR. SEIDLER:  -- either way; right?

3        Here's what I picked up on the docket.

4   American Express on September 30th.  I have a

5   pleading.

6        MS. KNEELAND:  Yeah.

7        Q.   BY MS. KNEELAND:  We've talked about the

8   Polaris that was in your name that transferred to

9   Brown Excavation.

10       A.   Uh-huh.

11       Q.   In your many amended schedules you

12  attempted to be more specific about that.  You said

13  that the Polaris was purchased with Core American

14  Express card.  Do you stand behind that answer?

15       A.   Yes.

16       Q.   Okay.  And is there any type of paperwork

17  that you completed with Brown Excavation in order to

18  convey title or evidence of ownership between the

19  Polaris to Brown?

20       A.   He's got the title.

21       MR. SEIDLER:  So the answer is yes?

22       Q.   BY MS. KNEELAND:  You just handed him a

23  copy of the --

24       A.   Yes.

25       Q.   Or just handed him the title?

```
 1            MR. SEIDLER:  You just handed it to him or
 2   did you do something else?
 3            THE WITNESS:  Just handed it to him.
 4            MR. SEIDLER:  How did the vehicle -- or
 5   Polaris get transferred?
 6            THE WITNESS:  I signed it.
 7            MR. SEIDLER:  Okay.  So you did something
 8   else.
 9            THE WITNESS:  Yes, I did something else.
10            MR. SEIDLER:  Okay.
11       Q.   BY MS. KNEELAND:  You signed over the title
12   to him?
13       A.   Correct.
14       Q.   Was there any bill of sale or anything like
15   that?
16       A.   Handwritten?  You mean written?
17       Q.   Right.
18       A.   I mean, we may have done something.  I
19   don't remember.
20       Q.   So for the 1966 Chevy pickup that you
21   conveyed to Brown Excavation, what paperwork did you
22   complete in order to effectuate that arrangement?
23       A.   Core got paid $25,000.  That was it.
24            MR. SEIDLER:  No.  What paperwork?
25            THE WITNESS:  None.
```

```
 1        Q.   BY MS. KNEELAND:  So about that.  So you

 2   say that Core got paid $25,000 from Brown for the

 3   pickup?

 4        A.   Correct.

 5        Q.   Did Brown write a check, write Core a check

 6   for $25,000?

 7        A.   No -- yeah, I mean, ultimately, yes.

 8        Q.   What do you mean, "ultimately, yes"?

 9        A.   They gave me $25,000 additional monies on a

10   property contract I had with them.

11        Q.   Okay.  And what contract was that that you

12   had with them.

13        A.   I don't remember which one it was.  I mean,

14   he wanted the truck.  He came by my shop.  He had to

15   have it.  And that was -- you know, he said, "I want

16   it."  And it was his favorite color, yada, yada.

17        Q.   What was -- the contract you had with

18   Brown, what was it to do with services being

19   performed?

20        A.   Needed utilities on the job.  I did the

21   site work.

22        Q.   Was this the same job on I-37 that --

23        A.   Yes.

24        Q.   -- 210 Development was involved in?

25        A.   Yes, I believe so.
```

1   is -- me and Core were no different.

2        Q.    Okay.  And so then when I asked you some

3   more about it you explained that the project that you

4   got a bump up on had to do with the lot that was over

5   on I-37 that was owned by 210 Developers; right?

6        A.    No, it's not owned by 210 Developers.

7        Q.    Okay.  It was the I-37 lot?

8        A.    35.

9        Q.    I-35 lot?

10        A.    Correct.

11        Q.    Okay.  So earlier you said that the owner

12   was 210.  Is that wrong?

13        A.    The owner of the project was 210.  The

14   owner of the property was somebody out of New York.

15        Q.    Oh, okay.  So the owner of the project was

16   210.  And that's where you got the bump up and

17   $25,000 in exchange for the 66 Chevy pickup; right?

18        A.    No.

19        Q.    Okay.  Help me understand.

20        A.    210 had nothing to do with me selling the

21   truck or trading the truck to Brown Excavation.

22        Q.    I didn't say that.  I was just trying to

23   connect that you got a bump up in the value of your

24   project from Brown in exchange for the pickup; right?

25   You didn't just say --

```
 1        A.    I got an increase of $25,000 on a contract

 2   for a 25,000 asset that he wanted.

 3        Q.    Okay.  So Mr. Brown did not write you a

 4   check for $25,000 in exchange for the pickup; right?

 5        A.    No, he increased the value of Core's

 6   contract by $25,000.

 7        Q.    And that contract that we're talking about

 8   was the one on I-35?

 9        A.    Correct.

10        Q.    Okay.  Moving on to the Jeep.  This was a

11   Jeep Rubicon that you purchased from Mr. Brown?

12        A.    Correct.

13        Q.    Okay.  And how much did you pay for the

14   Jeep Rubicon?

15        A.    32, I think.

16        Q.    $32,000?

17        A.    Uh-huh.

18        Q.    And who paid the $32,000?

19        A.    I did.

20        Q.    You personally?

21        A.    Yes.

22        Q.    And you paid that to whom?

23        A.    Robert Brown.

24        Q.    Robert Brown.

25              And then what happened next?  Did he give
```

1      A.    Like nine of them.

2      Q.    You --

3      A.    We had a project that needed diesel

4   generators to provide power.  We split the cost of

5   it.  I could not pay.  I couldn't pay my part of it

6   on the last piece of it.  And I give him the Jeep

7   back to make right on the contract that we had

8   together.

9      Q.    What was the project for which you needed

10  the generators?

11     A.    It was a project where the general

12  contractor could not get permanent power provided

13  fast enough to condition the spaces so they asked us

14  to provide -- can we provide them diesel generators.

15     Q.    Who was the general contractor?

16     A.    Cadence McShane.

17     Q.    What was -- where was the project located?

18     A.    Houston.

19     Q.    In Houston.

20           What kind of project was it?

21     A.    An apartment project.

22     Q.    An apartment project?

23           Who was the developer?

24     A.    210 Development Group.

25     Q.    When were you working on this project?

1  transcript was and then we can fill in the blanks.

2  Question: "Can you give me a ballpark

3  gross income for 2016 for Core Constructors or Core

4  Logistics?"

5  Answer: "Gross," question mark. "I have

6  no idea. I mean, I could probably give you a

7  ballpark on net."

8  A. I don't know. I can tell you speculation.

9  MR. SEIDLER: Don't speculate.

10  Q. BY MS. KNEELAND: So earlier, before I read

11  this back, you said you thought gross was $7 million

12  in 2016?

13  A. Total revenue.

14  Q. Okay. And ballpark on net?

15  A. Probably negative a million dollars.

16  Q. You think that Core lost a million dollars

17  in 2016?

18  A. Yes.

19  Q. If Core lost a million dollars in 2016, can

20  you explain to me what the reason what might have

21  caused that loss?

22  MR. SEIDLER: We're -- instruct the witness

23  not to answer. We're way, way out of -- I want to

24  accommodate you, but we're way, way, way outside the

25  scope of --

1   parcel of property; right?

2       A.    Owned?  Is that what you said?

3       Q.    Correct?

4       A.    Yes.

5       Q.    And how many acres was this parcel?

6       A.    I don't know.  We talked about it last

7   time.  Like 109, 10, 11, 12, 13, something like that.

8       Q.    Over a hundred acres?

9             And you testified earlier that that

10  property sold in the spring of this year; correct?

11      A.    Correct.

12      Q.    And what happened to the money, the sale

13  price?

14      A.    The loan was satisfied and the remainder

15  went to Texas Capital Bank to pay off a line of

16  credit -- pay down a line of credit.

17      Q.    Okay.  So what was the purchase price?

18      A.    I don't know.  I was out at that time and

19  it didn't matter to me.

20      Q.    Okay.  When you say the loan was satisfied,

21  what are you talking about?

22      A.    There was a note on it.

23            MR. SEIDLER:  A first lien?

24            THE WITNESS:  First lien.

25      Q.    BY MS. KNEELAND:  Okay.  And then you said

1    the remainder of the property went to Texas Capital

2    Bank?

3              MR. SEIDLER:  Texas Star, I think.

4              THE WITNESS:  Texas Capital.

5              MR. SEIDLER:  Oh, Texas Capital.  Sorry.

6       Q.    BY MS. KNEELAND:  What indebtedness was

7    paid down at Texas Capital Bank?

8       A.    $35,000.

9       Q.    And whose indebtedness at Texas Capital

10   Bank was paid?

11      A.    Core's.

12      Q.    Core's.

13            And what was the purpose of the Texas

14   Capital Bank loan?

15      A.    Line of credit.

16      Q.    A line of credit.

17            Was a line of credit maxed out or was there

18   room left on the line of credit?

19      A.    It was maxed out.

20      Q.    At $35,000?

21      A.    300,000.

22      Q.    At $300,000?

23            So $35,000 from the sale of the property

24   that Wishing Star Ranch owned went to pay Texas

25   Capital Bank?

```
1    Capital.
2              THE COURT:  Texas Capital would have been
3    one?
4              THE WITNESS:  I believe I had two.  At one
5    point in time, I had to provide one to Travelers, and
6    then I had to provide them -- I believe I had to
7    provide them 24 months' worth of bank statements and
8    copies of any checks that I had written or deposits
9    over $5,000.
10             THE COURT:  Okay.  So that information
11   would be in their --
12             THE WITNESS:  They have --
13             THE COURT:  -- possession.  Okay.
14             If I need anything else, I'll contact you
15   through Mr. Seidler's office.  And I appreciate it,
16   for the record, you did provide me a key and the --
17   for the Nueces County condo and also the password for
18   the garage entrance; right?  Thank you very much.
19             Mr. Epstein?
20             MR. EPSTEIN:  Yeah, just two quick
21   questions.
22
23                  FURTHER EXAMINATION
24   BY MR. EPSTEIN:
25        Q.   You mentioned earlier that Core Logistics
```

```
1   had an American Express card; is that right?

2        A.   Yes.

3        Q.   Why did -- and why did you use your wife's

4   American Express card on -- for Core Logistics'

5   expenses if Core Logistics had its own American

6   Express card?

7        A.   Because it was Core, we always had hit the

8   limit.

9        Q.   What was the limit?

10       A.   80,000.

11       Q.   $80,000?

12       A.   (Nods head in an up-and-down motion.)

13            Yes.

14            MR. EPSTEIN:  We've received some documents

15   from the bank, from the institutions, is it okay if

16   we share those documents with the trustee?

17            MR. SEIDLER:  With the trustee, yes.

18            MR. EPSTEIN:  No further questions.

19            MR. SEIDLER:  No one else, though?

20            THE COURT:  All right.  We've come a long

21   way here, and I appreciate everyone's patience.  I

22   think with that, we're going to conclude the meeting.

23   And I understand that you're still in conversation

24   with the United States Trustee's Office about

25   following up and --
```

1

## I N D E X

2                                                               PAGE

3    Appearances.........................................2

4    Index..............................................4

5    STEVEN BRICE WIBRACHT
6         Examination by Mr. Epstein.....................6
          Examination by Ms. Kneeland..................28
          Examination by Mr. Rice.....................82
7         Further Examination by Ms. Kneeland..........84
          Further Examination by Mr. Rice..............87
8         Cont. Further Examination by Ms. Kneeland.....88
          Further Examination by Mr. Epstein...........99

9

10    Reporter's Jurat.................................106

11

## E X H I B I T S

12

(None marked.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  IN THE STATE OF TEXAS     )

2                            )

   COUNTY OF BEXAR            )

3

4

5      I, PAMELA SUE PETERSON, Certified Shorthand

6  Reporter in and for the State of Texas, do hereby

7  certify:

8      That said transcript of proceedings was taken

9  before me at the time and place therein set forth and

10  was taken down by me in shorthand and thereafter was

11  transcribed into typewriting under my direction and

12  supervision, and I hereby certify the foregoing

13  transcript is a full, true, and correct transcript of

14  my shorthand notes so taken.

15      I further certify that I am neither counsel for

16  nor related to any party to said action, nor in any

17  way interested in the outcome thereof.

18      IN WITNESS WHEREOF, I have hereunto subscribed

19  my name this 13th day of December, 2017.

20

21

22

       _____
23     PAMELA SUE PETERSON, CSR
       Texas CSR 8924 - Expires 12-31-18
       Firm Registration No. 93
24     Hoffman Reporting
       206 East Locust Street
25     San Antonio, Texas 78212

# EXHIBIT 3

**Selected Excerpts from Transcript of
2004 Examination of Steven Brice Wibracht
February 22, 2018**

1          UNITED STATES BANKRUPTCY COURT
             WESTERN DISTRICT OF TEXAS
2                SAN ANTONIO DIVISION

3

4    IN RE:

5    STEVEN BRICE WIBRACHT and
     ERIN MICHELLE WIBRACHT
6                  CASE NO. 17-5230-RBK

7

8

9

10

11          RULE 2004 EXAMINATION

12       STEVEN BRICE WIBRACHT GARCIA

13

14          FEBRUARY 22, 2018

             9:30 a.m.
15

16    United States Bankruptcy Office

17     615 E. Houston St., Suite 533

18        San Antonio, Texas

19

20

21

22

23

24

25       Lynne M. Homan, CSR No. 8640



STEVEN BRICE WIBRACHT GARCIA
IN RE: WIBRACHT

February 22, 2018
2

```
 1                     APPEARANCES

 2   ON BEHALF OF STEVEN BRICE WIBRACHT:

 3        Martin Seidler, Esq.
          marty@seidlerlaw.com
 4        11107 Wurzbach Rd., Suite 504
          San Antonio, TX  78230
 5        (210) 694-0300

 6   ON BEHALF OF UNITED STATES BANKRUPTCY TRUSTEE:

 7        UNITED STATES DEPARTMENT OF JUSTICE
          Kevin M. Epstein, Esq.
 8        kevin.m.epstein@usdoj.gov
          615 E. Houston, Room 553
 9        San Antonio, TX  78295
          (210) 472-4640

10

11   ON BEHALF OF TRAVELERS CASUALTY & SURETY:

12        WATT TIEDER, HOFFAR & FITZGERALD, LLP
          Jennifer Larkin Kneeland, Esq.
13        jkneeland@watttieder.com
          1765 Greensboro Station Place, Suite 1000
14        McLean, VA  22102
          (703) 749-1026

15

16   ALSO PRESENT:

17        Ann Jillian, Paralegal Specialist

18

19

20

21

22

23

24

25
```



STEVEN BRICE WIBRACHT GARCIA
IN RE: WIBRACHT

February 22, 2018

3

```
 1                              INDEX
                                                        PAGE
 2  Appearances                                           2

 3  Index                                                 3

 4                      EXAMINATION INDEX

 5  Steven Brice Wibracht
                BY MR. EPSTEIN . . . . . . . . . . . .   4
 6              BY MR. SEIDLER . . . . . . . . . . . .  95
                BY MR. EPSTEIN . . . . . . . . . . . . .101
 7

 8

 9                 EXHIBIT INDEX (ALL EXHIBITS RETAINED)

    Deposition
10     14      Copies of Checks                         33

11     15      Copies of Check                          48

12     16      Copies of Checks                         51

13     17      Title Application                        59

14     18      Jeep Wrangler Bill of Sale               67

15     19      Application for Texas Title              73

16     20      Copy of Check                            77

17     21      Rolex Receipts                           78

18     22      Bank Records                             90

19

20  Witness Signature Page                             104

21  Reporter's Certificate                             107

22

23

24

25
```



1      Q.  So until about 2012?

2      A.  '13.

3      Q.  And why did you leave Federal Management

4  Solutions?

5      A.  I was bought out.

6      Q.  Does that mean at some point, you acquired an

7  ownership interest in Federal Management Solutions?

8      A.  Yes.

9      Q.  How did that work?  Was this some kind of

10  employee stock option plan or you had put some money in

11  at some point to the company?

12      A.  Sweat equity type deal.  I don't remember the

13  exact parameters of it.

14      Q.  So when you were bought out, what did you

15  receive from Federal Management Solutions?

16      A.  On my exit?

17      Q.  Yes.

18      A.  Cash and Core Logistics.

19      Q.  How much cash?

20      A.  Less than $40,000.  I don't remember the exact

21  amount.

22      Q.  And you said you received Core Logistics.  Was

23  Core Logistics previously owned by Federal Management

24  Solutions?

25      A.  It was previously owned by the same owner as



STEVEN BRICE WIBRACHT GARCIA
IN RE: WIBRACHT

February 22, 2018
12

1  Federal Management Solutions.

2      Q.    And when you received Core Logistics, were you

3  at that point a hundred percent owner of Core Logistics,

4  or I know there were two or three other owners at times,

5  so --

6      A.    Twenty-five percent.

7      Q.    And I know we've discussed this a little bit

8  at some other --

9             At that point, when you were bought out,

10  what was the ownership structure of Core Logistics,

11  coming out of the buy-out, that is?

12      A.    When I was bought out?

13      Q.    When you were bought out of Federal Management

14  Solutions and you acquired an ownership in Core

15  Logistics.

16      A.    There was four partners.

17      Q.    Tell me who each one is and how much each one

18  owned.

19      A.    Steven Wibracht, Glen Boltinghouse, Michael

20  Wibracht, Raymond Jenkins, and they were all 25.

21      Q.    Now if I remember correctly from one of the

22  meetings of creditors, Mr. Jenkins, did you buy

23  Mr. Jenkins out of his 25 percent?

24      A.    Yes.

25      Q.    And what did you pay him for his 25 percent?



1      A.    Fifteen or twenty thousand dollars.

2      Q.    So at that point, you owned 50 percent, your

3  brother, Michael, owned 25 percent and Mr. Boltinghouse

4  owned the other 25 percent, correct?

5      A.    Yes.

6      Q.    And when did you acquire the additional

7  percentage from Mr. Jenkins?

8      A.    I don't remember the date.

9      Q.    I mean, did you all operate for a year or two

10 together or was it a month later he was out?

11     A.    It was a fairly short period of time.

12     Q.    All right.  And Core Logistics, what did Core

13 Logistics do?

14     A.    Site work.

15     Q.    And I'm not a construction guy so I apologize

16 if there's some things I ask that kind of sound stupid

17 or I don't understand how it works.

18          Is Core Logistics typically a

19 subcontractor on a bigger project or is Core a general

20 that hires other people?

21     A.    Subcontractor.

22     Q.    So you were an owner of Core Logistics from

23 2013 to 2017, correct?

24     A.    Yes.

25     Q.    Was the company successful during that time?



STEVEN BRICE WIBRACHT GARCIA                    February 22, 2018
IN RE: WIBRACHT                                              14

1     A.    No.

2     Q.    And why do you say no?

3     A.    There's too much debt.

4     Q.    What was the problem with the company?

5     A.    We couldn't service the debt load.

6     Q.    What kind of debt load did you have?

7     A.    Equipment.

8     Q.    So you had monthly payments on equipment that

9  you couldn't make the payments on?

10    A.    Yes.

11    Q.    Is this because you couldn't get enough

12 business or you had to price yourself too low on jobs,

13 or what was the reason?

14    A.    Culmination.

15    Q.    And when you were working for Core, were you

16 taking a salary?

17    A.    Yes.

18    Q.    What was your salary?

19    A.    It was, when we started, it was monthly.  It

20 varied throughout the years.

21    Q.    How did you set what your salary would be?

22    A.    In the beginning, it was real easy.  It was

23 zero.  I mean, just like any other -- I mean, you do

24 what you can do to try to figure it out.

25    Q.    I mean, it's one thing if you took out



1  whatever money you could take out versus whether you

2  were drawing, you know, $2000 a week or $4000 a week, or

3  whatever the number might be.

4           Were you receiving a steady paycheck at

5  any time from Core Logistics?

6      A.   Yes.

7      Q.   And during that time, you know, what was your

8  salary set at?

9      A.   Approximately a hundred K annual.

10     Q.   What was your role with Core Logistics?

11     A.   Owner.

12     Q.   On a day-to-day basis, what did you do?

13     A.   Everything.  I mean, managed the finances,

14  managed the operations and try to -- you know, business

15  development.

16     Q.   Was your brother involved in the company?

17     A.   He was 25 percent owner.

18     Q.   And did he have a day-to-day involvement?

19     A.   No.

20     Q.   How about --

21          MR. SEIDLER:  Sorry.  I didn't hear that.

22     A.   No.

23     Q.   Did he draw a salary?

24     A.   Yes.

25     Q.   Similar to yours or different?



1    A.    Correct.  Was.

2    Q.    Was, okay.  Something didn't work out on that

3  job, is that right?  I couldn't tell from the story

4  exactly what happened.  It didn't make sense.

5    A.    The job started.

6    Q.    Okay.

7    A.    And the funding fell apart.

8    Q.    So when you say that you got them a job, does

9  that mean you a made an introduction from Brown to

10  Cadence McShane?

11            What does that mean you got them a job?

12    A.    Construction is a relationship driven

13  business.

14    Q.    Uh-huh.

15    A.    Brown was awarded the site and the utilities

16  on the job.  Core couldn't qualify financially to do

17  that job.

18    Q.    And I'm guessing this must have been a pretty

19  big job?  I mean, to pay you $45,000, this would have

20  been a much larger project.

21            How big a project are we talking about

22  here?

23    A.    I don't remember the magnitude of the site and

24  utility portion.  It was several years ago.

25    Q.    The $45,000 you were paid, is that common in



STEVEN BRICE WIBRACHT GARCIA                    February 22, 2018
IN RE: WIBRACHT                                               40

1    Q.   Let me turn to Exhibit 9, please.

2              Do you recognize this document?

3    A.   Yes.

4    Q.   This is a document titled Personal Financial

5    Statement -- or tell me what it is.

6    A.   It's a loan document that was filled out to

7    try to secure a small business loan for Core Logistics.

8    Q.   And it's dated October 13, 2016, right?

9    A.   Yes.

10   Q.   Were you able to get a small business loan

11   from this loan document?

12   A.   The SBA denied the loan.

13   Q.   Now I'm looking at the various numbers on

14   here.

15             $50,000 in cash on hand, then it talks

16   about a million dollars in stocks and bonds.  Do you see

17   that?

18   A.   Yes.

19   Q.   What does that refer to?

20   A.   That was reflective of an approximate

21   valuation of --

22             MR. SEIDLER:  Flip over to --

23             MR. EPSTEIN:  Well, let him answer the

24   question.

25   A.   A valuation of 50 percent ownership, 50



1  percent of Core Logistics.

2      Q.    How did you come up with that million dollar

3  valuation?

4      A.    Nothing scientific.

5      Q.    Five months later, in March of 2017, you gave

6  away your interest in Core Logistics for no

7  consideration, no money.

8              MR. SEIDLER:  Objection as to form.

9  You've mis-characterized what the transfer document

10  says.

11              There was a consideration there and there

12  is a monetary consideration as well.  If you can

13  re-phrase it.

14              MR. EPSTEIN:  Are you talking about for

15  $20 or am I missing something?

16              MR. SEIDLER:  That is consideration and

17  the assumption of millions of dollars worth of debt,

18  that is consideration, so that's not giving away.

19  Transfer is a better word.

20      Q.    Five months -- And non-pejorative, perhaps

21  that's the word.

22              Five months later, you transferred your

23  interest for $20, in Core Logistics for $20.

24              In October, you said you valued that

25  interest at a million dollars.  Did anything change



1  during those five months?

2      A.  Yes.

3      Q.  What changed?

4      A.  The ten year note to refinance all the

5  equipment didn't go through.  SBA denied it.  We ran out

6  of work.  We didn't have work for -- we didn't have any

7  real work for 2 1/2 months.

8          And to clarify for the record, I didn't

9  transfer my interest for $20.  I transferred my interest

10  for complete indemnity from all of the debt, which was

11  over a million dollars from Komatsu, which was $300,000

12  from Texas Capital.  There was lots of changes.

13      Q.  But at this point, you valued your interest,

14  in October of 2016, at a million dollars, which would

15  indicate that you thought it was --

16      A.  Based on a cash flow statement.  Based on a

17  cash flow of taking a three year note, three year 1.4

18  million dollar to a ten year amortization, which would

19  have freed up somewhere in the neighborhood of 50 to

20  sixty thousand dollars a month, that our bank told us we

21  were approved for, but the SBA came back after and

22  denied the loan.

23      Q.  That cash flow statement, does that exist

24  somewhere?

25      A.  I'm sure Core has them.



STEVEN BRICE WIBRACHT GARCIA
IN RE: WIBRACHT

February 22, 2018
43

1    Q.   Do you have it personally?

2    A.   No.  I'm no longer owner of Core.  I don't

3  have access to the records.

4    Q.   And on the bottom of this page is $175,000

5  other personal property.

6          Do you know what that is?

7    A.   Sure.  I mean, that was, I had watches, guns;

8  you know, everything that I've stated.  You guys have

9  copies of all that stuff that was sold or liquidated.

10   Q.   I'm just trying to figure out, in this list of

11 other items on the second page, DBTR 444, some I see

12 vehicles, but I assume the vehicles are in that $253,000

13 of vehicles, so I'm trying to figure out, does that mean

14 the firearms, the jewelry, the gold and silver bullion,

15 that that was worth $175,000?

16   A.   I didn't go get an appraisal on it.  It's just

17 filling out a loan document to the best of my knowledge,

18 putting down --  This was a personal financial --

19          MR. SEIDLER:  Just answer his question.

20 So you're asking about all the entries under number 5,

21 whether they were worth $175,000?

22   Q.   Not whether all of them are worth it, because

23 some of them are vehicles; whether the first four are

24 worth -- is that where the $175,000 came from?

25   A.   I don't recall.



STEVEN BRICE WIBRACHT GARCIA                    February 22, 2018
IN RE: WIBRACHT                                             48

1   project was?

2        A.    Frankel Family Trust.

3        Q.    When did you start working for Brown

4   Excavation?

5        A.    Sometime after I left Core.  I don't know the

6   date, my start date.

7        Q.    So that's something in 2017, correct?

8        A.    Correct.

9        Q.    And remind me what you do for Brown.

10       A.    Operations, business development.

11       Q.    In June of 2016, we see a check deposited into

12  your Bank of America account for $37,000 for Brown

13  Excavation made out to you.

14              Do you know what that was for?

15       A.

16              MR. SEIDLER:  Can you put it closer?

17              MR. EPSTEIN:  Yes.

18       A.    No, I don't remember.

19              MR. SEIDLER:  Do you want to mark that as

20  an Exhibit, and we'll find out?

21              MR. EPSTEIN:  We'll mark that as Exhibit

22  15, identified as BOA 39.

23              (Deposition Exhibit 15 marked for

24  identification.)

25       Q.    How would you find out, go about -- I mean,



1  $37,000 is a significant amount of money, I would

2  assume.

3           Is that a significant amount of money to

4  you?

5     A.   Today.

6     Q.   In June of 2016, was that a significant amount

7  of money to you?

8     A.   Sure.

9     Q.   How would you go about figuring out why Brown

10  Excavation paid you personally $37,000?

11     A.   I can look at the bank statement.  I mean,

12  there's something, I mean, there's something to it.

13     Q.   All right.  Well, if you come up with an

14  answer afterwards, would you let Mr. Seidler know.

15     A.   Sure.

16           MR. SEIDLER:  We can leave a space in the

17  2004 exam, and when you get it to read and sign, you'll

18  figure out what that's for, even if you have to ask

19  Brown.

20     A.   Yes.

21           MR. EPSTEIN:  I assume that Travelers is

22  going to be taking a 2004 exam at some point.  We can

23  use that time to follow up on a question like this.

24           MR. SEIDLER:  No, he'll find out for you.

25           MR. EPSTEIN:  Right.  If we need it on



STEVEN BRICE WIBRACHT GARCIA                    February 22, 2018
IN RE: WIBRACHT                                              82

1            If you turn to page 31 of 39.  I'm sorry,

2   it looks like, I'm sorry, 30 of 39, you have Dury's

3   guns, $23,000.

4            MR. SEIDLER:  Your question had to do

5   with $75,000 charged on Core's credit card to Dury's?

6        Q.   $75,000 --

7            MS. KILLIAN:   11015 is Core; the 41004 is

8   AmEx, American Express.

9        Q.   So on American Express cards from October,

10  2015 through May of 2017, mainly on the American Express

11  card in Erin Wibracht's name, which I think you

12  testified you have a credit card to use, right?

13            MR. SEIDLER:  That's a yes?

14       A.   Yes.

15       Q.   And the first four were on the Core American

16  Express card.  So we showed $75,000 worth of purchases

17  at Dury's Guns.

18            MR. SEIDLER:  On all the cards?

19            MR. EPSTEIN:  Yes, all together.

20            MR. SEIDLER:  Okay.  You made it sound

21  like he bought $75,000 worth of gun stuff for himself,

22  where, if the Core card was being used, you might want

23  to distinguish.

24       Q.   Absolutely.  So tell me, in October, November

25  of 2015, we see about $16,000 of purchases from Dury's



STEVEN BRICE WIBRACHT GARCIA                    February 22, 2018
IN RE: WIBRACHT                                              84

1       Q.   Were those purchases for Core, were they Core
2   Logistics or for you and Mr. Boltinghouse?
3       A.   There were several gun purchases that were
4   done for clients.  Specifically a model builder, he
5   liked to be paid in firearms.
6       Q.   So you'd buy --
7       A.   Subcontractor.
8       Q.   Okay.
9       A.   And he said instead of paying him $1200, buy
10  me this, buy me this.
11      Q.   And again, I'm going to tell you I'm not an
12  expert.  I mean, you go to Dury's Guns, there's a
13  background check on an individual buying it, but if Core
14  Constructors is buying it, how does that work?
15      A.   I do the background check.
16      Q.   It's your background check?
17      A.   Sure.
18      Q.   Okay.  And then how do you go about
19  transferring that gun to somebody?
20      A.   Hand it to them.
21      Q.   Hand it to them.  Okay.  And that's what you
22  did in this case, you handed it to one of your
23  subcontractors?
24      A.   Yes.  Giving a gun as a gift is a common
25  occurrence.



```
 1                 UNITED STATES BANKRUPTCY COURT
                     WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3

 4   IN RE:

 5   STEVEN BRICE WIBRACHT and
     ERIN MICHELLE WIBRACHT
 6                     CASE NO. 17-5230-RBK

 7                  REPORTER'S CERTIFICATION

 8              DEPOSITION OF STEVEN WIBRACHT

 9                    FEBRUARY 22, 2018

10            I, Lynne M. Homan, Certified Shorthand Reporter in

11   and for the State of Texas, hereby certify to the following:

12            That the witness, STEVEN WIBRACHT, was duly sworn by

13   the officer and that the transcript of the oral deposition is

14   a true record of the testimony given by the witness;

15            That the deposition transcript was submitted on

16   _____ to the witness for examination,

17   signature and return to me by _____;

18            That pursuant to information given to the deposition

19   officer at the time said testimony was taken, the following

20   includes counsel for all parties of record:

21        Mr. Martin Seidler, Attorney for Debtor,

22        Mr. Kevin Epstein, Attorney for U.S. Trustee,

23        Ms. Jennifer Kneeland, Attorney for Travelers Casualty

24                  and Surety Company;

25            I further certify that I am neither counsel for,
```

